MICA SUNDAY DEERFIELD,
19918 Hoppers Creek Drive
Katy, TX 77449,

          Plaintiff,

v.

MODS INTERNATIONAL, INC.,              Case No.: 2019-CV-_____
5523 Integrity Way
Appleton, WI 54913,

and

DOUGLAS A. LARSON,
3687 Lost Dauphin Road
De Pere, WI 54115,

          Defendants.

## COMPLAINT

Plaintiff, Mica Sunday Deerfield, ("Deerfield" or "Plaintiff"), by her attorneys Epiphany Law, LLC, states the following allegations in support of her Complaint against defendants, MODS International, Inc. ("MODS") and Douglas A. Larson ("Larson") (collectively, "Defendants").

### NATURE OF THE ACTION

1. Deerfield brings this action against Defendants for rescission/fraudulent inducement (or in the alternative, breach of contract), theft, theft by contractor and violation of the Wisconsin and Texas deceptive trade practices/unfair competition statutes, arising from Defendants' unauthorized and intentional misappropriation of funds and intent to defraud Deerfield of the down payment she made for four new container residences ("Container Residences") which were to be constructed and delivered to 14-3734 Government Beach

Road, Keaau, Hawaii (hereinafter the "Project"). Deerfield intended to utilize the Container Residences for a Bed and Breakfast concept. MODS, through its president Douglas Larson, fraudulently induced Deerfield to enter into a purchase contract for the construction and installation of the Container Residences (the "Contract") by virtue of numerous material misrepresentations regarding its qualifications and ability to timely deliver, which MODS knew to be untrue at the time they were made.

2. In reasonable reliance upon MODS' representations, and pursuant to the Contract between the Parties, Deerfield deposited a down payment of fifty percent of the total contract price, or $106,780, on or around February 16, 2018. Consistent with MODS' misrepresentation, the Contract further provided that the work would be complete within 120 days of the Commencement Date. Even allowing for some unforeseen slippage on time, the Project should have been completed and installed no later than July 6, 2018. To date, more than 6 months later, no work has been done at the site, nor has Deerfield been able to directly get any useful information from MODS with respect to the status of the Project. It is indisputable that the Project was not completed within the time required under the parties' Contract. MODS' unlawful misappropriation of funds constitutes theft by contractor pursuant to Wis. Stats. §§ 779.02(5) and 779.16.

3. Deerfield seeks actual and exemplary damages in recompense for the harm Defendants' unlawful actions have caused.

## PARTIES

4. Plaintiff, Mica Sunday Deerfield, is an adult resident of the State of Texas and is domiciled in Harris County, Texas.

2

5. Defendant, MODS International, Inc., is a Wisconsin corporation with a principal place of business at 5523 W. Integrity Way, Appleton, Wisconsin 54913.

6. MODS' registered agent is Douglas A. Larson, with a registered agent office at 5523 W. Integrity Way, Appleton, Wisconsin 54913.

7. Upon information and belief, MODS' sole member is Douglas A. Larson.

8. Defendant, Douglas A. Larson, is an adult resident of the state of Wisconsin and is domiciled in Brown County, Wisconsin.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(a)(1). There is complete diversity between the parties.

10. Plaintiff Deerfield is a citizen of the State of Texas. 28 U.S.C. § 1332 (a)(1).

11. Defendant MODS is a citizen of the State of Wisconsin. 28 U.S.C. § 1332 (c)(1).

12. Upon information and belief, Defendant Larson is a citizen of the state of Wisconsin. 28 U.S.C. § 1332 (a)(1).

13. The amount in controversy exceeds $75,000.00.

14. This Court has general personal jurisdiction over MODS pursuant to Wis. Stat. § 801.05(1)(d) because MODS is engaged in substantial and not isolated activities within this state, including its business relationship with Deerfield.

15. This Court also has specific personal jurisdiction over MODS pursuant to Wis. Stats. §§ 801.05 (3), 801.05(4), 801.05 (5).

16. This Court has general personal jurisdiction of Larson pursuant to Wis. Stats. §§ 801.05 (3), 801.05(4), 801.05 (5).

17. Venue is proper in this district because MODS' principal place of business is located in the Eastern District of Wisconsin. 28 U.S.C. § 1391(b).

## BACKGROUND FACTS

**A. MODS Fraudulently Induced Deerfield To Enter Into Contract**

18. Deerfield first learned of MODS through its website and an Amazon listing for its container homes.

19. Deerfield contacted MODS for additional information regarding its container homes and spoke to Larson who provided Deerfield with sample floor plans and photographs.

20. Laron assured Deerfield that MODS was an international company who built modular homes, offices, restaurants, etc. all over the world.

21. Larson assured Deerfield that it would be easy to set up the Container Residences in Hawaii.

22. Deerfield expressed that she wanted the Bed and Breakfast to be open for business by July 1, 2018, to which Larson assured Deerfield would be no problem.

23. Larson assured Deerfield if she wanted to expand the property in the future that it would be easy to add a commercial kitchen, more rental units, etc.

24. Larson assured Deerfield that MODS could quickly construct the Container Residences for approximately $45,000 per unit.

25. During the telephone conferences with Deerfield, Larson made express representations regarding the construction of the Container Residences, including how quickly MODS could complete the Project, despite knowing the timeframes being promised could not be met.

26. Larson also made written representations to Deerfield that indicated timeframes he knew MODS could not satisfy.

27. Upon information and belief, Larson made intentional misrepresentations to Deerfield regarding MODS' ability to construct the Container Residences in a timely fashion, solely in order to induce her to execute a contract and send a sizeable down payment to MODS.

28. Larson and MODS also falsely represented to Deerfield that MODS was appropriately licensed as a contractor in the necessary jurisdictions.

## B. Terms Of The Contract

29. Deerfield and MODS executed a DBIA Standard Form of Agreement Between Owner and Design-Builder – Lump Sum (the "Contract") on or about February 10, 2018. A copy of the Contract is attached hereto as **Exhibit A.**

30. The Contract was for the purchase and installation of 4 new Container Residences on the property located at 14-3734 Government Beach Road Keaau, Hawaii (the "Project Site"). (Ex. A at p.1).

31. The cost of the Contract was outlined as follows: $45,000 for each unit with stealth panels; $4,390 for transportation of each unit; and $4,000 per unit for a single wind turbine, for a total Contract cost of $213,560. (Ex. A at pp. 2-3).

32. Pursuant to the Contact a down payment of fifty percent (50%), or $106,780 (the "Down Payment"), was due at the time the Contract was executed, twenty-five percent (25%), or $53,390, was due when building components are ready to ship from the factory, and the final twenty-five percent (25%), or $53,390, was due at completion (i.e., when all the Container Residences were ready for occupancy). (Ex. A. at p. 3).

33. On or about February 12, 2018, Larson emailed Deerfield MODS' Invoice No. 13-1050 for $106,780, along with wire instructions.

34. Deerfield wired the required Down Payment to MODS on or around February 16, 2018.

35. The Contract provides that "The Work shall commence within five (5) days of [MODS'] receipt of [Deerfield's] Notice to Proceed...unless the parties mutually agree otherwise in writing" (the "Date of Commencement"). (Ex. A at § 5.1).

36. The Contract incorporated by reference the DBIA Standard Form of General Conditions of Contract Between Owner and Design-Builder, DBIA Document No. 535 (2010 Edition) (the "General Conditions"). (Ex. A. at § 2.1.1).

37. MODS never provided Deerfield with a copy of the General Conditions. A copy of the General Conditions has been obtained and is attached hereto as **Exhibit B**.

38. The General Conditions define "Work" as comprising all of "Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents." (Ex. B. at § 1.2.20).

39. Deerfield was never provided with a formal "Notice to Proceed" document, nor does the Contract define what constitutes a "Notice to Proceed." MODS never requested a specific form "Notice to Proceed" from Deerfield.

40. Based upon payment of the Down Payment, as well as contemporaneous correspondence and telephone conversations between Deerfield and MODS/Larson, it is clear that Deerfield had authorized, and MODS was aware of that authorization, MODS to proceed with construction and installation of the Container Residences.

41. The Contract provides a Substantial Completion date of the entire Project no later than one-hundred-twenty (120) calendar days after Date of Commencement. (Ex. A at § 5.2.1).

42. As early as March 8, 2018, MODS was providing Deerfield with specific design plans for the Container Residences and a list of individuals who were responsible for completing the Project.

43. Upon information and belief, the Container Residences were to be constructed at a factory in California and then shipped to the Project Site for installation.

44. The Substantial Completion date for the Project, pursuant to the Contract, was, at a minimum, on or about July 6, 2018.

## C. MODS Fails To Act Or Respond.

41. Based upon correspondence and telephone conversations, Deerfield believed that MODS was continuing to work on the Project throughout the months of March, April and May 2018.

42. Throughout May 2018, Deerfield and representatives of MODS exchanged several emails regarding finalizing design plans and selection of materials, fixtures and appliances for the Container Residences.

43. On or about May 3, 2018, the Kilauea volcano on the Big Island of Hawaii began to erupt.

44. Although located in the vicinity of the Project Site, the Kilauea volcano eruption did not directly impact the Project Site.

45. Deerfield spoke to Larson approximately three times during May and June 2018, each time Larson reassured Deerfield that the volcano would not affect the build in any way.

46. In May 2018 Deerfield expressed her concerns to the Project Manager that MODS may have difficulty transporting the Container Residences to the Property Site because the roads from Hilo, Hawaii were at that time being controlled by the State of Hawaii, and that many of the accommodations for the building crew were no longer available due to the volcano. The Project Manager stated to Deerfield that he would speak to Larson about her concerns, but no response was ever received by Deerfield.

47. In or around mid-June 2018 Deerfield asked the Project Manager if the Container Residences were ready to ship to Hawaii, and he said no, they have not been started.

48. On or about May 31, 2018 Deerfield emailed Larson stating that she "had been trying to reach you to discuss putting the project on hold until September and then checking to see where we are with the volcano. Please advise this is acceptable to MODS without any financial penalty to me." A copy of Deerfield's May 31, 2018 email is attached hereto as **Exhibit C.**

49. Neither Larson nor anyone else from MODS responded to Deerfield's May 31, 2018 email.

50. On or about June 24, 2018 Deerfield emailed Larson stating, "I am feeling more and more discouraged about he Hawaii project. I am wondering if you are interested in canceling the project?" (emphasis added). A copy of Deerfield's June 24, 2018 email is attached hereto as **Exhibit D.**

51. Neither Larson nor anyone else from MODS responded to Deerfield's June 24, 2018 email.

52. As of June 29, 2018, the Project Site had not even been surveyed. MODS informed Deerfield around this time that the surveyor had confirmed the survey could be

8

completed upon receipt of payment in full, which MODS stated it would provide to the surveyor promptly.

53. During the months of July through early August 2018 Deerfield left numerous voicemail messages (6-7) for Larson, but Larson never returned any of the messages.

54. Upon information and belief, not only did MODS never send payment to the surveyor as promised, but no surveying of the Project Site has ever been completed.

55. Upon information and belief, no Project Site preparation has been completed by MODS.

56. On or about August 10, 2018, Deerfield had a telephone conference with the Project manager, in which they discussed moving forward with the Project and identified a new completion date of December 1, 2018.

57. The same day, Deerfield emailed Larson a proposed revision to the original Contract, requesting confirmation that the Project could be completed by December 1, 2018 (the "Revised Contract"). A copy of Deerfield's August 10, 2018 email with attachments is attached hereto as **Exhibit E**.

58. Neither Larson nor anyone else from MODS responded to Deerfield's August 10, 2018 email.

59. On or about August 21, 2018, Deerfield email Larson, "In accordance with our current contract, I'm hereby stating that I would like to proceed with the contract." She further indicated that while she would have preferred a completion date of December 1, 2018, she would concede to a completion date of January 1, 2019, and directed, "Please begin work and keep me informed as to our status." A copy of Deerfield's August 21, 2018 email is attached hereto as **Exhibit F.**

9

60. Neither Larson nor anyone else from MODS responded to Deerfield's August 21, 2018 email.

61. On or about August 27, 2018, the Project manager informed Deerfield during a telephone conversation that he "had not heard from Doug Larson about restarting the Project."

62. On or about August 27, 2018, Deerfield emailed Larson and again inquired about the status of the Project. A copy of Deerfield's August 27, 2018 email is attached hereto as **Exhibit G.**

63. The same day, Larson finally responded to Deerfield in an email and acknowledged her request to restart the Project with a completion of December 1, 2018, but conditioned completion of the Project on (i) the volcano's activity and (ii) Deerfield's withdrawal of a Complaint she had filed with the State of Wisconsin Department of Agriculture, Trade and Consumer Protection (hereinafter the "DATCP Complaint"). A copy of Larson's August 27, 2018 email is attached hereto as **Exhibit H.**

64. Larson threatened Deerfield that if she did not withdraw the DATCP Complaint, he would direct MODS' lawyer to sue her.

65. On or about August 28, 2018, Deerfield emailed Larson that she would withdraw the DATCP Complaint, "assuming we get this project started and you send me back the contract with the new completion date." A copy of Deerfield's August 28, 2018 email is attached hereto as **Exhibit I.**

66. The same day, Larson responded affirmatively to Deerfield in an email, stating, "Will do." A copy of Larson's August 28, 2018 email is attached hereto as **Exhibit J.**

67. Larson never sent Deerfield an executed copy of the Revised Contract, despite his agreement to do so.

68. MODS never restarted work on the Project. Consequently, Deerfield did not withdraw the DATCP Complaint.

69. On or about September 5, 2018, the Kilauea volcano on the Big Island of Hawaii stopped erupting.

70. On or about September 6, 2018, Deerfield emailed Larson again requesting that he return an executed copy of the Revised Contract. A copy of Deerfield's September 6, 2018 email is attached hereto as **Exhibit K.**

71. Neither Larson nor anyone else from MODS responded to Deerfield's September 6, 2018 email.

72. On or about September 15, 2018, Deerfield again emailed Larson requesting that he, "please send the signed contract to me forthwith so that we can move forward and make our agreed to date of Dec. 1, 2018. The volcano has calmed down and should not cause us any trouble." A copy of Deerfield's September 15, 2018 email is attached hereto as **Exhibit L.**

73. Neither Larson nor anyone else from MODS responded to Deerfield's September 15, 2018 email.

74. On or about October 2, 2018, Deerfield sent Larson another email, stating that she had not heard from anyone at MODS regarding the Contract, the Project, the surveyor, or the permit application for the Project. Deerfield again inquired as to the current status of the Project. A copy of Deerfield's October 2, 2018, 2018 email is attached hereto as **Exhibit M.**

75. Neither Larson nor anyone from MODS responded to Deerfield's October 2, 2018 email.

76. On or about October 12, 2018, Deerfield continued her efforts to contact MODS about the Project. She emailed Larson, stating she had not received the Revised Contract and again asking that he please send it to her. A copy of Deerfield's October 12, 2018 email is attached hereto as **Exhibit N.**

77. Neither Larson nor anyone from MODS responded to Deerfield's October 12, 2018 email.

78. On or about October 23, 2018, Deerfield sent Larson another email, in which she stated, "you have agreed to a December 1 substantial completion date, yet I am not aware of anything going on there. What is the status? And you promised me a contract, which I never received. Please advise!" A copy of Deerfield's October 23, 2018 email is attached hereto as **Exhibit O.**

79. Neither Larson nor anyone from MODS responded to Deerfield's October 23, 2018 email.

80. Having been all but ignored by MODS and Larson for months, Deerfield sent MODS a letter, via Certified Mail – Return Receipt Requested, on or about October 27, 2018 (the "Certified Letter"). A copy of the Certified Letter is attached hereto as **Exhibit P**.

81. The Certified Letter has since been returned to Deerfield as "unclaimed."

82. On or about December 10, 2018, Deerfield's counsel sent correspondence to MODS' Corporate Counsel, Jeffrey Wilson, requesting a full refund of the Down Payment, given MODS' repeated material breaches of the Contract and failure to complete the Project. A copy of Heather J. Macklin's December 10, 2018 letter is attached hereto as **Exhibit Q**.

83. On or about December 17, 2018, Mr. Wilson responded on behalf of MODS, via letter, denying the demand for return of the Down Payment, stating that, "I had a chance to

review your concern letter with our president [Larson]…After my discussion with him, I understand that Ms. Deerfield terminated the project for convenience per Article 8 of the contract signed by her…Accordingly, MODS would not be liable to return any of the amount of the down payment." A copy of Mr. Wilson's December 17, 2018 letter is attached hereto as **Exhibit R**.

84. Deerfield never terminated the Contract for convenience or any other reason, prior to asking, through counsel on December 10, 2018, for a refund of her Down Payment due to MODS' material breaches of the Contract.

85. Upon information and belief, Defendants never secured the necessary permits required for the Project.

86. Upon information and belief, Defendants never completed any required work at the Project Site.

87. Upon information and belief, MODS never commenced construction or fabrication of the Container Homes.

**D. Fraudulent Business Practices And Piercing The Corporate Veil**

88. Upon information and belief, Larson has been in the construction industry for several years, doing business as several companies, including Constructionone, Inc., Midstate Corp. of Appleton, Wind Technology Constructors, Inc., Wind Technology Group, Inc., Orion Builds, Inc., MODS International, Inc., and MODS Client Services, Inc. (collectively, the "Larson Companies"). Incorporation of the Larson Companies date back to May 1999.

89. Upon information and belief, currently only Orion Builds, Inc., MODS International, Inc., and MODS Client Services, Inc. are active entities.

90. At all times material, Larson was and has been an officer, director, and/or agent of MODS, with responsibility for directing and managing MODS' activities.

91. Upon information and belief, neither Larson nor MODS currently hold valid contractor licenses in Hawaii (where the Container Residences were to be installed), California (where the Container Residences were to be fabricated prior to being shipped to Hawaii), or Wisconsin (where MODS and Larson are located).

92. MODS' Wisconsin Dwelling Contractor license expired 10/14/2017, and its Wisconsin Dwelling Contractor Qualifier license expired 7/10/2018.

93. Upon information and belief, MODS is not adequately capitalized.

94. Upon information and belief, MODS and Larson commingle funds.

95. Upon information and belief, Larson exercises dominant control over MODS and uses MODS' assets for his personal benefit.

96. Larson, as a consequence of his current and past business practices, has used the Larson Companies, including MODS, to defraud countless individuals and entities, including Deerfield.

97. Hundreds of lawsuits have been filed against Larson and the Larson Companies, including MODS, alleging, among other claims, breach of contract, fraud and theft.

98. Larson is currently being criminally prosecuted in the State of Connecticut for first degree larceny, first degree telephone fraud, and violation of Connecticut's New Home Construction Requirements, due to MODS' acceptance and retention of $95,000 in October 2017 from a Connecticut resident for the purpose of building a new home, which MODS has failed to deliver.

14

99. Larson personally filed for relief under Chapter 11 of the United States Bankruptcy Code on September 7, 2017.

100. On December 8, 2017, the United States Trustee moved to convert the case to chapter 7 as a result of: Larson's failure to provide proof of insurance on his real estate, vehicles and other assets; Larson's failure to provide amendments and financial documents; and Larson's continued intermingling of his personal finances with his businesses finances.

101. Days prior to a January 5, 2018 hearing on the motion to convert, the United States Trustee learned Larson had an off-shore account at Cayman National Bank Ltd, with a reported balance of $16,123,980.19 as of April 16, 2016.

102. At the hearing, Larson admitted the Cayman National account was open at the time he filed for bankruptcy, but he plead the Fifth Amendment when questioned about the status of the funds in the account.

103. On November 6, 2018, the United States Trustee filed a Complaint To Deny Douglas Larson's Discharge for, among other reasons, failing to disclose assets, lawsuits and creditors and failing to explain dissipation of assets.

## COUNT 1 – RECISSION/FRAUDULENT INDUCEMENT (AGAINST MODS)

104. Deerfield repeats, realleges, and incorporates by reference, her allegations stated in paragraphs 1 – 103 above as though fully set forth herein.

105. MODS, through Larson, intentionally and fraudulently made material misrepresentations to Deerfield during negotiations that MODS had the capability of delivering the Container Residences before the Substantial Completion Date set forth in the Contract.

106. Online reviews, at Yelp, Google, the Better Business Bureau and elsewhere reveal that numerous customers who gave money to MODS during the last several months of 2017

and the first couple of months of 2018 never received the container buildings they contracted for and never received their money back.

107. During this same timeframe, when MODS and Deerfield were negotiating the Contract, MODS (and Larson) knew the timeframe completion representations were false and that they could not deliver and had no intention of delivering the Container Residences on or before the Substantial Completion Date.

108. MODS, through Larson, also fraudulently misrepresented the status and/or existence of its contractor licenses.

109. Defendants' actions were willful in that MODS and Larson deliberately and intentionally made various material misrepresentations to Deerfield in order to induce her to enter into the Contract and make the Down Payment of $106,780 to MODS.

110. Upon information and belief, Defendants always intended to use the Down Payment for purposes not related to the Project.

111. From February through August 2018 (at which time the Defendants ceased responding to any of Deerfield's communication attempts), MODS and Larson continued making intentionally false representations to Deerfield regarding the status of the Project and MODS' ability to complete it pursuant to the terms of the Contract.

112. The misrepresentations made by MODS, via Larson, to Deerfield were malicious in that Larson knowingly acted contrary to the commonly accepted duties of a licensed contractor.

113. Larson made material misrepresentations of fact to Deerfield regarding completing the Project in a timely manner as well as MODS' alleged ability, skill, expertise, manpower and access to materials necessary to complete the Project on time.

114. Defendants' representations of fact were untrue at the time they were made.

115. Deerfield justifiably relied to her detriment on Defendants' intentional misrepresentations.

116. Deerfield has suffered damage and loss, in an amount to be determined at trial, as a direct consequence of MODS' fraudulent misrepresentations.

## COUNT 2 – (IN THE ALTERNATIVE) BREACH OF CONTRACT
## (AGAINST MODS)

117. Deerfield repeats, realleges, and incorporates by reference, her allegations stated in paragraphs 1 - 103 above as though fully set forth herein.

118. Deerfield entered into a valid Contract with MODS.

119. Deerfield has substantially performed her obligations under the Contract.

120. MODS has materially breached the Contract by its failure to complete the Project by the Substantial Completion Date.

121. MODS has materially breached the Contract by its failure to do any Project Site preparation or fabrication of the Container Residences.

122. MODS has materially breached the Contract by its failure to refund Deerfield her Down Payment.

123. Deerfield has suffered significant damages as a direct consequence of MODS' breaches of the Contract.

## COUNT 3 – THEFT BY CONTRACTOR – WIS. STAT. § 779.02(5)
## (AGAINST MODS)

124. Deerfield repeats, realleges, and incorporates by reference her allegations stated in paragraphs 1 - 103 above as though fully set forth herein.

125. MODS was the prime contractor on the Project.

126. Deerfield paid MODS the Down Payment for improvements to be made to her property by virtue of the Project, as specified in the Contract.

127. Pursuant to Wis. Stat. § 779.02(5), the Down Payment MODS received from Deerfield was to be held by MODS as a trust fund for the Project, to the extent of the amount of claims due or to become due from MODS or any subcontractors for labor, services, materials, plans and specifications used for the Project.

128. MODS did not hold the Down Payment in trust, but instead misappropriated the trust funds for other purposes.

129. MODS' wrongful misappropriation of the Down Payment constitutes theft by contractor.

130. Deerfield is an interested party who has been damaged by MODS' wrongful misappropriation of the Down Payment.

### COUNT 4 – THEFT BY CONTRACTOR – WIS. STAT. § 779.02(5) (AGAINST LARSON)

131. Deerfield repeats, realleges, and incorporates by reference her allegations stated in paragraphs 1 - 103 above as though fully set forth herein.

132. MODS is a corporation.

133. Larson is an officer, director and/or agent of MODS, responsible for the misappropriation of the Down Payment.

134. By directing MODS to convert the Down Payment for uses other than the Project and by virtue of his position at MODS, Larson is subject to personal liability pursuant to Wis. Stat. § 779.02(5).

135. Pursuant to Wis. Stats. § 779.02(5), Larson is liable to Deerfield in the amount of the converted trust funds.

## COUNT 5 – THEFT – WIS. STATS. §§ 895.446(a) AND 943.20
## (AGAINST MODS)

136. Deerfield repeats, realleges, and incorporates by reference her allegations stated in paragraphs 1 - 103 above as though fully set forth herein.

137. MODS, by virtue of its business, is a trustee having possession of the Down Payment that belongs to Deerfield.

138. MODS has misappropriated the Down Payment for uses other than work on or completion of the Project.;

139. MODS has retained the Down Payment without Deerfield's consent.

140. MODS has intentionally refused to return the Down Payment to Deerfield, despite Deerfield's demand that it do so.

141. MODS does not have authority to retain the Down Payment.

142. MODS has converted or intends to convert to its own use the Down Payment.

143. MODS' conduct is in violation of Wis. Stat. § 943.20.

144. Deerfield has suffered damage or loss by reason of MODS' intentional conduct.

145. Pursuant to Wis. Stat. § 895.446(3)(a-c), Deerfield is entitled to recover actual damages, costs of investigation and litigation of this matter and exemplary damages of not more than 3 times the amount of actual damages awarded from MODS.

## COUNT 6 – THEFT – WIS. STATS. §§ 895.446(a) AND 943.20
## (AGAINST LARSON)

146. Deerfield repeats, realleges, and incorporates by reference her allegations stated in paragraphs 1 - 103 above as though fully set forth herein.

147. Larson, by virtue of his employment with and complete dominance over MODS, is responsible for MODS' intentional refusal to refund the Down Payment to Deerfield.

148. Larson, by virtue of his employment with and complete dominance over MODS, is responsible for MODS' intentional conversion of or intent to convert the Down Payment to MODS' or Larson's own use.

149. Larson's conduct is in violation of Wis. Stat. § 943.20.

150. Deerfield has suffered damage or loss by reason of Larson's intentional conduct.

151. Pursuant to Wis. Stat. § 895.446(3)(a-c), Deerfield is entitled to recover actual damages, costs of investigation and litigation of this matter and exemplary damages of not more than 3 times the amount of actual damages awarded from Larson.

## COUNT 7 – PIERCING THE CORPORATE VEIL / ALTER EGO
### (AGAINST LARSON)

152. Deerfield repeats, realleges, and incorporates by reference, her allegations stated in paragraphs 1 - 103 above as though fully set forth herein.

153. Larson has, at all times relevant hereto, maintained and exercised complete dominance and control over MODS' finances, policies and practices with respect to all aspects of MODS' business, including the Contract and the Project.

154. MODS, at all times relevant hereto, has had no separate mind, will or existence of its own, apart from that of Larson.

155. Larson used his dominance and control over MODS to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty and to commit dishonest and unjust acts in contravention of Deerfield's rights.

156. Larson's dominance and control over MODS with respect to all aspects of its business, including its participation in the Contract and the Project, proximately caused Deerfield's injuries.

## COUNT 8 – WISCONSIN CONSUMER PROTECTION LAW
## WIS. STAT. § 100.18 - FRAUDULENT REPRESENTATIONS
## (AGAINST MODS)

157. Deerfield repeats, realleges, and incorporates by reference, her allegations stated in paragraphs 1 - 116 above as though fully set forth herein.

158. MODS, with the intention of selling product (e.g., container buildings) to the public, including Deerfield, and with the intention of causing the public, including Deerfield, to enter into contracts with MODS for the purchase of such product (e.g. container buildings), knowingly and intentionally published, disseminated and placed before the public advertisements relating to such purchase of product, which advertisements contained representations and statements of fact that are untrue, deceptive and misleading.

159. Upon information and belief, at the time MODS disseminated these advertisements for the sale of product (e.g. container buildings) to the public, it did so as part of a plan to induce the public to pay it money while it simultaneously intending not to sell the advertised product.

160. As a result of its conduct, MODS has acted in violation of Wis. Stat. § 100.18.

161. Deerfield has been injured and suffered pecuniary loss as a result of MODS' violation of Wis. Stat. § 100.18.

## COUNT 9 – TEXAS DECEPTIVE TRADE PRACTICES ACT
## TX. BUS. & COM. § 17.50 - RELIEF FOR CONSUMERS
## (AGAINST MODS)

162. Deerfield repeats, realleges, and incorporates by reference, her allegations stated in paragraphs 1 - 116 above as though fully set forth herein.

21

163. Deerfield is a consumer by virtue of having sought to acquire, by purchase, goods and services from MODS.

164. MODS engaged in false, misleading and/or deceptive acts/practices.

165. Deerfield relied to her detriment on MODS' false, misleading and/or deceptive acts/practices and has suffered damages and pecuniary losses.

166. MODS' false, misleading and/or deceptive acts/practices were a producing cause of Deerfield's damages.

167. MODS' actions with respect to Deerfield, the Contract and the Project are unconscionable.

WHEREFORE, the Plaintiff, Mica Sunday Deerfield, hereby prays for judgment in her favor and against Defendants MODS International, Inc. and Douglas A. Larson, and respectfully requests this Court enter an order:

A. Rescinding the Contract and requiring MODS to return Deerfield's Down Payment of $106,780;

B. Alternatively, awarding Deerfield actual and consequential damages in an amount to be determined at trial;

C. Piercing the corporate veil and holding Larson personally liable for any judgment rendered against MODS in this action;

D. Awarding Deerfield double or treble compensatory damages in an amount to be proven, but not less than $106,780, that will fairly and adequately compensate Deerfield for the losses she suffered;

E. Awarding Deerfield punitive damages;

F.  Awarding Deerfield all reasonable costs, disbursements and attorneys' fees incurred in connection with this action, to the extent legally allowed; and

G.  Granting such other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues triable to a jury.

Dated this 14th day of January 2019.

s/ Heather J. Macklin
Heather J. Macklin, SBN: 1113335
Attorney for Plaintiff
EPIPHANY LAW, LLC
2800 E. Enterprise Avenue
Appleton, WI 54913
920-996-0000 – Phone
920-996-0001 – Fax
hmacklin@epiphanylaw.com

# STANDARD FORM OF AGREEMENT BETWEEN OWNER AND DESIGN-BUILDER - LUMP SUM

**Document No. 525**

Second Edition, 2010
© Design-Build Institute of America
Washington, DC



EXHIBIT

_A_



## Design-Build Institute of America - Contract Documents
## LICENSE AGREEMENT

**By using the DBIA Contract Documents, you agree to and are bound by the terms of this License Agreement.**

1. **License.** The Design-Build Institute of America ("DBIA") provides DBIA Contract Documents and licenses their use worldwide. You acknowledge that DBIA Contract Documents are protected by the copyright laws of the United States. You have a limited nonexclusive license to: (a) Use DBIA Contract Documents on any number of machines owned, leased or rented by your company or organization; (b) Use DBIA Contract Documents in printed form for bona fide contract purposes; and (c) Copy DBIA Contract Documents into any machine-readable or printed form for backup or modification purposes in support of your permitted use.

2. **User Responsibility.** You assume sole responsibility for the selection of specific documents or portions thereof to achieve your intended results, and for the installation, use, and results obtained from the DBIA Contract Documents. You acknowledge that you understand that the text of the DBIA Contract Documents has important legal consequences and that consultation with an attorney is recommended with respect to use or modification of the text. You will not represent that any of the contract documents you generate from DBIA Contract Documents are DBIA documents unless (a) the document text is used without alteration or (b) all additions and changes to, and deletions from, the text are clearly shown.

3. **Copies.** You may not use, copy, modify, or transfer DBIA Contract Documents, or any copy, modification or merged portion, in whole or in part, except as expressly provided for in this license. Reproduction of DBIA Contract Documents in printed or machine-readable format for resale or educational purposes is expressly prohibited. You will reproduce and include DBIA's copyright notice on any printed or machine-readable copy, modification, or portion merged into another document or program.

4. **Transfers.** You may not transfer possession of any copy, modification or merged portion of DBIA Contract Documents to another party, except that a party with whom you are contracting may receive and use such transferred material solely for purposes of its contract with you. You may not sublicense, assign, or transfer this license except as expressly provided in this Agreement, and any attempt to do so is void.

5. **Term.** The license is effective for one year from the date of purchase. DBIA may elect to terminate it earlier, by written notice to you, if you fail to comply with any term or condition of this Agreement.

6. **Limited Warranty.** DBIA warrants the electronic files or other media by which DBIA Contract Documents are furnished to be free from defects in materials and workmanship under normal use during the Term. There is no other warranty of any kind, expressed or implied, including, but not limited to the implied warranties of merchantability and fitness for a particular purpose. Some states do not allow the exclusion of implied warranties, so the above exclusion may not apply to you. This warranty gives you specific legal rights and you may also have other rights which vary from state to state. DBIA does not warrant that the DBIA Contract Documents will meet your requirements or that the operation of DBIA Contract Documents will be uninterrupted or error free.

7. **Limitations of Remedies.** DBIA's entire liability and your exclusive remedy shall be: the replacement of any document not meeting DBIA's "Limited Warranty" which is returned to DBIA with a copy of your receipt, or at DBIA's election, your money will be refunded. In no event will DBIA be liable to you for any damages, including any lost profits, lost savings or other incidental or consequential damages arising out of the use or inability to use DBIA Contract Documents even if DBIA has been advised of the possibility of such damages, or for any claim by any other party. Some states do not allow the limitation or exclusion of liability for incidental or consequential damages, so the above limitation or exclusion may not apply to you.

8. **Acknowledgement.** You acknowledge that you have read this agreement, understand it and agree to be bound by its terms and conditions and that it will be governed by the laws of the District of Columbia. You further agree that it is the complete and exclusive statement of your agreement with DBIA which supersedes any proposal or prior agreement, oral or written, and any other communications between the parties relating to the subject matter of this agreement.

# INSTRUCTIONS

For DBIA Document No. 525 Standard Form of Agreement Between Owner and Design-Builder - Lump Sum (2010 Edition)

## Checklist

Use this Checklist to ensure that the Agreement is fully completed and all exhibits are attached.

| | | |
|---|---|---|
| x_____ | Page 1 | Owner's name, address and form of business |
| x_____ | Page 1 | Design-Builder's name, address and form of business |
| x_____ | Page 1 | Project name and address |
| x_____ | Section 2.1.3 | Identify other exhibits to the Agreement |
| x_____ | Section 4.2 | Note the optional provisions that are provided |
| x_____ | Section 4.3.2 | Complete blanks for additional sum for use of Work Product |
| x_____ | Section 5.2.1 | Complete blanks for calendar days and note the optional language that is provided |
| _____ | Section 5.2.2 | Insert any interim milestones (optional) |
| x_____ | Section 5.4 | Complete blanks for liquidated damages and note the optional provisions that are provided |
| x_____ | Section 5.5 | If the parties select the option provided they have to insert an amount |
| x_____ | Section 5.6 | Complete blanks for early completion bonus and note the optional provision that is provided |
| x_____ | Section 5.7 | Note the optional provisions that are provided |
| x_____ | Section 6.1 | Complete blanks for Contract Price |
| x_____ | Section 6.2 | Insert markups for changes and note optional provisions |
| x_____ | Section 6.3.4 | Note the optional provision that is provided |
| x_____ | Section 6.4.1 | Note optional provision |
| x_____ | Section 7.1.1 | Complete blanks for day of month |
| x_____ | Section 7.2.1 | Complete blanks for retention percentage and note optional provision |
| x_____ | Section 7.4 | Complete blanks for interest rate |
| x_____ | Section 8.1.3 | Choose overhead/profit method for termination for convenience |
| x_____ | Section 8.2.1 | Complete blanks for percentages |
| x_____ | Section 8.2.2 | Complete blanks for percentages |
| _____ | Section 9.1.1 | Insert Owner's Senior Representative's name, etc. (optional) |
| _____ | Section 9.1.2 | Insert Owner's Representative's name, etc. (optional) |
| x_____ | Section 9.2.1 | Insert Design-Builder's Senior Representative's name, etc. (optional) |
| x_____ | Section 9.2.2 | Insert Design-Builder's Representative's name, etc. (optional) |
| _____ | Section 10.1 | Attach Insurance Exhibit |
| _____ | Section 10.2 | Insert amount and conditions of bonds or other security and note the options that are provided |
| _____ | Section 11.1 | Insert any other provisions (optional) |
| x_____ | Last Page | Owner's and Design-Builder's execution of the Agreement |

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 26 of 122   Document 1

# General Instructions

| No. | Subject | Instruction |
|-----|---------|-------------|
| 1. | Standard Forms | Standard form contracts have long served an important function in the United States and international construction markets. The common purpose of these forms is to provide an economical and convenient way for parties to contract for design and construction services. As standard forms gain acceptance and are used with increased frequency, parties are able to enter into contracts with greater certainty as to their rights and responsibilities. |
| 2. | DBIA Standard Form Contract Documents | Since its formation in 1993, the Design-Build Institute of America ("DBIA") has regularly evaluated the needs of owners, design-builders, and other parties to the design-build process in preparation for developing its own contract forms. Consistent with DBIA's mission of promulgating best design-build practices, DBIA believes that the design-build contract should reflect a balanced approach to risk that considers the legitimate interests of all parties to the design-build process. DBIA's Standard Form Contract Documents reflect a modern risk allocation approach, allocating each risk to the party best equipped to manage and minimize that risk, with the goal of promoting best design-build practices. |
| 3. | Use of Non-DBIA Documents | To avoid inconsistencies among documents used for the same project, DBIA's Standard Form Contract Documents should not be used in conjunction with non-DBIA documents unless the non-DBIA documents are appropriately modified on the advice of legal counsel. Moreover, care should also be taken when using different editions of the DBIA Standard Form Documents on the same project to ensure consistency. |
| 4. | Legal Consequences | DBIA Standard Form Contract Documents are legally binding contracts with important legal consequences. Contracting parties are advised and encouraged to seek legal counsel in completing or modifying these Documents. |
| 5. | Reproduction | DBIA hereby grants to purchasers a limited license to reproduce its Documents consistent with the License Agreement accompanying these Documents. At least two original versions of the Agreement should be signed by the parties. Any other reproduction of DBIA Documents is strictly prohibited. |
| 6. | Modifications | Effective contracting is accomplished when the parties give specific thought to their contracting goals and then tailor the contract to meet the unique needs of the project and the design-build team. For that reason, these Documents may require modification for various purposes including, for example, to comply with local codes and laws, or to add special terms. DBIA's latest revisions to its Documents provide the parties an opportunity to customize their contractual relationship by selecting various optional contract clauses that may better reflect the unique needs and risks associated with the project.<br><br>Any modifications to these Documents should be initialed by the parties. At no time should a document be re-typed in its entirety. Re-creating the document violates copyright laws and destroys one of the advantages of standard forms-familiarity with the terms. |
| 7. | Execution | It is good practice to execute two original copies of the Agreement. Only persons authorized to sign for the contracting parties may execute the Agreement. |

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 27 of 122   Document 1

# Specific Instructions

| Section | Title | Instruction |
|---------|-------|-------------|
| General | Purpose of This Agreement | DBIA Document No. 525 ("Agreement") should be used only when the parties intend that Owner pay Design-Builder a lump sum fixed price for the completion of all design and construction services. There will be greater mutual understanding and cooperation if the lump sum is established based on Owner's Project Criteria that are well defined.<br><br>If there is uncertainty about Owner's Project Criteria, or it remains to be developed by Owner and Design-Builder jointly, a cost-plus/guaranteed maximum price ("GMP") contracting approach may be more suitable. In such case, the parties should use DBIA Document No. 530. |
| General | Purpose of These Instructions | These Instructions are not part of this Agreement, but are provided to aid the parties in their understanding of the Agreement and in completing the Agreement. |
| General | Related Documents | This Agreement shall be used in conjunction with the General Conditions of Contract. Other related Contract Documents are listed in Article 2 of this Agreement. |
| General | Date | On Page 1, enter the date when both parties reach a final understanding. It is possible, due to logistical reasons, that the dates when the parties execute the Agreement may be different. Once both parties execute the Agreement, the effective date of the Agreement will be the date recorded on Page 1. This date does not, however, determine Contract Time, which is measured according to the terms of Article 5. |
| General | Parties: Owner and Design-Builder | On Page, 1 enter the legal name and full address of Owner and Design-Builder, as well as the legal form of each entity, e.g., corporation, partnership, limited partnership, limited liability company, or other. |
| 2.1.2 | Basis of Design Documents | The Basis of Design Documents are critical in establishing the scope of work. These documents include the Owner's Project Criteria, Design-Builder's Proposal, and the Deviation List, if any, contained in the Design-Builder's Proposal. Prior to the execution of this Agreement, Design-Builder will have submitted its Proposal based on Owner's Project Criteria. To avoid ambiguities or conflicts between Owner's Project Criteria and Design-Builder's Proposal, Design-Builder's Proposal shall specifically list any deviations from Owner's Project Criteria. Design-Builder's Deviation List shall, if accepted by Owner, become a Contract Document and shall have precedence over Owner's Project Criteria. |
| 2.1.5 | Construction Documents | After execution of the Agreement, and consistent with the requirements of Section 2.4 of the General Conditions of Contract, Design-Builder will prepare Construction Documents subject to Owner's review and approval. |
| 3.2 | Order of Precedence | The Contract Documents are listed in Section 2.1 in the order of their precedence. This hierarchy of documents reflects DBIA's belief that the Basis of Design Documents are critical documents that take precedence over other Contract Documents existing at the time the Agreement is executed. This section also makes clear that if a Deviation List exists it takes precedence over the Owner's Project Criteria. Moreover, Section 2.1.3 recognizes that there may be other exhibits attached to this Agreement. If this is the case, the parties should discuss whether these exhibits should be part of the Basis of Design Documents. If these exhibits are not made part of the Basis of Design Documents, these exhibits will not take priority over the Basis of Design Documents in the event of a conflict. |
| 3.3 | Definitions | Terms, words and phrases used in the Agreement shall have the same meanings used in the General Conditions of Contract. |

| Section | Title | Instruction |
|---------|-------|-------------|
| 3.4 | Design Specification | The Owner is cautioned that if it includes design specifications in its Project Criteria, there is case law holding that the Design-Builder is entitled to rely on such information, and to the extent such information is not accurate, the Design-Builder will be entitled to an adjustment in the Contract Price and/or Contract Time. Accordingly, the Owner to avoid such potential liability should consider using performance specifications. |
| 4.1 | Work Product | This Agreement provides that the Design-Builder shall retain ownership of the Work Product it produces, but obligates Design-Builder to grant a limited license to Owner to use the Work Product according to the terms and circumstances described in Sections 4.2, 4.3, 4.4 and 4.5. |
| 4.2 | Owner's Limited License Upon Payment in Full | Design-Builder shall grant Owner, at Owner's sole risk, a limited license to use the Work Product at the completion of the Work in connection with Owner's occupation of the Project. This Section also provides the parties with the option of transferring ownership of some or all of the Work Product to the Owner upon payment in full for all Work performed. Generally, where the Owner desires ownership of Work Product, it is sufficient to transfer ownership of unique architectural and design elements. |
| 4.3 | Owner's Limited License Upon Owner's Termination for Convenience or Design-Builder's Election to Terminate | Owner should not use the Termination for Convenience Clause to obtain Design-Builder's valuable design concepts, and then seek lower bids from other design-builders. Therefore, where Owner terminates this Agreement for its convenience, and then decides to complete the Project with its own or third-party forces, Design-Builder shall grant Owner the rights set forth in Section 4.2, provided Owner pays Design-Builder all amounts due Design-Builder as required by the Contract Documents, including paying Design-Builder an additional sum per Section 4.3.2 for the use of the Work Product. In the event Design-Builder elects to terminate this Agreement for cause, for reasons set forth in Section 11.4 of the General Conditions of Contract, these same conditions apply to Owner's use of the Work Product. |
| 4.3.2 | Additional Compensation | To minimize disputes, the parties should negotiate prior to execution of the Agreement the amount Owner shall pay Design-Builder for use of Design-Builder's Work Product in the event Owner terminates this Agreement for its convenience or Design-Builder elects to terminate this Agreement for cause. Enter this amount. |
| 4.4 | Owner's Limited License Upon Design-Builder's Default | If Design-Builder is properly terminated for default, Owner is granted a limited license to use the Work Product, to complete the Project, and Owner shall thereafter have the same rights and obligations as set forth in Section 4.2. |
| 4.5 | Owner's Indemnification for Use of Work Product | Owner's use or alteration of the Work Product shall be at its sole risk, and Owner must agree to defend, indemnify and hold harmless Design-Builder and anyone working by or through Design-Builder, including Design Consultants of any tier. |
| 5.1 | Date of Commencement | Design-Builder's obligation to commence work is triggered by its receipt of a Notice to Proceed unless the parties mutually agree otherwise. |
| 5.2.1 | Substantial Completion of the Entire Work | Enter the calendar days duration by which Substantial Completion has to be achieved. The parties in this Section have the option of modifying the definition of Substantial Completion set forth in the General Conditions of Contract if they want to use a Temporary Certificate of Occupancy as the benchmark. If this option is selected, Substantial Completion will be deemed to be achieved no later than the date a Temporary Certificate of Occupancy is issued if applicable to the Project. |

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 29 of 122   Document 1

| Section | Title | Instruction |
|---------|-------|-------------|
| 5.2.2 | Interim Milestones | It may be that some portions of the Work must be completed in phases or within a prescribed period of time to accommodate Owner's needs. The parties may, at their option, identify these portions of the Work to be completed prior to Substantial Completion of the entire Work. Enter the calendar days, starting from the Date of Commencement, for achieving Substantial Completion of these identified portions of the Work. If these portions of the Work are required to be substantially completed by certain milestone dates, enter those dates. As presently drafted no remedy is provided to the Owner if an interim milestone is not met. If the Owner has special requirements as it relates to interim milestones, the Owner may want to consider a remedy for the Design-Builder's failure to meet an interim milestone, as well as a bonus to the Design-Builder for satisfying such interim milestone. |
| 5.4 | Liquidated Damages | Owner should make a good faith evaluation of the amount that is reasonably necessary to compensate it for delay. Owner should not establish liquidated damages to penalize Design-Builder.<br><br>Section 5.4 establishes a grace period between the Scheduled Substantial Completion Date and the assessment of liquidated damages in order to prevent disputes as to which party bears responsibility for only a few days of delay. The parties should enter the calendar days that may pass following the Scheduled Substantial Completion Date before liquidated damages will be assessed. The parties are also provided the option of establishing liquidated damages if the Design-Builder fails to achieve Final Completion within a specified number of days after Substantial Completion. If this option is selected, the parties have to negotiate the number of days, as well as the liquidated damages amount. The parties in negotiating liquidated damages should keep in mind that the amount of liquidated damages for failing to achieve Final Completion should be a considerably scaled down amount and should reflect the financial harm to the Owner. In no case should the total amount of liquidated damages for the Project exceed an amount that is reasonably necessary to compensate Owner for Project delay.<br><br>The parties also have the option here of eliminating liquidated damages altogether, in which case the Owner can recover actual damages for Project delay at an amount that is capped by the parties. The Owner is cautioned that even if this option for actual damages is selected it still cannot recover consequential damages, as these are waived under Section 10.5.1 of the General Conditions of Contract. |
| 5.5 | Liquidated Damages Cap | The parties can agree to cap liquidated damages for delay at a negotiated amount. |
| 5.6 | Early Completion Bonus | If the Project economics justify liquidated damages, then it is appropriate to couple these liquidated damages with an early completion bonus. The parties should enter the number of calendar days prior to the Scheduled Substantial Completion Date that will set the Bonus Date. Also, enter the amount of the bonus to be paid per day that will allow Owner to share with Design-Builder the economic benefits of early completion. The parties also have the option in Section 5.6 of capping the early completion bonus at a negotiated amount. |
| 5.7 | Compensation for Force Majeure Events | The parties are provided the opportunity of providing the Design-Builder the right to receive compensation for Force Majeure Events. By selecting this option, the parties agree to modify Section 8.2.2 of the General Conditions of Contract, in which case the parties have to negotiate how many cumulative days of Force Majeure delays must occur before the Design-Builder is entitled to either a negotiated amount per day for delay or the direct costs it has incurred as a result of such delay. |
| 6.1 | Contract Price | Enter the lump sum price Owner will pay Design-Builder for the Scope of Work. The Contract Price should compensate Design-Builder for the services it provides and the risk it assumes in providing single point responsibility to Owner. |

| Section | Title | Instruction |
|---------|-------|-------------|
| 6.2 | Markups for Changes | Enter the markups agreed upon by Design-Builder and Owner to be used for pricing Changes to the Work. Prior to negotiating or agreeing to these markups, both parties should familiarize themselves with Article 9 of the General Conditions of Contract, Changes to the Contract Price and Time. For additive Change Orders, the parties have to negotiate the Fee the Design-Builder will receive. For deductive Change Orders, parties have the option by checking the appropriate box of whether there will be no additional reduction or whether there will be an additional reduction based on a negotiated percentage. |
| 6.3.4 | Allowance Value | This section recognizes that the parties may agree that certain items of Work should be treated as an Allowance Item and priced based on Allowance Values. The Allowance Value for which the Design-Builder will be entitled to receive compensation includes direct cost of labor, materials, equipment, transportation, taxes and insurance associated with the Allowance Item. All other costs associated with the Allowance Item, such as design fees, general conditions costs and fee, are deemed to be included in the Contract Price. However, the parties agree that in the event the actual cost of the Allowance Item is greater than or less than the Allowance Value by a negotiated percentage, then Design-Builder's right to Fee and markup shall be determined pursuant to Section 6.2. |
| 6.4 | Performance Incentives | There may be performance incentives that will influence Project success. Such incentives may include award fees tied to the Design-Builder achieving certain standards relative to client satisfaction, safety, and personnel retention. The parties are encouraged to discuss the use of such incentives during negotiation of this Agreement. Any agreement on the use of incentives should be set forth in an exhibit attached to this Agreement. |
| 7.1.1 | Progress Payments | Enter the day of the month when Design-Builder shall submit its Application for Payment. |
| 7.2.1 | Retainage | Enter the percentage Owner will retain from Progress Payments to Design-Builder until fifty percent (50%) of the Work is completed. Owner should recognize that it creates undue hardship to hold retainage on Subcontractors that have completed their work early in the Project. Owner should accordingly consider releasing retainage on Subcontractors that complete work early in the Project, providing that these Subcontractors have satisfactorily performed their portion of the Work.

The parties are provided the option of modifying the retainage provision by checking the box. This option excludes from retainage the Design-Builder's General Conditions costs and amounts paid to Design-Builder's Design Consultant. The rationale for selecting this option is that the Design-Builder is obligated to pay its General Conditions costs in full each month and that under the design-bid-build delivery method, the Owner typically does not retain sums from its designer. |
| 7.4 | Interest | The parties should enter the rate at which interest will accrue on Design-Builder's payments if unpaid five (5) days after due. Late payment creates a hardship for Design-Builder, its Design Consultants and Subcontractors. |
| 7.5 | Record Keeping | The Owner is provided access to Design-Builder's accounting information as it relates to changes of the Work. However, if the parties have agreed to multipliers or markups for changes, the time to challenge and negotiate those percentages is at the time the parties execute the Agreement and not during the Project or after it has been completed. Accordingly, the Owner can at any time audit these percentages only to confirm that such percentage has been properly charged and not to challenge the composition of such percentage. |

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 31 of 122   Document 1

| Section | Title | Instruction |
|---------|-------|-------------|
| 8.1.3 | Termination for Convenience: Overhead and Profit | The parties should choose prior to execution of the Agreement the method that will be used to determine overhead and profit paid to Design-Builder in the event Owner terminates Design-Builder for its convenience. The parties may choose to set percentage rates for overhead and profit prior to execution of the Agreement, or may choose to determine reasonable sums to be paid for overhead and profit at the time of the termination. If the parties choose to set overhead and profit rates prior to execution of the Agreement, the percentages should be entered in Section 8.1.3. |
| 8.2 | Termination for Convenience: Additional Payments | Although it is important for Owner to have a process for terminating this Agreement for convenience, the process must consider the interests of Design-Builder. If Owner terminates this Agreement for its own convenience, compensating Design-Builder for its costs will not be adequate because Design-Builder will have committed its resources for a small amount of revenue. Therefore, in addition to the overhead and profit paid in Section 8.1, Owner shall pay Design-Builder an additional sum, calculated as a percentage of the remaining balance of the Contract Price. Enter the percentages Owner shall pay Design-Builder if Owner terminates this Agreement for its own convenience prior to or after the start of construction. |
| 8.3 | Termination for Convenience: Owner's Use of Work Product | Owner should not use the Termination for Convenience clause to obtain Design-Builder's valuable design concepts and then seek lower bids from another design-builder. If Owner terminates this Agreement for its own convenience, and chooses to proceed with the Project using Design-Builder's Work Product, Owner should pay an additional sum for the use of Design-Builder's Work Product pursuant to Section 4.3. |
| Article 9 | Representatives of the Parties | Enter the name, title, address and telephone number of Owner's Senior Representative and Owner's Representative at Sections 9.1.1 and 9.1.2, respectively.<br><br>Enter the name, title, address and telephone number of Design-Builder's Senior Representative and Design-Builder's Representative at Sections 9.2.1 and 9.2.2, respectively.<br><br>The parties can elect to establish Representatives during the performance of the Project rather than at the time of execution of this Agreement. If Representatives are identified after execution of the Agreement, an appropriate amendment should be made to the Agreement at the time these individuals are designated. |
| 10.1 | Insurance | Attach an Insurance Exhibit setting forth in detail the insurance coverages required for the Project. Parties are advised to familiarize themselves with the terms of Article 5 of the General Conditions of Contract, Insurance and Bonds, and to consult their insurance advisor. |
| 10.2 | Bonds | Enter the type and amount of bonds or other performance security required for the Project. Where bonding is not required by statute, Owner may want to evaluate the project risks versus the bonding costs in deciding what type of performance security to require. |
| 11.1 | Other Provisions | Insert any other provisions. For example, the parties may elect to have disputes resolved through litigation rather than arbitration in which case the optional language in this Section should be included. |

© 2010 Design-Build Institute of America

# TABLE OF CONTENTS

| Article | Name | Page |
|---|---|---|

Article 1   Scope of Work ............................................................................... 4

Article 2   Contract Documents ....................................................................... 4

Article 3   Interpretation and Intent ................................................................ 4

Article 4   Ownership of Work Product ........................................................... 5

Article 5   Contract Time.................................................................................. 6

Article 6   Contract Price ................................................................................. 7

Article 7   Procedure for Payment .................................................................. 9

Article 8   Termination for Convenience ....................................................... 10

Article 9   Representative of the Parties....................................................... 11

Article 10  Bonds and Insurance .................................................................. 11

Article 11  Other Provisions.......................................................................... 12



# Standard Form of Agreement Between Owner and Design-Builder - Lump Sum

*This document has important legal consequences. Consultation with
an attorney is recommended with respect to its completion or modification.*

This **AGREEMENT** is made as of the _____10th_____ day of _February_ in the
year 2018, by and between the following parties, for services in connection with the Project identified below.

**OWNER:**
*(Name and address)*

> Mica Deerfield
> 19115 Mosey Hedge Lane
> Katy, Texas 77449
> 607-329-3660
> mdeerfie@juno.com

**DESIGN-BUILDER:**
*(Name and address)*

> MODS International, Inc.
> 5523 West Integrity Way
> Appleton, WI 54913
> 800-869-1277  Main Office
> 920-574-0215  Cell phone for Douglas Larson
> dlarson@modsinternational.com

**PROJECT:**
*(Include Project name and location as it will appear in the Contract Documents)*

> **Four New Container Residences**  located at 143734 Government Beach Road
> Keaau, Hawaii
> New Building Lot

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 34 of 122   Document 1

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

Architectural design including engineering with wet stamped plans
Design based on St. Croix unit as previously shown
8 New Shipping containers 20'x8'x9'-6" giving you a clear height of 9' inside 16'x20' foot print each unit
Structural steel welded in place as designed by our structural engineer
Concrete foundation using piers with steel plate embedded in top
Excavation for piers and minor site grading
Containers welded to steel plates in piers
Landscape by others
Transportation from factory to your building location
Crane or all terrain forklift for placement on piers
Tapered foam insulated roof panels
White rubber membrane roof system
New Excel 10 wind turbine with tower installed
48"x48" sliding windows on side walls
15' curtain wall windows on front of units as previously shown with screens and inserted mini-blinds
Stealth metal panels with color choice
½" reveal between panels
Interior walls framed with 2x4" wood studs
Foam insulation
5/8" type X fire rated drywall with knockdown finish
Primed and painted with two coats of paint, colors to be determined
Interior metal ceiling to be painted per your choice of colors
9' clear height ceiling level for maximum height
Interior doors pre-hung with solid panel core
Door hardware to be selected
50amp electrical service with electrical design per code
Interior wall sconce lights and ceiling lights as needed using low voltage LED
Ceiling fans (3) per unit
Exterior lights
CAT5 cables for TV and internet pre-wired
Plumbing design
Bathroom with Kohler or equal fixtures
Shower module with mixer and hand wand
Mirror, medicine cabinet, all towel bars and paper holders (finish to be determined)
Three units have kitchen cabinets, upper and lower with sink
Corian counter tops with over 100 color selections
Appliances by owner
On unit has lower cabinets and space for minifridge (furnished by MODS)
Flooring to be Armstrong lux vinyl wood grain or carpet tiles (to be determined)
Hard tiles in bathroom (Ceramic or equal)
HVAC using Mitsubishi Mini-split system with remote control
Project supervision on site by MODS staff
Project manager and interior designer assigned to project
Final cleaning before turn over to owner
Project warranty of one full year from date of turn over

Price Breakdown

Each Unit              $45,000 with stealth panels
Transportation          4,390 Each unit
Single Wind Turbine   4,000 Each unit        (The Turbine is $16,000/4 Units lowers the overall price)

**Total Investment   $53,390 Each x 4 units equals $213,560**

**Payment Schedule:**

50%  Due at contract execution    $106,780

25%  Due when building components are ready to ship from factory to your building site.   $53,390

25%  Due at completion and units are ready to move in to.   $53,390

## Article 1

### Scope of Work

**1.1** Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

## Article 2

### Contract Documents

**2.1** The Contract Documents are comprised of the following:

**2.1.1** All written modifications, amendments, minor changes and Change Orders to this Agreement issued in accordance with DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (2010 Edition) ("General Conditions of Contract");

**2.1.2** The Basis of Design Documents, including the Owner's Project Criteria, Design-Builder's Proposal and the Deviation List, if any, contained in the Design-Builder's Proposal, which shall specifically identify any and all deviations from Owner's Project Criteria;

**2.1.3** This Agreement, including all exhibits and attachments, executed by Owner and Design-Builder (List for example, performance standard requirements, performance incentive requirements, markup exhibits, allowances, or unit prices);

**2.1.4** The General Conditions of Contract; and

**2.1.5** Construction Documents prepared and approved in accordance with Section 2.4 of the General Conditions of Contract.

## Article 3

### Interpretation and Intent

**3.1** Design-Builder and Owner, prior to execution of the Agreement, shall carefully review all the Contract Documents, including the various documents comprising the Basis of Design Documents, for any conflicts or ambiguities. Design-Builder and Owner will discuss and resolve any identified conflicts or ambiguities prior to execution of the Agreement.

**3.2** The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event inconsistencies, conflicts, or ambiguities between or among the Contract Documents are discovered after execution of the Agreement, Design-Builder and Owner shall attempt to resolve any ambiguity, conflict or inconsistency informally, recognizing that the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof. Conflicts existing within Section 2.1.2 shall be resolved by giving precedence first to the Deviation List, if any, then the Owner's Project Criteria, and then the Design-Builder's Proposal.

**3.3** Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

**3.4** If Owner's Project Criteria contain design specifications: (a) Design-Builder shall be entitled to reasonably rely on the accuracy of the information represented in such design specifications and their

compatibility with other information set forth in Owner's Project Criteria, including any performance specifications; and (b) Design-Builder shall be entitled to an adjustment in the Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by such inaccurate design specification.

**3.5** The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

# <u>Article 4</u>

## Ownership of Work Product

**4.1** **Work Product.** All drawings, specifications and other documents and electronic data, including such documents identified in the General Conditions of Contract, furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service and Design-Builder shall retain the ownership and property interests therein, including but not limited to any intellectual property rights, copyrights and/or patents, subject to the provisions set forth in Sections 4.2 through 4.5 below.

**4.2** **Owner's Limited License Upon Project Completion and Payment in Full to Design-Builder.** Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's occupancy of the Project, conditioned on Owner's express understanding that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below.

### *[At the parties' option, one of the following may be used in lieu of Section 4.2]:*

☐ Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder: (a) grants Owner a limited license to use the Work Product in connection with Owner's occupancy of the Project; and (b) transfers all ownership and property interests, including but not limited to any intellectual property rights, copyrights and/or patents, in that portion of the Work Product that consists of architectural and other design elements and specifications that are unique to the Project. The parties shall specifically designate those portions of the Work Product for which ownership in the Work Product shall be transferred. Such grant and transfer are conditioned on Owner's express understanding that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below.

or

☒ Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder transfers to Owner all ownership and property interests, including but not limited to any intellectual property rights, copyrights and/or patents, in the Work Product. Such transfer is conditioned on Owner's express understanding that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligations to provide the indemnity set forth in Section 4.5 below.

**4.3** **Owner's Limited License upon Owner's Termination for Convenience or Design-Builder's Election to Terminate.** If Owner terminates this Agreement for its convenience as set forth in Article 8 hereof,

Case 1:19-cv-00079-WCG Filed 01/14/19 Page 38 of 122 Document 1

or if Design-Builder elects to terminate this Agreement in accordance with Section 11.4 of the General Conditions of Contract, Design-Builder shall, upon Owner's payment in full of the amounts due Design-Builder under the Contract Documents, grant Owner a limited license to use the Work Product to complete the Project and subsequently occupy the Project, and Owner shall thereafter have the same rights as set forth in Section 4.2 above, conditioned on the following:

**4.3.1** Use of the Work Product is at Owner's sole risk without liability or legal exposure to any Indemnified Party and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below; and

**4.3.2** Owner agrees to pay Design-Builder the additional sum of thirty-five thousand Dollars (\$ 35,000) as compensation for the right to use the Work Product to complete the Project and subsequently use the work Product in accordance with Section 4.2 if Owner resumes the Project through its employees, agents, or third parties.

**4.4** **Owner's Limited License upon Design-Builder's Default.** If this Agreement is terminated due to Design-Builder's default pursuant to Section 11.2 of the General Conditions of Contract, then Design-Builder grants Owner a limited license to use the Work Product to complete the Project and subsequently occupy the Project, and Owner shall thereafter have the same rights and obligations as set forth in Section 4.2 above. Notwithstanding the preceding sentence, if it is ultimately determined that Design-Builder was not in default, Owner shall be deemed to have terminated the Agreement for convenience, and Design-Builder shall be entitled to the rights and remedies set forth in Section 4.3 above.

**4.5** **Owner's Indemnification for Use of Work Product.** If Owner is required to indemnify any Indemnified Parties based on the use or alteration of the Work Product under any of the circumstances identified in this Article 4, Owner shall defend, indemnify and hold harmless such Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the use or alteration of the Work Product.

# Article 5

## Contract Time

**5.1** **Date of Commencement.** The Work shall commence within five (5) days of Design-Builder's receipt of Owner's Notice to Proceed ("Date of Commencement") unless the parties mutually agree otherwise in writing.

**5.2** **Substantial Completion and Final Completion.**

**5.2.1** Substantial Completion of the entire Work shall be achieved no later than eight (_____120_____) calendar days after the Date of Commencement ("Scheduled Substantial Completion Date").

*[At the parties' option, the following supplemental language may be inserted at the end of Section 5.2.1. if the Project is subject to a Temporary Certificate of Occupancy]*

☒ The parties agree that the definition for Substantial Completion set forth in Section 1.2.18 of the General Conditions of Contract is hereby modified to read as follows:

"*Substantial Completion* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and use the Project or a portion thereof for its intended purposes, provided, however, that Substantial Completion shall be deemed to have been achieved no later than the date of issuance of a

Temporary Certificate of Occupancy issued by the local building official."

**5.2.2**    Interim milestones and/or Substantial Completion of identified portions of the Work ("Scheduled Interim Milestone Dates") shall be achieved as follows: *(Insert any interim milestones for portions of the Work with different scheduled dates for Substantial Completion)*

**5.2.3**    Final Completion of the Work or identified portions of the Work shall be achieved as expeditiously as reasonably practicable. Final Completion is the date when all Work is complete pursuant to the definition of Final Completion set forth in Section 1.2.7 of the General Conditions of Contract.

**5.2.4**    All of the dates set forth in this Article 5 (collectively the "Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract.

**5.3**    **Time is of the Essence.** Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

# Article 6

## Contract Price

**6.1**    **Contract Price.** Owner shall pay Design-Builder in accordance with Article 6 of the General Conditions of Contract the sum of _____ one hundred-forty thousand _____ Dollars (\$ 140,000_)
("Contract Price"), subject to adjustments made in accordance with the General Conditions of Contract. Unless otherwise provided in the Contract Documents, the Contract Price is deemed to include all sales, use, consumer and other taxes mandated by applicable Legal Requirements.

**6.2**    **Markups for Changes.** If the Contract Price requires an adjustment due to changes in the Work, and the cost of such changes is determined under Sections 9.4.1.3 or 9.4.1.4 of the General Conditions of Contract, the following markups shall be allowed on such changes:

**6.2.1**    For additive Change Orders, including additive Change Orders arising from both additive and deductive items, it is agreed that Design-Builder shall receive a Fee of fifteen _____ _____percent ( ____15____ %) of the additional costs incurred for that Change Order, plus any other markups set forth at Exhibit  hereto.

**6.2.2**    For deductive Change Orders, including deductive Change Orders arising from both additive and deductive items, the deductive amounts shall include:

### *[Check one box only]*

☐        No additional reduction to account for Design-Builder's Fee or any other markup.

or

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 40 of 122   Document 1

☒ An amount equal to the sum of: (a) fifteen_____
percent (_____15_____%) applied to the direct costs of the net reduction (which amount will
account for a reduction associated with Design-Builder's Fee); plus (b) any other markups set
forth at Exhibit hereto applied to the direct costs of the net reduction.

**6.3     Allowance Items and Allowance Values.**

**6.3.1**     Any and all Allowance Items, as well as their corresponding Allowance Values, are set forth in an Exhibit hereto.

**6.3.2**     Design-Builder and Owner have worked together to review the Allowance Items and Allowance Values based on design information then available to determine that the Allowance Values constitute reasonable estimates for the Allowance Items. Design-Builder and Owner will continue working closely together during the preparation of the design to develop Construction Documents consistent with the Allowance Values. Nothing herein is intended in any way to constitute a guarantee by Design-Builder that the Allowance Item in question can be performed for the Allowance Value.

**6.3.3**     No work shall be performed on any Allowance Item without Design-Builder first obtaining in writing advanced authorization to proceed from Owner. Owner agrees that if Design-Builder is not provided written authorization to proceed on an Allowance Item by the date set forth in the Project schedule, due to no fault of Design-Builder, Design-Builder may be entitled to an adjustment of the Contract Time(s) and Contract Price.

**6.3.4**     The Allowance Value for an Allowance Item includes the direct cost of labor, materials, equipment, transportation, taxes and insurance associated with the applicable Allowance Item. All other costs, including design fees, Design-Builder's overall project management and general conditions costs, overhead and fee, are deemed to be included in the original Contract Price, and are not subject to adjustment, regardless of the actual amount of the Allowance Item.

***[In the alternative, the parties may want to delete Section 6.3.4 and add the following provision.]***

☐     In the event the actual direct cost of labor, materials, equipment, transportation, taxes and insurance associated with an Allowance Item is fifteen percent (15%) greater than or less than the Allowance Value for such Allowance Item, Design-Builder and Owner agree that Design-Builder's right to Fee and markup shall be adjusted in accordance with Section 6.2.

**6.3.5**     Whenever the actual costs for an Allowance Item is more than or less than the stated Allowance Value, the Contract Price shall be adjusted accordingly by Change Order, subject to Section 6.3.4. The amount of the Change Order shall reflect the difference between actual costs incurred by Design-Builder for the particular Allowance Item and the Allowance Value.

**6.4     Performance Incentives.**

**6.4.1**     Owner and Design-Builder have agreed to the performance incentive arrangements set forth in Exhibit _____N/A_____.

*[The parties are encouraged to discuss and agree upon performance incentives that will influence project success. These incentives may consist of Award Fees, incentives for safety, personnel retention, client satisfaction and similar items.]*

# Article 7

## Procedure for Payment

**7.1**     **Progress Payments.**

See  **Payment Schedule above.**

**7.2**     **Retainage on Progress Payments.**

**7.2.1**     Owner will retain _____zero_____ percent (_____0_____%) of each Application for Payment provided, however, that when fifty percent (50%) of the Work has been satisfactorily completed by Design-Builder and Design-Builder is otherwise in compliance with its contractual obligations, Owner will not retain any additional retention amounts from Design-Builder's subsequent Applications for Payment. Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project.

*[Design-Builder and Owner may want to consider substituting the following retainage provision.]*

☐     Owner will retain _____zero_____ percent (_____0_____%) from Design-Builder's Applications for Payment, exclusive of general conditions costs, and any amounts paid to Design-Builder's Design Consultant, from each Application for Payment provided, however, that when fifty percent (50%) of the Work has been satisfactorily completed by Design-Builder and Design-Builder is otherwise in compliance with its contractual obligations, Owner will not retain any additional amounts from Design-Builder's subsequent Applications for Payment. Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project.

**7.2.2**     Within fifteen (15) days after Substantial Completion of the entire Work or, if applicable, any portion of the Work, pursuant to Section 6.6 of the General Conditions of Contract, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work or completed portion of the Work, less an amount equal to (a) the reasonable value of all remaining or incomplete items of Work as noted in the Certificate of Substantial Completion and (b) all other amounts Owner is entitled to withhold pursuant to Section 6.3 of the General Conditions of Contract.

**7.3**     **Final Payment.** Design-Builder shall submit its Final Application for Payment to Owner in accordance with Section 6.7 of the General Conditions of Contract. Owner shall make payment on Design-Builder's properly submitted and accurate Final Application for Payment within thirty (30) days after Owner's receipt of the Final Application for Payment, provided that Design-Builder has satisfied the requirements for final payment set forth in Section 6.7.2 of the General Conditions of Contract.

**7.4**     **Interest.** Payments due and unpaid by Owner to Design-Builder, whether progress payments or final payment, shall bear interest commencing five (5) days after payment is due at the rate of _six_____ percent (_____6_____%) per month until paid.

**7.5**     **Record Keeping and Finance Controls.** With respect to changes in the Work performed on a cost basis by Design-Builder pursuant to the Contract Documents, Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after Final Payment, Owner and Owner's accountants shall be afforded access to, and the right to audit from time-to-time, upon reasonable notice, Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to changes in the Work performed on a cost basis in accordance with the Contract Documents, all of which Design-Builder shall preserve for a period of

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 42 of 122    Document 1

three (3) years after Final Payment. Such inspection shall take place at Design-Builder's offices during normal business hours unless another location and time is agreed to by the parties. Any multipliers or markups agreed to by the Owner and Design-Builder as part of this Agreement are only subject to audit to confirm that such multiplier or markup has been charged in accordance with this Agreement, with the composition of such multiplier or markup not being subject to audit.

# Article 8

## Termination for Convenience

**8.1** Upon ten (10) days' written notice to Design-Builder, Owner may, for its convenience and without cause, elect to terminate this Agreement. In such event, Owner shall pay Design-Builder for the following:

**8.1.1** All Work executed and for proven loss, cost or expense in connection with the Work;

**8.1.2** The reasonable costs and expenses attributable to such termination, including demobilization costs and amounts due in settlement of terminated contracts with Subcontractors and Design Consultants; and

**8.1.3** *(Choose one of the following:)*

☐ The fair and reasonable sums for overhead and profit on the sum of items 8.1.1 and 8.1.2 above.

or

☒ Overhead and profit in the amount of <u>twenty</u> percent (<u>20</u> %) on the sum of items 8.1.1 and 8.1.2 above.

**8.2** In addition to the amounts set forth in Section 8.1 above, Design-Builder shall be entitled to receive one of the following as applicable:

**8.2.1** If Owner terminates this Agreement prior to commencement of construction, Design-Builder shall be paid <u>twenty five</u> percent (<u>25</u> %) of the remaining balance of the Contract Price.

**8.2.2** If Owner terminates this Agreement after commencement of construction, Design-Builder shall be paid _____ percent (_____%) of the remaining balance of the Contract Price.

**8.3** If Owner terminates this Agreement pursuant to Section 8.1 above and proceeds to design and construct the Project through its employees, agents or third parties, Owner's rights to use the Work Product shall be as set forth in Section 4.3 hereof. Such rights may not be transferred or assigned to others without Design-Builder's express written consent and such third parties' agreement to the terms of Article 4.

*[The following Article 9 should be used only if the Owner and Design-Builder agree to establish their respective representatives at the time the Agreement is executed rather than during the performance of the Project.]*

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 43 of 122   Document 1

# Article 9

## Representatives of the Parties

**9.1    Owner's Representatives.**

**9.1.1**    Owner designates the individual listed below as its Senior Representative ("Owner's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

**9.1.2**    Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

**9.2    Design-Builder's Representatives.**

**9.2.1**    Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Dick Vock, Project Manager above address with mobile number of 314-406-4350

**9.2.2**    Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Same as above

# Article 10

## Bonds and Insurance

**10.1    Insurance.** Design-Builder and Owner shall procure the insurance coverages set forth in the Insurance Exhibit attached hereto and in accordance with Article 5 of the General Conditions of Contract.

**10.2    Bonds and Other Performance Security.** Design-Builder shall provide the following performance bond and labor and material payment bond or other performance security:

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 44 of 122   Document 1

*[Check one box only. If no box is checked, then no bond is required.]*

☐ Required        ☒ Not Required

**Payment Bond.**

*[Check one box only. If no box is checked, then no bond is required.]*

☐ Required        ☒ Not Required

**Other Performance Security.**

*[Check one box only. If no box is checked, then no other performance security is required. If the "Required" box is checked, identify below the specific performance security that is being required and all salient commercial terms associated with that security.]*

☐ Required        ☒ Not Required

# Article 11

## Other Provisions

11.1    **Other provisions, if any, are as follows:** *(Insert any additional provisions)*

*[Section 2.3.1 of the General Conditions of Contract sets forth a traditional negligence standard as it relates to the Design-Builder's performance of design professional services. If the Basis of Design Documents identify specific performance standards that can be objectively measured, the parties, by including the following language, agree that the Design-Builder is obligated to achieve such standards.]*

☒      Notwithstanding Section 2.3.1 of the General Conditions of Contract, if the parties agree upon specific performance standards in the Basis of Design Documents, the design professional services shall be performed to achieve such standards.

*[In lieu of Sections 10.3.1 through 10.3.3 of the General Conditions of Contract, the parties may want to delete such sections and include the following alternative dispute resolution clause.]*

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 45 of 122    Document 1

XX     Any claims, disputes, or controversies between the parties arising out of or related to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 of the General Conditions of Contract shall be resolved in mediation or arbitration in the State of Wisconsin.  Both parties agree to non-court settlement.

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**

Mica Deerfield
*(Name of Owner)*

*Mica Deerfield*

*(Signature)*

Mica Deerfield
*(Printed Name)*

Owner
*(Title)*

Date: _____

**DESIGN-BUILDER:**

MODS International, Inc.
*(Name of Design-Builder)*

*Douglas Larson*
*(Signature)*

Douglas Larson
*(Printed Name)*

President
*(Title)*

Date: ___February 10, 2018

**Caution: You should sign an original DBIA document which has this caution printed in blue. An original assures that changes will not be obscured as may occur when documents are reproduced.**



# STANDARD FORM OF GENERAL CONDITIONS OF CONTRACT BETWEEN OWNER AND DESIGN-BUILDER

**Document No. 535**
Second Edition, 2010
© Design-Build Institute of America
Washington, DC



EXHIBIT
B
tabbies®

# TABLE OF CONTENTS

| Article | Name | Page |
|---------|------|------|
| Article 1 | General | 1 |
| Article 2 | Design-Builder's Services and Responsibilities | 2 |
| Article 3 | Owner's Services and Responsibilities | 8 |
| Article 4 | Hazardous Conditions and Differing Site Conditions | 10 |
| Article 5 | Insurance | 11 |
| Article 6 | Payment | 12 |
| Article 7 | Indemnification | 15 |
| Article 8 | Time | 16 |
| Article 9 | Changes to the Contract Price and Time. | 17 |
| Article 10 | Contract Adjustments and Disputes | 18 |
| Article 11 | Stop Work and Termination for Cause | 21 |
| Article 12 | Electronic Data | 24 |
| Article 13 | Miscellaneous | 25 |

# Article 1

## General

**1.1     Mutual Obligations**

**1.1.1**     *Owner and Design-Builder* commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents.

**1.2     Basic Definitions**

**1.2.1**     *Agreement* refers to the executed contract between Owner and Design-Builder under DBIA Document No. 530, *Standard Form of Agreement Between Owner and Design-Builder - Cost Plus Fee with an Option for a Guaranteed Maximum Price* (2010 Edition).

**1.2.2**     *Basis of Design Documents* are as follows: those documents specifically listed in, as applicable, the GMP Exhibit or GMP Proposal as being the "Basis of Design Documents."

**1.2.3**     *Construction Documents* are the documents, consisting of Drawings and Specifications, to be prepared or assembled by the Design-Builder consistent with the Basis of Design Documents unless a deviation from the Basis of Design Documents is specifically set forth in a Change Order executed by both the Owner and Design-Builder, as part of the design review process contemplated by Section 2.4 of these General Conditions of Contract.

**1.2.4**     *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.5**     *Design-Build Team* is comprised of the Design-Builder, the Design Consultant, and key Subcontractors identified by the Design-Builder.

**1.2.6**     *Design Consultant* is a qualified, licensed design professional in the State of Georgia who is employed or retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder, to furnish design services required under the Contract Documents. A Design Sub-Consultant is a qualified, design professional licensed in the State of Georgia who is not an employee of the Design Consultant, but is retained by the Design Consultant or employed or retained by anyone under contract to Design Consultant, to furnish design services required under the Contract Documents.

**1.2.7**     *Final Completion* is the date on which all Work is complete in accordance with the Contract Documents, including but not limited to, any items identified in the punch list prepared under Section 6.5 and the submission of all documents set forth in Section 6.6.2.

**1.2.8**     *Force Majeure Events* are those events that are beyond the control of both Design-Builder and Owner, including the events of fire, flood, earthquake, hurricane, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions or court order as set forth in Section 8.3.

**1.2.9**     *General Conditions of Contract* refer to this DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (2010 Edition).

**1.2.10**     *GMP Exhibit* means that exhibit attached to DBIA Document No. 530, *Standard Form of Agreement Between Owner and Design-Builder - Cost Plus Fee With an Option for a Guaranteed Maximum Price*, which exhibit will have been agreed upon by Owner and Design-Builder prior to the execution of the Agreement.

Case 1:19-cv-00079-WCG     Filed 01/14/19     Page 50 of 122     Document 1

**1.2.11** *GMP Proposal* means that proposal developed by Design-Builder in accordance with Section 6.8 of DBIA Document No. 530, *Standard Form of Agreement Between Owner and Design-Builder - Cost Plus Fee With an Option for a Guaranteed Maximum Price*.

**1.2.12** *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.13** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.14** *Owner's Engineer* will assist the Owner in the administration of the Design-Build Contract including, but not limited to, the following tasks: preliminary design services; development of the Request for Qualifications and subsequent shortlisting; development of the Request for Proposals and subsequent proposal evaluation and Design-Builder selection; design and construction phase services; resident services during construction; and supplemental services. Black & Veatch will serve as the Owner's Engineer on the current Project.

**1.2.15** *Owner's Project Criteria* are developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, as well as submittal requirements and other requirements governing Design-Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, design performance specifications, design specifications, and LEED® or other sustainable design criteria and other Project-specific technical materials and requirements. The Owner's Project Criteria are set forth in Exhibit A to the Agreement.

**1.2.16** *Site* is the land or premises on which the Project is located.

**1.2.17** *Subcontractor* is any person or entity retained by Design-Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

**1.2.18** *Sub-Subcontractor* is any person or entity retained by a Subcontractor as an independent contractor to perform any portion of a Subcontractor's Work and shall include materialmen and suppliers.

**1.2.19** *Substantial Completion* or *Substantially Complete* means the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and use the Project or a portion thereof for its intended purposes and necessary certificates can be issued such as a temporary or final certificate of occupancy for the building permits and the Engineers Certification for Georgia EPD.

**1.2.20** *Work* is comprised of all Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents.

## Article 2

### Design-Builder's Services and Responsibilities

**2.1    General Services.**

**2.1.1**    The Design-Builder's services are broken into two phases as follows:

**2.1.1.1**    Phase One – Generally consists of preliminary engineering, geotechnical investigations and  design development as may be necessary to produce 80% complete

Construction Documents for the Project, as well as preparation, in close collaboration with the Owner, of a proposed price and schedule to provide a fully complete and operating Project, meeting Owner's Project Criteria. The proposed price and schedule includes the Project's design (developed to the Owner's required level of completion), a Guaranteed Maximum Price, Project schedule, and supporting documentation, such as detailed open-book costing for the Guaranteed Maximum Price. Phase One services also include the following:

Develop the Project execution plan, including Project schedule;

Perform engineering studies to support design development and cost estimating. Previous studies should be used where feasible;

Produce the basis-of-design report;

Attend / coordinate Project scoping meetings, as needed, and produce report identifying all Project regulatory / permitting agency coordination activities required;

Develop the engineering design documents (including preparing and submitting intermediate design review packages) and conduct value-engineering activities in conjunction with Owner for the preparation of a Project final scope, GMP proposal, and schedule;

Prepare a Project cost model and provide detailed cost estimates as the design and design alternatives are advanced;

Identify Project permitting requirements, initiate certain permitting activities and acquire permits necessary for performance of Phase One services;

Submit the GMP Proposal in accordance with Section 6.8 of the Agreement.

**2.1.1.2** Phase Two – Provided the Owner accepts Design-Builder's GMP Proposal, Design Builder's Phase Two services generally consist of completing the Project's final design, permitting, construction, commissioning and performance testing as follows:

Complete final design of Project and develop 100% Construction Documents;

Procure equipment and Subcontractors;

Secure necessary permits;

Construct the Project in accordance with this Agreement;

Conduct startup, commissioning and performance testing;

Provide operator training;

Provide warranty coverage; and

Otherwise provide whatever services or Work as required by the Contract Documents to provide Owner with a complete and fully operational Project.

**2.1.2** Provided the Owner accepts Design-Builder's GMP Proposal, Design Builder's Phase Two construction services will include construction of a new treatment facility with other improvements required under Owner's Project Criteria. Construction is to occur in two Parts as follows:

**2.1.2.1** Part I - includes constructing and placing on-line 1 MGD of wastewater

treatment capacity. A firm quotation for the purchase, relocation, rehabilitation and field erection of a pre-owned 1 MGD package-type wastewater treatment plant will be assigned to the Design–Builder (for development of a subcontract). This firm quotation is contained in the Owner's Project Criteria. Design Builder shall achieve Substantial Completion of this Part I within 365 calendar days after the Date of Commencement. Design-Builder will provide all design, permitting, field trades, construction, performance testing, commissioning and start-up services as may be required to complete the Part I construction. Design-Builder shall provide a splitter box and necessary plant piping to accompany the plant to create a complete and fully operational system in accordance with Owner's Project Criteria. This plant is a "stand-alone" plant that will connect into the existing plant facilities such as RAS/WAS, disinfection, solids dewatering systems so that the capacity is operational while the remaining Part II is constructed. The plant must connect with the plant SCADA / Controls system.

**2.1.2.2** Part II - includes constructing the remaining process units set forth in Owner's Project Criteria, including filtration, ultraviolet disinfection, solids digestion, dewatering equipment, rehabilitation / replacement of Membrane Filtration Unit No. 3, and any remaining plant piping. Design-Builder shall achieve Substantial Completion of Part 2 within 548 calendar days after the Date of Commencement.

**2.1.3** Design-Builder's Representative shall be reasonably available to Owner and shall have the necessary expertise and experience required to supervise the Work. Design-Builder's Representative shall communicate regularly with Owner and shall be vested with the authority to

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 53 of 122   Document 1

act on behalf of Design-Builder. Design-Builder's Representative may be replaced only with the mutual agreement of Owner and Design-Builder.

**2.1.4**    Design-Builder shall provide Owner with a monthly status report detailing the progress of the Work, including (i) whether the Work is proceeding according to schedule, including an update of Design-Builder's schedule prepared in accordance with Section 2.1.3, indicating the actual progress of the Work against Design-Builder's plan for execution of the Work, (ii) whether the Work is proceeding within the parameters of the Guaranteed Maximum Price, including an update indicating areas of potential overruns and savings, (iii) whether discrepancies, conflicts, or ambiguities exist in the Contract Documents that require resolution,
(iv) whether health and safety issues exist in connection with the Work; (v) status of the contingency account to the extent provided for in the Standard Form of Agreement Between Owner and Design-Builder - Cost Plus Fee with an Option for a Guaranteed Maximum Price; and (v) other items that require resolution so as not to jeopardize Design-Builder's ability to complete the Work for the Contract Price and within the Contract Time(s).

**2.1.5**    Unless a schedule for the execution of the Work has been attached to the Agreement as an exhibit at the time the Agreement is executed, Design-Builder shall prepare and submit, at least three (3) days prior to the meeting contemplated by Section 2.1.4 hereof, a schedule for the execution of the Work for Owner's review and response. The schedule shall be in critical path format, indicate the dates for the start and completion of the various stages of Work, including the dates when Owner information and approvals are required to enable Design-Builder to achieve the Contract Time(s) and clearly indicate the critical path and identify the Work activities on the critical path. The schedule shall be periodically updated as required in Section 2.1.2 and revised as required by conditions and progress of the Work, but such revisions shall not relieve Design-Builder of its obligations to complete the Work within the Contract Time(s), as such dates may be adjusted in accordance with the Contract Documents. Owner's review of, and response to, the schedule shall not be construed as relieving Design- Builder of its complete and exclusive control over the means, methods, sequences and techniques for executing the Work.

**2.1.6**    The parties will meet within seven (7) days after execution of the Agreement to discuss issues affecting the administration of the Work and to implement the necessary procedures, including those relating to submittals and payment, to facilitate the ability of the parties to perform their obligations under the Contract Documents.

## 2.2    Design Professional Services.

**2.2.1**    Design-Builder shall, consistent with applicable state licensing laws, provide through qualified, design professionals licensed in the State of Georgia employed by Design-Builder, or procured from qualified, independent licensed Design Consultants, the necessary design services, including architectural, engineering and other design professional services, for the preparation of the required drawings, specifications and other design submittals to permit Design-Builder to complete the Work consistent with the Contract Documents. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Design Consultant.

## 2.3    Standard of Care for Design Professional Services.

**2.3.1**    The standard of care for all design professional services performed to execute the Work shall be the highest standard of professional care and skill used by members of the design profession practicing under similar conditions at the same time and locality of the Project.

## 2.4    Design Development Services.

**2.4.1**    Design-Builder and Owner shall, consistent with any applicable provision of the Contract Documents, agree upon any interim design submissions that Owner may wish to review, which interim design submissions may include design criteria, drawings, diagrams and specifications

setting forth the Project requirements and shall be included in Design-Builder's schedule provided in accordance with Section 2.1.3. Interim design submissions shall be consistent with the Basis of Design Documents, as the Basis of Design Documents may have been changed through the design process set forth in this Section 2.4.1. On or about the time of the scheduled submissions, Design-Builder and Owner shall meet and confer about the submissions, with Design-Builder identifying during such meetings, among other things, the evolution of the design

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 55 of 122   Document 1

and any changes to the Basis of Design Documents, or, if applicable, previously submitted design submissions. Changes to the Basis of Design Documents, including those that are deemed minor changes under Section 9.3.1, shall be processed in accordance with Article 9. Minutes of the meetings, including a full listing of all changes, will be maintained by Owner's Engineer and provided to all attendees for review. Following the design review meeting, Owner shall review and approve the interim design submissions and meeting minutes in a time that is consistent with the turnaround times set forth in Design-Builder's schedule.

**2.4.2**    Design-Builder shall submit to Owner Construction Documents setting forth in detail drawings and specifications describing the requirements for construction of the Work. The Construction Documents shall be consistent with the latest set of interim design submissions, as such submissions may have been modified in a design review meeting and recorded in the meetings minutes. The parties shall have a design review meeting to discuss, and Owner shall review and approve, the Construction Documents in accordance with the procedures set forth in Section 2.4.1 above. Design-Builder shall proceed with construction in accordance with the approved Construction Documents and shall submit one set of approved Construction Documents to Owner prior to commencement of construction.

**2.4.3**    Owner's review and approval of interim design submissions, meeting minutes, and the Construction Documents is for the purpose of mutually establishing a conformed set of Contract Documents compatible with the requirements of the Work. Neither Owner's review nor approval of any interim design submissions, meeting minutes, and Construction Documents shall be deemed to transfer any design liability from Design-Builder to Owner.

**2.4.4**    To the extent not prohibited by the Contract Documents or Legal Requirements, Design-Builder may prepare interim design submissions and Construction Documents for a portion of the Work to permit construction to proceed on that portion of the Work prior to completion of the Construction Documents for the entire Work.

**2.5    Legal Requirements.**

**2.5.1**    Design-Builder shall perform the Work in accordance with all Legal Requirements and shall provide all notices applicable to the Work as required by the Legal Requirements.

**2.5.2**    The Contract Price and/or Contract Time(s) shall be adjusted to compensate Design-Builder for the effects of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work, or if a Guaranteed Maximum Price is established after the date of the Agreement, the date the parties agree upon the Guaranteed Maximum Price. Such effects may include, without limitation, revisions Design-Builder is required to make to the Construction Documents because of changes in Legal Requirements.

**2.6    Government Approvals and Permits.**

**2.6.1**    Except as identified in an Owner's Permit List attached as an exhibit to the Agreement, Design-Builder shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees required for the prosecution of the Work by any government or quasi-government entity having jurisdiction over the Project.

**2.6.2**    Design-Builder shall provide reasonable assistance to Owner in obtaining those permits, approvals and licenses that are Owner's responsibility.

**2.7    Design-Builder's Construction Phase Services.**

**2.7.1**    Unless otherwise provided in the Contract Documents to be the responsibility of Owner or a separate contractor, Design-Builder shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit Design-Builder to complete construction of the

Project consistent with the Contract Documents.

**2.7.2**   Design-Builder shall perform all construction activities efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents. Design-Builder shall at all times exercise complete and exclusive control over the means, methods, sequences and techniques of construction.

**2.7.3**   Design-Builder shall employ only Subcontractors who are duly licensed and qualified to perform the Work consistent with the Contract Documents. Owner may reasonably object to Design-Builder's selection of any Subcontractor, provided that the Contract Price and/or Contract Time(s) shall be adjusted to the extent that Owner's decision impacts Design-Builder's cost and/or time of performance.

**2.7.4**   Design-Builder assumes responsibility to Owner for the proper performance of the Work of Subcontractors and any acts and omissions in connection with such performance. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Subcontractor or Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

**2.7.5**   Design-Builder shall coordinate the activities of any Work it self-performs and that of all Subcontractors. If Owner performs other work on the Project or at the Site with separate contractors under Owner's control, Design- Builder agrees to reasonably cooperate and coordinate its activities with those of such separate contractors so that the Project can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.7.6**   Design-Builder shall cause each subcontract agreement to contain a provision calling for the assignment of the subcontract by Design-Builder to Owner. Each subcontract agreement for a portion of the Work is assigned by the Design-Builder to Owner provided that:

> **2.7.6.1** Assignment effective only after termination of the Contract by Owner for cause and only for those subcontract agreements in which the Owner accepts by notifying the Subcontractor and Design-Builder in writing; and

> **2.7.6.2** Assignment is subject to the prior rights of surety, if any, obligated under bond relating to the Contract.

**2.7.7**   Design-Builder shall keep the Site reasonably free from debris, trash and construction wastes to permit Design-Builder to perform its construction services efficiently, safely and without interfering with the use of adjacent land areas. Upon Substantial Completion of the Work, or a portion of the Work, Design-Builder shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

> **2.7.7.1** Painting contractors may not discharge into the municipal storm drain system (stormwater pipes, catch basins, drainage ditches, and similar conveyances) any wastewater resulting from the cleaning of painting equipment or the removal of paint from structures.   If  solvents or other potentially hazardous products are used to clean painting equipment,  the resulting wastewater may be hazardous waste and must be properly disposed of or  recycled.

> **2.7.8.3** For jobs involving new taps into the sanitary sewer system, contractors must verify that, in no uncertain terms, connections are into the sanitary sewer system and not the  municipal storm drain system (stormwater pipes, catch basins, drainage ditches, and similar conveyances).  Tests using tracing dye or smoke are the preferred verification methods; however, a combination of site drawings, visual observation and/or other methods may be adequate.

**2.7.8.4** Concrete contractors must use designated concrete washout areas at worksites. Pouring leftover concrete or rinsing concrete residue off of vehicles/equipment where it may enter the municipal storm drain system (stormwater pipes, catch basins, drainage ditches, and similar conveyances) is strictly prohibited.

**2.7.8.5** Contract companies that provide waste management services must provide waste bins that help minimize stormwater pollution. Items that must be in place include lids/covers and drain plugs. Additionally, the bins should be as leak-proof as possible (i.e., no holes from corrosion or damage). At locations where a waste bin is found to not meet these specifications, the waste management contractor should do their best to provide a suitable bin when requested by city personnel.

2.7.9    In an effort to raise awareness of sediment and erosion control requirements and issues, it is the requirement of Oconee County Utility Department that the Design-Builder's Superintendent possess a valid Site Inspector Certification (CMCSI) from Oconee County. The Design- Builder will submit a copy of each required employee's certificate to the Owner. The Superintendent's certificate must be on file prior to Notice To Proceed.  Ground disturbing activities will be prohibited until the requirements of this section are fulfilled.

2.7.10  In the event that a governmental or quasi-governmental entity having jurisdiction over the Project or Site, including any regulatory agency, determines that Design-Builder or any of its Subcontractors has violated any Legal Requirements imposing environmental standards, requirements or law upon the Work, Design-Builder assumes full liability and responsibility for such violation, correcting such violation  and subsequent enforcement issued by such governmental or quasi-governmental entity. The Owner reserves the right to terminate the Agreement if it can be confirmed through reasonable evidence that Design-Builder or any of its Subcontractors violated  any environmental Legal Requirements.

**2.8**     **Design-Builder's Responsibility for Project Safety.**

**2.8.1**    Design-Builder recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, and (iii) all other property at the Site or adjacent thereto. Design-Builder assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work. Design-Builder shall, prior to commencing construction, designate a Safety Representative with the necessary qualifications and experience to supervise the implementation and monitoring of all safety precautions and programs related to the Work. Unless otherwise required by the Contract Documents, Design-Builder's Safety Representative shall be an individual stationed at the Site who may have responsibilities on the Project in addition to safety. The Safety Representative shall make routine daily inspections of the Site and shall hold weekly safety meetings with Design-Builder's personnel, Subcontractors and others as applicable.

**2.8.2**    Design-Builder and Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific safety requirements set forth in the Contract Documents, provided that such Owner-specific requirements do not violate any applicable Legal Requirement. Notwithstanding any Owner-specific safety requirements set forth in the Contract Documents, Design-Builder remains solely responsible for Project Safety and compliance with all Legal Requirements relating to safety.  Design-Builder specifically acknowledges that any Owner-specific requirements set forth in the Contract Documents or otherwise imposed on Design-Builder's performance of Work shall not give rise to any duty or obligation on the Owner for Project Safety or compliance with any Legal Requirements relating to safety.  Design-Builder will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Owner's Representative and, to the extent mandated by Legal  Requirements, to all government or quasi-government authorities having jurisdiction over safety- related matters involving the Project or the

Work.

**2.8.3**   Design-Builder's responsibility for safety under this Section 2.8 is not intended in any way to relieve Subcontractors and Sub-Subcontractors of their own contractual and legal obligations and responsibility for (i) complying with all Legal Requirements, including those related to health and safety matters, and (ii) taking all necessary measures to implement and monitor all safety precautions and programs to guard against injuries, losses, damages or accidents resulting from their performance of the Work.

## 2.9    Design-Builder's Warranty.

**2.9.1**   Design-Builder warrants to Owner that the construction, including all materials and equipment furnished as part of the construction, shall be new unless otherwise specified in the Contract Documents, of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship. Design-Builder's warranty obligation excludes defects caused by abuse, alterations, or failure to maintain the Work in a commercially reasonable manner not caused by Design-Builder. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner with greater warranty rights than set forth in this Section 2.9 or the Contract Documents. Design-Builder will provide Owner with all manufacturers' warranties upon Substantial Completion.

## 2.10   Correction of Defective Work.

**2.10.1**   Design-Builder agrees to correct any Work that is found to not be in conformance with the Contract Documents, including that part of the Work subject to Section 2.9 hereof, within a period of two years from the date of Substantial Completion of the Work or within such longer period to the extent required by any specific warranty included in the Contract Documents. Design-Builder shall be responsible for all costs including redesign and reconstruction costs incurred by Owner to correct any of the Work.

**2.10.2**   Design-Builder shall, within seven (7) days of receipt of written notice from Owner that the Work is not in conformance with the Contract Documents, take meaningful steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work affected by the nonconforming Work. If Design-Builder fails to commence the necessary steps within such seven (7) day period, Owner, in addition to any other remedies provided under the Contract Documents, may provide Design-Builder with written notice that Owner will commence correction of such nonconforming Work with its own forces. If Owner does perform such corrective Work, Design-Builder shall be responsible for all costs incurred by Owner in performing such correction, including all fees of attorneys, architects, engineers and other professionals incurred by Owner. If the nonconforming Work creates an emergency requiring an  immediate response, the seven (7) day period identified herein shall be deemed inapplicable.

**2.10.3**   The two-year period referenced in Section 2.10.1 above applies only to Design-Builder's obligation to correct nonconforming Work and is not intended to constitute a period of limitations for any other rights or remedies Owner may have regarding Design-Builder's other obligations under the Contract Documents.

## 2.11   Required Manufacturers and Suppliers

**2.11.1**   Design-Builder agrees to comply with the Owner's request that Heyward, Inc., Atlanta, be considered and evaluated as the supplier of equipment needed to provide 1 MGD of treatment capacity described in Part 1 of the Work.

## Article 3

## Owner's Services and Responsibilities

**3.1**    **Duty to Cooperate.**

**3.1.1**    Owner shall, throughout the performance of the Work, cooperate with Design-Builder and perform its responsibilities, obligations and services in a timely manner to facilitate Design-Builder's timely and efficient performance of the Work and so as not to delay or interfere with Design-Builder's performance of its obligations under the Contract Documents.

**3.1.2**    Owner shall provide timely reviews and approvals of interim design submissions and Construction Documents consistent with the turnaround times set forth in Design-Builder's schedule.

**3.1.3**    Owner shall give Design-Builder timely notice of any Work that Owner notices to be defective or not in compliance with the Contract Documents.

**3.2**    **Furnishing of Services and Information.**

**3.2.1**    Unless expressly stated to the contrary in the Contract Documents, Owner shall provide, at its own cost and expense, for Design-Builder's information and use the following, all of which Design-Builder is entitled to reasonably rely upon in performing the Work:

**3.2.1.1**  Surveys describing the property, boundaries, topography and reference points for use during construction, including existing service and utility lines;

**3.2.1.2**  To the extent available, existing geotechnical information describing subsurface conditions, and other surveys describing other latent or concealed physical conditions at the Site. Notwithstanding any such information that the Owner may provide, Design-Builder shall be responsible for interpretation of existing records and assumes responsibility for any geotechnical or subsurface conditions or uncertainties, whether or not such conditions are disclosed in any geotechnical information or surveys provided to Design-Builder by Owner;

**3.2.1.3**  Temporary and permanent easements, zoning and other requirements and encumbrances affecting land use, or necessary to permit the proper design and construction of the Project and enable Design-Builder to perform the Work;

**3.2.1.4**  A legal description of the Site;

**3.2.1.5**  To the extent available, record drawings of any existing structures at the Site; and

**3.2.1.6**  To the extent available, environmental studies, reports and impact statements describing the environmental conditions, including Hazardous Conditions, in existence at the Site.

**3.2.2**    Owner is responsible for securing and executing all necessary agreements with adjacent land or property owners that are necessary to enable Design-Builder to perform the Work. Owner is further responsible for all costs, including attorneys' fees, incurred in securing these necessary agreements.

**3.3**    **Owner's Engineer**

**3.3.1**    Owner's Engineer will assist the Owner in the administration of the Contract Documents including, but not limited to, the following tasks: preliminary design services; development of the Request for Qualifications and subsequent shortlisting; development of the Request for Proposals and subsequent proposal evaluation and Design-Builder selection; design and construction phase services; resident services during construction; and supplemental services. The Owner's Engineer shall communicate regularly with the Design-Builder and the Owner and Design-Builder

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 60 of 122    Document 1

shall endeavor to communicate with each other through the Owner's Engineer in matters arising out of or relating to the Contract Documents. The Owner's Engineer shall have authority to act on behalf of the Owner only to the extent expressly granted in the Agreement and these General Conditions. The Owner's Engineer shall have the authority:

> **3.3.1.1** to reject Work that does not conform to the Construction Documents;
>
> **3.3.1.2** to review and approve, or take other appropriate action upon, Design-Builder's shop drawings, product data and samples, but only for the limited purpose of checking for conformance with the design concept of the Contract Documents;
>
> **3.3.1.3** to make minor revisions to the Work that do not result in a change in the Contract Time or Guaranteed Maximum Price as set forth in Section 9.3; and
>
> **3.3.1.4** to suspend or stop Work in accordance with Section 11.1.

**3.3.2** The Owner's Engineer shall not have authority to:

> **3.3.2.1** approve or modify the Basis of Design Documents;
>
> **3.3.2.2** approve or modify Design-Builder's interim design submissions;
>
> **3.3.2.3** approve or modify the Construction Documents, except as described in Section 3.3.1.3;
>
> **3.3.2.4** modify the Owner's Project Criteria;
>
> **3.3.2.5** approve or modify the GMP Exhibit or GMP Proposal;
>
> **3.3.2.6** agree to or approve any modifications, amendments or Work Change Directives or Change Orders to the Contract Documents, except for minor revisions to the Work as provided for in Section 3.3.1.3.;
>
> **3.3.2.7** declare Substantial Completion or final completion of the Project; or
>
> **3.3.2.8** Approve payment for Design-Builder's Applications for Payment.

**3.4  Government Approvals and Permits.**

**3.4.1** Owner shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees set forth in the Owner's Permit List attached as an exhibit to the Agreement.

**3.4.2** Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are Design-Builder's responsibility.

**3.5  Owner's Separate Contractors.**

**3.5.1** Owner shall be entitled to self-perform any work related to the Work through separate Contractors. Owner is responsible for all work performed on the Project or at the Site by separate contractors under Owner's control. Owner shall contractually require its separate contractors to cooperate with, and coordinate their activities so as not to interfere with, Design-Builder in order to enable Design-Builder to timely complete the Work consistent with the Contract Documents.

# Article 4

## Hazardous Conditions and Differing Site Conditions

**4.1**   **Hazardous Conditions.**

 **4.1.1** Unless otherwise expressly provided in the Contract Documents to be part of the Work, Design-Builder is not responsible for any Hazardous Conditions encountered at the Site. Upon encountering any Hazardous Conditions, Design-Builder will stop Work immediately in the affected area and duly notify Owner and, if required by Legal Requirements, all government or quasi-government entities with jurisdiction over the Project or Site.

 **4.1.2** Upon receiving notice of the presence of suspected Hazardous Conditions, Owner shall take the necessary measures required to ensure that the Hazardous Conditions are remediated or rendered harmless. Such necessary measures shall include Owner retaining qualified independent experts to (i) ascertain whether Hazardous Conditions have actually been encountered, and, if they have been encountered, (ii) prescribe the remedial measures that Owner must take either to remove the Hazardous Conditions or render the Hazardous Conditions harmless.

 **4.1.3** Design-Builder shall be obligated to resume Work at the affected area of the Project only after Owner's expert provides it with written certification that (i) the Hazardous Conditions have been removed or rendered harmless and (ii) all necessary approvals have been obtained from all government and quasi-government entities having jurisdiction over the Project or Site.

 **4.1.4** Design-Builder will be entitled, in accordance with these General Conditions of Contract, to an adjustment in the Guaranteed Maximum Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by the presence of Hazardous Conditions.

 **4.1.5** Notwithstanding the preceding provisions of this Section 4.1, Owner is not responsible for Hazardous Conditions introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable. To the fullest extent permitted by law, Design-Builder shall indemnify, defend and hold harmless Owner and Owner's officers, directors, employees and agents, including Owner's Engineer, from and against all claims, losses, damages, liabilities and expenses, including attorneys' fees, the fees of consultants and experts and all costs and expenses of litigation, arising out of or resulting from those Hazardous Conditions introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable.

 **4.1.6**

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 62 of 122   Document 1

# Insurance

**5.1    Design-Builder's Insurance Requirements.**

**5.1.1**    Design-Builder is responsible for procuring and maintaining the insurance for the coverage amounts all as set forth in the Insurance Exhibit attached to the Agreement as Exhibit B.  Coverage shall be secured from insurance companies authorized to do business in the state in which the Project is located, and with a minimum rating set forth in the Agreement.

**5.1.2**    Design-Builder's insurance shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project.

**5.1.3**    Prior to commencing any construction services hereunder, Design-Builder shall provide Owner with certificates evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect until the two-year correction period in Section 2.10 has expired and final payment is made to Design-Builder and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Owner. If any of the foregoing insurance coverages are required to remain in force after final payment are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the Final Application for Payment. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the Design-Builder with reasonable promptness according to the Design-Builder's information and belief.

**5.1.4**    Owner and Owner's Engineer shall be named as an additional insured under any liability insurance policy.

**5.2    Owner's Liability Insurance.**

**5.2.1**    Owner, in its discretion, may procure and maintain from insurance companies authorized to do business in the state in which the Project is located such liability insurance necessary to protect Owner from claims which may arise from the performance of Owner's obligations under the Contract Documents or Owner's conduct during the course of the Project.
**5.2.2**

**5.3    Payment and Performance Bonds**

**5.3.1**    Design Builder shall provide payment and performance bonds meeting the requirements of O.C.G.A. §§ 36-91-70; 36-91-90.  Design Builder shall provide such bonds on the forms attached to the Agreement as Exhibit C.

# Article 6

## Payment

**6.1**    **Schedule of Values.**

**6.1.1**    Unless required by the Owner upon execution of this Agreement, within ten (10) days of execution of the Agreement, Design-Builder shall submit for Owner's review and approval a schedule of values for all of the Work. The Schedule of Values will (i) subdivide the Work into its respective parts, (ii) include values for all items comprising the Work, (iii) segregate as a separate category the Design-Builder's general conditions and include values for all items comprising the general conditions; (iv) include a separate category for Design-Builder's fee, and (v) serve as the basis for monthly progress payments made to Design-Builder throughout the Work.

**6.1.2**    The Owner will timely review and approve the schedule of values so as not to delay the submission of the Design-Builder's first application for payment. The Owner and Design-Builder shall timely resolve any differences so as not to delay the Design-Builder's submission of its first application for payment.

**6.2**    **Monthly Progress Payments.**

**6.2.1**    On or before the date established in the Agreement, Design-Builder shall submit for Owner's review and approval an accurate and complete Application for Payment requesting payment for all Work performed as of the date of the Application for Payment. The Application for Payment shall be based upon the Schedule of Values approved by the Owner and be accompanied by all supporting documentation required by the Contract Documents and/or established at the meeting required by Section 2.1.4 hereof. The Application for Payment shall include the percentage of completion of the divisions of the Work and Design-Builder's general conditions identified in the Schedule of Values and shall allocate the GMP based on those percentages together with the Design-Builder's fee, payment for equipment and materials, less previous payments and retainage.

**6.2.1.1**    With each Application for Payment submitted by Design-Builder, except for its Final Application for Payment, Design-Builder shall submit a fully executed Conditional Claim Waiver and Release Upon Progress Payment form, a copy of which is attached to the Agreement as Exhibit C.  Design-Builder's submittal of a fully executed Conditional Claim Waiver and Release Upon Progress Payment in accordance with this section shall be an express condition precedent to Owner's obligation to make payment to Design-Builder in response to Design-Builder's Application for Payment.

**6.2.1.2**    With each Application for Payment, the Design-Builder shall submit a manifest billing including documentation supporting all costs for which Design_Builder seeks payment, including but not limited to, payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner to demonstrate that cash disbursements already made by the Design-Builder on account of the Cost of the Work equal or exceed progress payments already received by the Design-Builder, less that portion of those payments attributable to the Design-Builder's Fee, plus payrolls for the period covered by the present Application for Payment.

**6.2.2**    The Application for Payment may request payment for equipment and materials not yet incorporated into the Project, provided that (i) Owner is satisfied that the equipment and materials

are suitably stored at either the Site or another acceptable location, (ii) the equipment and materials are protected by suitable insurance and (iii) upon payment, Owner will receive the equipment and materials free and clear of all liens and encumbrances.

**6.2.3** The Application for Payment shall constitute Design-Builder's representation that the Work described herein has been performed consistent with the Contract Documents, has progressed to the point indicated in the Application for Payment, and that title to all Work will pass to Owner free and clear of all claims, liens, encumbrances, and security interests upon the incorporation of the Work into the Project, or upon Design-Builder's receipt of payment, whichever occurs earlier.

**6.3** **Withholding of Payments.**

**6.3.1** On or before the date established in the Agreement, Owner shall pay Design-Builder all amounts properly due. If Owner determines that Design-Builder is not entitled to all or part of an Application for Payment as a result of Design-Builder's failure to meet its obligations hereunder, it will notify Design-Builder in writing at least five (5) days prior to the date payment is due. The notice shall indicate the specific amounts Owner intends to withhold, the reasons and contractual basis for the withholding, and the specific measures Design-Builder must take to rectify Owner's concerns. Design-Builder and Owner will attempt to resolve Owner's concerns prior to the date payment is due. If the parties cannot resolve such concerns, Design-Builder may pursue its rights under the Contract Documents, including those under Article 10 hereof.

**6.3.2** Notwithstanding anything to the contrary in the Contract Documents, Owner shall pay Design-Builder all undisputed amounts in an Application for Payment within the times required by the Agreement.

**6.4** **Design-Builder's Payment Obligations.**

**6.4.1** Design-Builder will pay Design Consultants and Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Design-Builder has received from Owner on account of their Work. Design-Builder will impose similar requirements on Design Consultants and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 7.2 hereof.

**6.5** **Substantial Completion.**

**6.5.1** Design-Builder shall notify Owner when it believes the Work, or to the extent permitted in the Contract Documents, a portion of the Work, is Substantially Complete. Within five (5) days of Owner's receipt of Design-Builder's notice, Owner and Design-Builder will jointly inspect such Work to verify that it is Substantially Complete in accordance with the requirements of the Contract Documents. If such Work is Substantially Complete, Owner shall prepare and issue a Certificate of Substantial Completion that will set forth (i) the date of Substantial Completion of the Work or portion thereof, (ii) the remaining items of Work that have to be completed before final payment, (iii) provisions (to the extent not already provided in the Contract Documents) establishing Owner's and Design-Builder's responsibility for the Project's security, maintenance, utilities and insurance pending final payment, and (iv) an acknowledgment that warranties commence to run on the date of Substantial Completion, except as may otherwise be noted in the Certificate of Substantial Completion.

**6.5.2** Upon Substantial Completion of the entire Work or, if applicable, any portion of the Work, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work or completed portion of the Work, less an amount equal to 150% of the reasonable value of all remaining, incomplete, or defective items of Work as noted in the Certificate of Substantial Completion, as determined by Owner, plus all other amounts Owner is entitled to withhold pursuant to Section 6.3 above. Owner shall make payment of such retained amounts to Design-Builder within thirty (30) days of Design-Builder's submittal of an accurate and complete Application

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 65 of 122   Document 1

for Payment for the retained amounts to be released.

**6.5.3** Owner, at its option, may use a portion of the Work which has been determined to be Substantially Complete, provided, however, that (i) a Certificate of Substantial Completion has been issued for the portion of Work addressing the items set forth in Section 6.5.1 above, (ii) Design-Builder and Owner have obtained the consent of their sureties and insurers, and to the extent applicable, the appropriate government authorities having jurisdiction over the Project, and (iii) Owner and Design-Builder agree that Owner's use or occupancy will not interfere with Design-Builder's completion of the remaining Work.

## 6.6    **Final Payment.**

**6.6.1** After receipt of a Final Application for Payment from Design-Builder, Owner shall make final payment by the time required in the Agreement, provided that Design-Builder has achieved Final Completion and its final accounting as required by Section 6.6.2.2 substantiates the Cost of the Work for which Design-Builder seeks payment.

**6.6.2** At the time of submission of its Final Application for Payment, Design-Builder shall provide the following information, the provision of all of which is an express condition to Owner's obligation to make final payment to Design-Builder:

> **6.6.2.1** ;A fully executed Final, Unconditional Claim Waiver and Release upon Final Payment form, a copy of which is attached to the Agreement as Exhibit D;
>
> **6.6.2.2** A final accounting for the Cost of the Work in a form and such detail as is acceptable to the Owner and its auditors;
>
> **6.6.2.3** Consent of Design-Builder's surety, if any, to final payment;
>
> **6.6.2.4** All operating manuals, warranties and other deliverables required by the Contract Documents;
>
> **6.6.2.5** Certificates of insurance confirming that required coverages will remain in effect consistent with the requirements of the Contract Documents; and
>
> **6.6.2.6** As-built drawings.

**6.6.3** Upon making final payment, Owner waives all claims against Design-Builder except claims relating to (i) Design-Builder's failure to satisfy its payment obligations, if such failure affects Owner's interests, (ii) Design-Builder's failure to complete the Work consistent with the Contract Documents, including defects appearing after Substantial Completion and (iii) the terms of any special warranties required by the Contract Documents. Acceptance of payment by the Design-Builder constitutes a waiver of all claims by Design-Builder except those claims previously made in writing by Design-Builder and which are identified by Design-Builder as unsettled.

**6.6.4** Deficiencies in the Work discovered after Substantial Completion, whether or not such deficiencies would have been included on the Punch List if discovered earlier, shall be deemed warranty Work. Such deficiencies shall be corrected by Design-Builder under Sections 2.9 and 2.10 herein, and shall not be a reason to withhold final payment from Design-Builder, provided, however, that Owner shall be entitled to withhold from the Final Payment the reasonable value of completion of such deficient Work until such Work is completed.

# Article 7

## Indemnification

7.1    **Patent and Copyright Infringement.**

**7.1.1**    Design-Builder shall defend any action or proceeding brought against Owner based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued. Owner shall give prompt written notice to Design-Builder of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same. Design-Builder shall indemnify and hold harmless Owner from and against all damages, losses expenses and costs, including but not limited to all attorneys' fees, the fees of consultants and experts and costs and expenses of litigation incurred by Owner or awarded against Owner or Design- Builder in any such action or proceeding. Design-Builder agrees to keep Owner informed of all developments in the defense of such actions.

**7.1.2**    If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Design-Builder shall at its sole expense take reasonable steps to procure the right to operate or use the Work. If Design-Builder cannot so procure such right within a reasonable time, Design-Builder shall promptly, at Design-Builder's option and at Design-Builder's expense, (i) modify the Work so as to avoid infringement of any such patent or copyright or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

**7.1.3**    Sections 7.1.1 and 7.1.2 above shall not be applicable to any suit, claim or proceeding based on infringement or violation of a patent or copyright (i) relating solely to a particular process or product of a particular manufacturer specified by Owner and not offered or recommended by Design-Builder to Owner or (ii) arising from modifications to the Work by Owner or its agents after acceptance of the Work. If the suit, claim or proceeding is based upon events set forth in the preceding sentence, Owner shall defend, indemnify and hold harmless Design-Builder to the same extent Design-Builder is obligated to defend, indemnify and hold harmless Owner in Section 7.1.1 above.

**7.1.4**    The obligations set forth in this Section 7.1 shall constitute the sole agreement between the parties relating to liability for infringement of violation of any patent or copyright.

7.2    **Indemnification**

**7.2.1 Design Builder's Performance.** To the fullest extent permitted by law, Design-Builder shall indemnify, defend and hold harmless Owner (and other entities identified in the Agreement to be indemnified by Design-Builder, including Owner's Engineer), all of their political subdivisions, affiliates, parents, subsidiaries, elected officials, appointed officials, members, stockholders, officers, directors, employees, representatives, agents, insurers, successors and assigns (all of which are hereinafter collectively referred to as "Indemnitees"), from and against all claims, damages, losses, costs and expenses, including but not limited to all attorneys', paralegal, consultants' and experts' fees, legal expenses and dispute resolution costs (collectively "Legal Expenses"), arising out of or resulting from the performance of Design-Builder's Work; provided, any such claim, damage, loss, cost or expense: (1) is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than direct damage to Design-Builder 's Work itself), including the loss of use resulting therefrom, and is caused or alleged to be caused in whole or in any part by any act or omission of Design-Builder or anyone directly or indirectly employed by Design-Builder or anyone for whose acts or omissions Design-Builder may be liable, regardless of whether it is also caused in part by a party indemnified hereunder; or (2) arises out of or relates to Design-Builder 's performance under this Agreement, or results from any claimed failure of Design-Builder, or anyone directly or indirectly employed by Design-Builder or anyone for whose acts or omissions Design-Builder may be liable, to properly fulfill Design-Builder's obligations under this Agreement. This indemnity obligation shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist under law except to the extent that it is caused by the sole negligence of any party indemnified hereunder in which case this obligation shall not apply relative to such indemnified party.

**7.2.2 No Limitation Upon Liability.** In any and all claims against Indemnitees by any worker of Subcontractor, anyone directly or indirectly employed by Subcontractor, or anyone for whose acts or omissions Subcontractor may be liable, the indemnification obligations under this Section 7.2 shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for Subcontractor under workers' compensation acts, disability benefit acts, or other employee benefit acts.

**7.2.3 Compliance with Laws.** Design-Builder is bound by, and, at its own cost, shall comply with all Legal Requirements, including, but not limited to, all applicable federal, state and local codes, laws, ordinances and regulations, including but not limited to laws pertaining to equal employment opportunity, social security, unemployment compensation, workers' compensation, immigration compliance, tax, safety, and building codes. Design-Builder shall indemnify, defend and hold harmless Indemnitees with respect to all claims, fines, penalties, damages, losses, costs and expenses including Legal Expenses attributable to the failure or claimed failure of Design-Builder, or its workers, agents, Payees, to comply with all Legal Requirements.

**7.2.4 Consideration.** Included in the Contract Price is the sum of one hundred dollars ($100.00) as specific consideration for the indemnity obligations provided under this Section 7.2.

**7.2.1** .

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 68 of 122   Document 1

# Article 8

## Time

**8.1** **Obligation to Achieve the Contract Times.**

   **8.1.1**   Design-Builder agrees that it will commence performance of the Work and achieve the Contract Time(s) in accordance with Article 5 of the Agreement.

**8.2** **Delays to the Work.**

   **8.2.1**   If Design-Builder is delayed in the performance of the Work due to acts, omissions, conditions, events, or circumstances beyond its control and due to no fault of its own or those for whom Design-Builder is responsible, the Contract Time(s) for performance shall be reasonably extended by Change Order. By way of example, events that will entitle Design-Builder to an extension of the Contract Time(s) include acts or omissions of Owner or anyone under Owner's control (including separate contractors), changes in the Work, Hazardous Conditions, unanticipated inclement weather conditions and Force Majeure Events.

   **8.2.2**   In addition to Design-Builder's right to a time extension for those events set forth in Section 8.2.1 above, Design-Builder shall also be entitled to an appropriate adjustment of the Guaranteed Maximum Price provided, however, that the Guaranteed Maximum Price shall not be adjusted for unanticipated inclement weather conditions or Force Majeure Events unless otherwise provided in the Agreement.

**8.3** **Force Majeure**

   Neither party shall be liable for any failure or delay in the performance of its obligation pursuant to the Contract Documents, and such failure or delay shall not be deemed a default or grounds for termination hereunder if all of the following conditions are satisfied:

   a.    If such failure or delay could not have been anticipated and prevented by reasonable precautions;
   b.    If such failure or delay cannot reasonably be circumvented by the non-performing party through the use of alternate sources, work-around plans, or other means; and
   c.    If and to the extent such failure or delay is caused, directly or indirectly, by fire, flood, earthquake, hurricane, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions or court order.

   An event, which satisfies all of the conditions set forth above, shall be referred to as a "Force Majeure Event". Upon the occurrence of a Force Majeure Event, the affected party shall be excused from any further performance of those of its obligations, which are affected by the Force Majeure Event for as long as (a) such Force Majeure Event continues and (b) the affected party continues to use reasonable efforts to mitigate the effect of the Force Majeure Event and recommence performance whenever and to whatever extent possible.

   Upon the occurrence of a Force Majeure Event, the affected party shall promptly notify the other by telephone (to be confirmed by written notice within five (5) days of the inception of the failure or delay) of the occurrence of a Force Majeure Event and shall describe in reasonable detail the nature of the Force Majeure Event.

   Notwithstanding anything contained herein to the contrary, strikes, slow-downs, walkouts, lockouts, and industrial disputes affecting the workforce of Design-Builder or its Subcontractors shall not constitute "Force Majeure Events" and are not excused under this provision.

# Article 9

## Changes to the Contract Price and Time

**9.1    Change Orders.**

**9.1.1**    A Change Order is a written instrument issued after execution of the Agreement signed by Owner and Design-Builder, stating their agreement upon all of the following:

**9.1.1.1** The scope of the change in the Work;

**9.1.1.2** The amount of the adjustment to the Guaranteed Maximum Price; and

**9.1.1.3** The extent of the adjustment, if any, to the Contract Time(s).

**9.1.2**    All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents. Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for such changes.

**9.1.3**    An executed Change Order constitutes a full and final settlement and accord and satisfaction of all effects of the changes described and included in the Change Order upon any and all aspects of the Contract Documents and compensates Design-Builder fully for such changes.    Accordingly, except as specifically described and included in a Change Order 1) Design-Builder expressly waives and releases any and all right to make a claim or demand or to take any action or proceeding for any other consequences resulting from, arising out of, or related to the Change Order, whether the consequences result directly or indirectly from the changes described and included therein; and 2) Design-Builder expressly waives and releases any claim it may have against the Owner for a) any adjustment in the schedule, including but not limited to the Scheduled Substantial Completion Date, Scheduled Interim Milestone Dates or final completion date, or b) any additional compensation or damages, resulting from, arising out of, or related to, the changes described and included herein, including, but not limited to, any claim for impact or damages due to delay, disruption, hindrance, interference, inefficiencies or extra work arising out of, resulting from, or related to, the changes described and included therein, including, but not limited to, any effect that such changes may have on the unchanged portion of the Work or schedule.

**9.2    Work Change Directives.**

**9.2.1**    Owner may, by Work Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions. A Work Change Directive is a written order prepared and signed by Owner directing a change in the Work prior to agreement on an adjustment, if any, in the Contract Price and/or the Contract Time(s).

**9.2.2**    Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for the Work Change Directive. Upon reaching an agreement, the parties shall prepare and execute an appropriate Change Order reflecting the terms of the agreement. Design-Builder will promptly proceed with the change in the Work during those negotiations.

**9.3    Minor Changes in the Work.**

**9.3.1**    Minor changes in the Work do not involve an adjustment in the Guaranteed Maximum Price and/or Contract Time(s) and do not materially and adversely affect the Work, including the design, quality, performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of

# Article 9

the Contract Documents, provided, however, that Design-Builder shall promptly inform Owner, in writing, of any such changes and record such changes on the documents maintained by Design-Builder. Owner may also order minor changes in the Work.

**9.4      Contract Price Adjustments.**

   **9.4.1**      The increase or decrease in the Guaranteed Maximum Price resulting from a change in the Work shall be determined by one or more of the following methods:

      **9.4.1.1** Unit prices set forth in the Agreement or as subsequently agreed to between the parties;

      **9.4.1.2** A mutually accepted lump sum, properly itemized and supported by sufficient substantiating data to permit evaluation by Owner;

      **9.4.1.3** Costs, fees and any other markups set forth in the Agreement; or

**9.4.1.4** If an increase or decrease cannot be agreed to as set forth in items 9.4.1.1 through 9.4.1.3 above and Owner issues a Work Change Directive, the cost of the change of the Work as demonstrated by invoices, payrolls and other like documentation of Cost of the Work paid by Design-Builder plus the following percentages of the various portions of the Cost of the Work:

    **9.4.1.4.1** For payroll costs for employees in the direct employ of Design-Builder in the performance of the Work and costs of all materials and equipment furnished and incorporated in the Work, the Design-Builder's fee shall be fifteen percent;

    **9.4.1.4.2** For payments made by the Design-Builder to the Subcontractors for Work performed or furnished by Subcontractors, the Design-Builder's fee shall be five percent.

**9.4.2** If unit prices are set forth in the Contract Documents or are subsequently agreed to by the parties, but application of such unit prices will cause substantial inequity to Owner or Design-Builder because of differences in the character or quantity of such unit items as originally contemplated, the parties may negotiate an equitable adjustment.

**9.4.3** If Owner and Design-Builder disagree upon whether Design-Builder is entitled to be paid for any services required by Owner, or if there are any other disagreements over the scope of Work or proposed changes to the Work, Owner and Design-Builder shall resolve the disagreement pursuant to Article 10 hereof. As part of the negotiation process, Design-Builder shall furnish Owner with a good faith estimate of the costs to perform the disputed services in accordance with Owner's interpretations. If the parties are unable to agree and Owner expects Design-Builder to perform the services in accordance with Owner's interpretations, Design-Builder shall proceed to perform the disputed services, conditioned upon Owner issuing a written order to Design-Builder (i) directing Design-Builder to proceed and (ii) specifying Owner's interpretation of the services that are to be performed.

**9.5    Emergencies.**

**9.5.1** In any emergency affecting the safety of persons and/or property, Design-Builder shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Guaranteed Maximum Price and/or Contract Time(s) on account of emergency work shall be determined as provided in this Article 9.

# Article 10

## Contract Adjustments and Disputes

**10.1    Requests for Contract Adjustments and Relief.**

**10.1.1** If Design-Builder believes that it is entitled to an adjustment in the Guaranteed Maximum Price and/or Contract Time(s) from Owner for any event arising out of or related to the Work or Project, Design Builder shall provide written notice to the Owner stating in reasonable detail the basis for its claim for relief. Such notice shall, if possible, be made prior to incurring any cost or expense and in accordance with any specific notice requirements contained in applicable sections of these General Conditions of Contract. In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed fourteen (14) days, after the occurrence giving rise to the claim for relief. Such notice shall include sufficient information to advise the Owner of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request. No later than thirty (30) days after the event giving rise to Design-Builder's claim for

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 72 of 122   Document 1

adjustment of the Guaranteed Maximum Price and/or Contract Time(s), Design-Builder shall provide Owner with a second notice of its claim for relief setting forth in detail its cost estimate and/or proposed schedule revision, which shall include such supporting documentation and detail as Owner may require to facilitate its review and response. The notices required by this section are express conditions precedent to Design-Builder's right to file a claim for adjustment of the Guaranteed Maximum Price and/or Contract Time(s) for events arising out of or related to the Work or the Project and Design-Builder's failure to give the written notices required by this section shall result in Design-Builder's waiver and release of its claim.

**10.1.2** No adjustment in the Guaranteed Maximum Price or Contract Time(s) shall be made for any suspension, delay or interruption of the Work resulting from the fault or negligence of Design-Builder or from any action of the elements or bad weather unless such weather conditions are abnormal for climatic region in which the Project is located and for the time of year; nor shall an adjustment be made hereunder where it is excluded under any other provisions of the Contract Documents.

**10.2 Dispute Avoidance and Resolution.**

**10.2.1**The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, Design-Builder and Owner each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**10.2.2**Design-Builder and Owner will first attempt to resolve disputes or disagreements at the field level through discussions between Design-Builder's Representative and Owner's Engineer who shall convene a dispute resolution conference at the Owner's request. In the event of a claim asserted by Design-Builder, such conference shall be convened within thirty (30) days of Design Builder's second written notice required under Section 10.1.1, provided Design-Builder has provided Owner with information and documentation sufficient to meet the requirements of that section and to otherwise allow the Owner to reasonably review and respond to Design-Builder's claim, unless the Owner and Design-Builder mutually agree otherwise.

**10.2.3**If a dispute or disagreement cannot be resolved through Design-Builder's Representative and Owner's Engineer, Design-Builder's Senior Representative and Owner's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such dispute or disagreement. Five (5) days prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

**10.2.4**If after meeting as provided in Section 10.2.3 the Senior Representatives determine that the dispute or disagreement cannot be resolved on terms satisfactory to both parties, within thirty (30) days of the conclusion of the meeting of Senior Representatives, the parties shall submit the dispute or disagreement to non-binding mediation. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules in effect as of the effective date of this Agreement. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. Unless otherwise mutually agreed by the Owner and Design-Builder and consistent with the mediator's schedule, the mediation shall commence within ninety (90) days of the submission of the dispute to mediation.

**10.2.5**If after engaging in the dispute resolution process set forth in Sections 10.2.1 through 10.2.4, the parties are unable resolve their dispute or disagreement, each party shall be free to file such actions and seek such relief as it deems appropriate in the Superior Court of Oconee County. The parties expressly agree that the Superior Court of Oconee County shall be the sole and exclusive

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 73 of 122   Document 1

venue for any action by either party seeking relief or recovery for any event, claim, dispute or disagreement arising out of the Contract Documents, not resolved through negotiations or mediation as provided for in this Section 10.2. The parties agree that except in the instance where a party refuses to participate in the dispute resolution process set forth in Sections 10.2.1 through 10.2.4, such dispute resolution process shall be a condition precedent to filing any action or seeking any relief or remedy in the Superior Court of Oconee County.

**10.3    Duty to Continue Performance.**

> **10.3.1**  Design-Builder shall continue  to perform the Work pending the final resolution of any dispute or disagreement between Design-  Builder and Owner.

# Article 11

## Stop Work and Termination for Cause

**11.1    Owner's Right to Suspend or Stop Work.**

> **11.1.1** The Owner' shall have the authority to suspend or stop the Work wholly or in part by written order, without cause and for its convenience, for such periods as - may be necessary.  The Owner may also suspend or stop Work under this section for cause, including, but not limited to,  to conditions Owner considers unfavorable for  the suitable prosecution of the Work; or for failure on the part of the Design-Builder to correct  conditions unsafe for workers or for the general public; or for Design-Builder's failure to carry out orders given  or to perform any requirements under the Contract Documents.  . No provision of the Contract Documents  shall be construed under  any circumstances to create any obligation of the Owner to exercise its authority or right suspend or stop the Work under this section for the benefit of the Design-Builder.  If Design-Builder believes it is entitled to an adjustment to the Guaranteed Maximum Price or Contract Time(s) due to any action undertaken by the Owner to suspend or stop Work under this section, Design-Builder must assert a claim in accordance with Section 10.1.1.  Failure by Design-Builder to meet the requirements of Section 10.1.1 in asserting such a claim shall result in waiver and release of Design-Builder's claim.
> **11.1.1**

**11.2    Owner's Right to Perform and Terminate for Cause.**

> **11.2.1**  If Design-Builder is adjudged bankrupt or insolvent, or if he makes  a general assignment for the benefit of his creditors, or if a trustee or receiver is appointed for the Design-Builder or for any of his property, or if he files a petition to take advantage of any debtor's act or to reorganize under bankruptcy  or persistently fails to (i) provide a sufficient number of skilled workers, (ii)  supply  the  materials and equipment required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay Design Consultants or Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed by the Contract Time(s), as such times may be adjusted, (vi) abide by the authority of the Owner's Engineer, or otherwise violates any provision of the Contract Documents or (vii) perform its obligations under the Contract Documents, then Owner, in addition to any other rights and remedies provided in the Contract Documents or by law, shall have the rights set forth in Sections 11.2.2 and 11.2.3 below.

> **11.2.2**  Upon the occurrence of an event set forth in Section 11.2.1 above, Owner may provide written notice to Design-Builder that it intends to terminate the Agreement unless the problem cited is cured within seven (7) days of Design-Builder's receipt of such notice. If Design-Builder fails to cure such problem, then Owner may give a second written notice to Design-Builder of its intent to terminate within an additional seven (7) day period. If Design-Builder, within such second seven (7) day period, fails  to cure such problem, then Owner may declare the Agreement terminated for default by providing written notice to Design-Builder of such declaration.

> **11.2.3**  Upon declaring the Agreement terminated pursuant to Section 11.2.2 above, Owner may enter upon the premises and take possession, for the purpose of completing the Work, of all designs, drawings, materials, equipment, scaffolds, tools, appliances, other items, and Design-

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 75 of 122    Document 1

Builder's subcontracts, which have been purchased, provided or contracted for the performance of the Work, all of which Design-Builder hereby transfers, assigns and sets over to Owner for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items. In the event of such termination, Design-Builder shall not be entitled to receive any further payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents. At such time, if the unpaid balance of the Contract Price exceeds the cost and expense incurred by Owner in completing the Work, such excess shall be paid by Owner to Design-Builder. Notwithstanding the preceding sentence, if the Agreement establishes a Guaranteed Maximum Price, Design-Builder will only be entitled to be paid for Work performed prior to its default. If Owner's cost and expense of completing the Work exceeds the unpaid balance of the Contract Price, then Design-Builder shall be obligated to pay the difference to Owner. Such costs and expense shall include not only the cost of completing the Work, but also, without limitation, losses, damages, costs and expense, including all attorneys' fees, the fees and costs of design professionals, consultants and experts, and all other costs and expenses of litigation, incurred by Owner in connection with the re-procurement and the assertion and defense of claims arising from Design-Builder's default.

**11.2.4** When the Owner terminates the Agreement pursuant to this Section 11.2, said termination shall not affect any right of the Owner against the Design-Builder then existing or which may thereafter accrue.

**11.2.5** If Owner improperly terminates the Agreement for cause, the termination for cause will be converted to a termination for convenience in accordance with the provisions of Article 8 of the Agreement.
**11.2.6**


# Article 12

## Electronic Data

12.1    **Electronic Data.**

**12.1.1** The parties recognize that Contract Documents, including drawings, specifications and three-dimensional modeling (such as Building Information Models) and other Work Product may be transmitted among Owner, Owner's Engineer, Design-Builder and others in electronic media as an alternative to paper hard copies (collectively "Electronic Data").

12.2    **Transmission of Electronic Data.**

**12.2.1** Owner and Design-Builder shall agree upon the software and the format for the transmission of Electronic Data. Design-Builder shall be responsible for securing the legal rights to access the agreed-upon format, including, if necessary, obtaining appropriately licensed copies of the applicable software or electronic program to display, interpret and/or generate the Electronic Data.

**12.2.2** Neither party makes any representations or warranties to the other with respect to the functionality of the software or computer program associated with the electronic transmission of Work Product. Unless specifically set forth in the Agreement, ownership of the Electronic Data does not include ownership of the software or computer program with which it is associated, transmitted, generated or interpreted.

**12.2.3** By transmitting Work Product in electronic form, the transmitting party does not transfer or assign its rights in the Work Product. The rights in the Electronic Data shall be as set forth in Article 4 of the Agreement. Under no circumstances shall the transfer of ownership of Electronic Data be deemed to be a sale by the transmitting party of tangible goods.

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 76 of 122   Document 1

**12.3    Electronic Data Protocol.**

    **12.3.1** The parties acknowledge that Electronic Data may be altered or corrupted, intentionally or otherwise, due to occurrences beyond their reasonable control or knowledge, including but not limited to compatibility issues with user software, manipulation by the recipient, errors in transcription or transmission, machine error, environmental f a c t o r s , and operator error.

Consequently, the parties understand that there is some level of increased risk in the use of Electronic Data for the communication of design and construction information and, in consideration of this, agree, and shall require their independent contractors, Subcontractors and Design Consultants to agree, to the following protocols, terms and conditions set forth in this Section 12.3.

**12.3.2** Electronic Data will be transmitted in the format agreed upon in Section 12.2.1 above, including file conventions and document properties, unless prior arrangements are made in advance in writing.

**12.3.3** The Electronic Data represents the information at a particular point in time and is subject to change. Therefore, the parties shall agree upon protocols for notification by the author to the recipient of any changes which may thereafter be made to the Electronic Data, which protocol shall also address the duty, if any, to update such information, data or other information contained in the electronic media if such information changes prior to Final Completion of the Project.

**12.3.4** The transmitting party specifically disclaims all warranties, expressed or implied, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the media transmitting the Electronic Data. However, transmission of the Electronic Data via electronic means shall not invalidate or negate any duties pursuant to the applicable standard of care with respect to the creation of the Electronic Data, unless such data is materially changed or altered after it is transmitted to the receiving party, and the transmitting party did not participate in such change or alteration.

# Article 13

## Miscellaneous

**13.1** **Confidential Information.**

**13.1.1** Confidential Information is defined as information which is determined by the transmitting party to be of a confidential or proprietary nature and: (i) the transmitting party identifies as either confidential or proprietary; (ii) the transmitting party takes steps to maintain the confidential or proprietary nature of the information; and (iii) the document is not otherwise available in or considered to be in the public domain. The receiving party agrees to maintain the confidentiality of the Confidential Information and agrees to use the Confidential Information solely in connection with the Project. Design-Builder acknowledges that Owner is a governmental entity and is subject to the public records and open meetings laws of the state of Georgia. Accordingly, Owner's duty to maintain confidentiality is subject to its duties under those laws.

**13.1.2** All or substantial portions of the following documents may not be considered to be public records pursuant to applicable provisions of Georgia law: Design-Builder's and Owner's Engineer's work product under the Contract Documents; and all plans, drawings and other documents containing security plans and arrangements and/or detailed plans and drawings of any facility of the Owner. Such work product, security arrangements, and/or detailed plans and drawings are herein referenced as Sensitive Document(s). Without limiting the foregoing, it is expressly understood and agreed that Sensitive Document(s) is not limited to documents related to this Agreement and includes any and all documents herein described concerning any facility of the Owner regardless of the type of facility and regardless of the manner in which the Design-Builder acquired possession of such documents. The Owner retains sole authority and discretion to determine whether all or any portion of any Sensitive Document is a public record pursuant to applicable provisions of Georgia law. Under no circumstances will the Design-Builder provide the original or copy of any portion of any Sensitive Document (without regard to the status of such Sensitive Document as in preliminary, draft or final form) to any person or entity unless directed by the Owner or unless reasonably necessary to satisfy Design-Builder obligations pursuant to this contract. The Design-

Builder will maintain and implement such rules and procedures governing the conduct of its officers, employees, agents and subcontractors and the maintenance, handling and use of Sensitive Documents as may be reasonably necessary to prevent the release of any Sensitive Document in violation of this provision. Such rules and procedures will be subject to review by the Owner and such changes as the Owner determines to be reasonably necessary, including without limitation maintaining a log identifying any Sensitive Document provided to any person or entity that includes at a minimum, identification of the Sensitive Document provided, name of person releasing the Sensitive Document, name of person receiving the Sensitive Document, reason for releasing Sensitive Document, and date Sensitive Document released.

Without exception, every person or entity receiving a Sensitive Document must agree not to copy or release such Sensitive Document to any other person or entity, unless otherwise approved by the Owner in writing. Such log need not include the release of any document to an officer or employee of the Design-Builder or to any employee of the Owner. A violation of any provision of this section is a material violation of this Agreement and will be the basis for termination of this Agreement for cause, in accordance with Section 11.2 hereof, notwithstanding any other provision of this Agreement to the contrary.

**13.2    Assignment.**

    **13.2.1**  Neither Design-Builder nor Owner shall, without the written consent of the other assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents.

**13.3    Successorship.**

    **13.3.1**  Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**13.4    Governing Law.**

    **13.4.1**  The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**13.5    Severability.**

    **13.5.1**  If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**13.6    No Waiver.**

    **13.6.1**  The failure of either Design-Builder or Owner to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**13.7    Headings.**

    **13.7.1**  The headings used in these General Conditions of Contract, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**13.8    Notice.**

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 79 of 122   Document 1

**13.8.1** Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement, or (iii) if transmitted by facsimile, by the time stated in a machine generated confirmation that notice was received at the facsimile number of the intended recipient.

## 13.9 Amendments.

**13.9.1** The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party. Design-Builder specifically acknowledges that Owner's Engineer is not authorized to change, alter or amend the Contract Documents except as may be specifically provided in Section 3.1.1.

## 13.10 Drug-Free Workplace

The Owner is a drug-free workplace employer. Oconee County requires construction contractors to provide a drug-free workplace in the performance of any Owner contract.

In order to be eligible to submit a Bid for an Owner construction contract, a prospective contractor must certify that it will, if awarded the contract, provide a drug-free workplace during the performance of the contract. This requirement is met by:

(A)     notifying employees that the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance is prohibited in the workplace and specifying the actions that will be taken for violations of such prohibition;

(B)     establishing a drug-free awareness program to inform employees about (i) the dangers of drug abuse in the workplace, (ii) the contractor's policy of maintaining a drug-free workplace, (iii) any available drug counseling, rehabilitation, and employee assistance programs, and (iv) the penalties that may be imposed upon employees for drug abuse violations;

(C)     notifying each employee that as a condition of employment, the employee will (i) abide by the terms of the prohibition outlined in (a) above, and (ii) notify the contractor of any criminal drug statute conviction for a violation occurring in the workplace not later than five days after such conviction;

(D)     notifying the Owner within ten days after receiving from an employee a notice of a criminal drug statute conviction or after otherwise receiving actual notice of such conviction;

(E)     imposing a sanction on, or requiring the satisfactory participation in a drug counseling, rehabilitation or abuse program by, an employee convicted of drug crime;

(F)     making a good faith effort to continue to maintain a drug-free workplace for employees; and

(G)     requiring any party to which it subcontracts any portion of the work under the contract to comply with the provisions of (A)–(F).

If the prospective contractor is an individual, the drug-free workplace requirement is met by not engaging in the unlawful manufacture, distribution, dispensation, possession, or use of a controlled

substance in the performance of the contract.

By submitting a bid, a prospective contractor certifies that it will comply with the Owner's drug-free workplace requirement. A false certification or the failure to comply with the above drug-free workplace requirements during the performance of a contract shall be grounds for suspension, termination or debarment.

### 13.11 Design-Builder's Safety Representative

The Design-Builder shall be required to designate a qualified and experienced safety representative for the Project Site. This individual shall be responsible for explaining compliance requirements to the Design-Builder's employees, maintaining and supervising safety precautions and programs, conducting weekly safety inspections of the Site and providing a copy of the report to the Owner.

The Design-Builder shall at all times perform the Work under the Contract Documents in a safe and proper manner and in compliance with all applicable ordinances, statutes, rules and regulations concerning safety, including but not limited to, such applicable statutes, rules and regulations known as or issued pursuant to, the Occupational Safety and Health Act ("OSHA") (hereinafter "Safety Standards"). Without limiting the foregoing in any manner, safety standards concerning trenching and excavation are particularly important. The Design-Builder shall, at its own expense, strictly adhere to all pertinent safety standards, rules and OSHA regulations required or recommended by governmental or quasi- governmental authorities having jurisdiction. The Design-Builder hereby acknowledges that it has its own safety program for all Work covered by or performed under the Contract Documents. The Design-Builder agrees to conduct its own frequent and regular inspections of all Work covered by or performed under the Contract Documents at the Site to verify compliance with the Design-Builder safety program and all applicable Safety Standards. The Design-Builder and the Owner acknowledge and agree that the Owner has no control, responsibility or authority over the Design-Builder or the Design-Builder's employees or Subcontractors with regard to the safety and health conditions or compliance with applicable Safety Standards relating to or arising out of the Design-Builder's Work or the performance of any Work covered by the Contract Documents. The Design-Builder has the sole responsibility and authority for ensuring that any and all hazardous conditions relating to or arising out of the Design-Builder's Work are corrected and for complying with all applicable Safety Standards at all times.

With regard to the Design-Builder's Work or any Work covered by or performed under the Contract Documents, the Owner is not the controlling employer or controlling entity for the purpose of identifying violations or applicable Safety Standards, detecting hazardous conditions or ensuring that hazardous conditions or violations of applicable Safety Standards are corrected.

Without limiting the foregoing, the Owner's Engineer, the Oconee County Utility Department Safety Coordinator or the authorized Inspector(s) may, but is not contractually obligated to, bring Design-Builder violations of the applicable Safety Standards to the attention of the Design-Builder for correction by the Design- Builder. If the Design-Builder fails to correct violations of applicable Safety Standards, the Owner's Engineer or Oconee County Utility Department Safety Coordinator or its authorized Inspector(s) may, but is not contractually obligated to, take such actions as it deems appropriate to notify governmental or quasi-governmental authorities having jurisdiction over the Design-Builder's compliance with applicable Safety Standards. The provisions of this sub-paragraph shall be in addition to, and not in limitation of, other provisions of this contract for the enforcement of the terms of this contract.

The Design-Builder shall notify the Owner and Oconee County Utility Department Engineer, or his/her designee, immediately of any serious accident, injury or fatality.

The Design-Builder shall immediately notify the Owner and Oconee County Utility Department Engineer or his/her designee of any OSHA inspection.

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 81 of 122   Document 1

The Design-Builder shall notify the Owner and Oconee County Utility Department Engineer of any unusual hazards created by the Work or found during construction.

The Design-Builder shall provide to the Owner and Oconee County Utility Department Engineer a copy of all Work permits, if requested. Permits issued will include confined space entry, lockout / tagout, blasting, excavations, etc. The Design-Builder shall provide to the Owner a copy of a written safety program to meet the needs of the job (i.e. hazard communication, excavation, trenching, confined space, etc.). In addition, the Design-Builder will provide the following:

- A copy of their drug and alcohol abuse program,
- Fire protection and emergency evacuation plan,
- Medical services—regarding worker's compensation medical services and first aid on the job site,
- Personal protective equipment (PPE)—determine personal protective equipment needs and documentation of PPE assessment. The Design-Builder shall maintain good housekeeping (i.e. clean work areas, clear access, barricaded dangerous areas).

### 13.12 No Third Party Rights

This Agreement is entered into by and between the parties hereto for their exclusive benefit. The parties do not intend to create or establish by this Agreement any third party beneficiary status or rights, and no such third-party shall be entitled to enforce any right or obligation or enjoy any benefit created or established by this Agreement.

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 82 of 122   Document 1

From: Mica Deerfield <mica.deerfield@gmail.com>
Date: Thu, May 31, 2018 at 1:51 PM
Subject: Project on Hold
To: Mods Container Homes Doug <dlarson@modsinternational.com>, Briggs Noble <bnoble@modsinternational.com>

I have been trying to reach you to discuss putting the project on hold until September and then checking to see where we are with the volcano. Please advise this acceptable to MODS without any financial penalty to me.

Sent from my iPhone

EXHIBIT
C
tabbies

From: Mica Deerfield <mica.deerfield@gmail.com>
Date: Sun, Jun 24, 2018 at 2:56 PM
Subject: Hawaii Project
To: Mods Container Homes Doug <dlarson@modsinternational.com>

Dear Doug,

I am feeling more and more discouraged about the Hawaii project. I am wondering if you are interested in canceling the project? If so can we come to some agreement about a refund of part of the money which I paid you? Please call me on Monday and let me know what you can do for me. Thank you

Mica Sunday Deerfield
Wild Hawaii
808-339-1958

EXHIBIT

D

From: Mica Deerfield <mica.deerfield@gmail.com>
Date: Fri, Aug 10, 2018 at 8:22 PM
Subject: New contract for Hawaii project
To: Doug Larson MODS <dlarson@modsinternational.com>


Hi Doug, Attached please find the contract we signed before, with a new completion date of December 1, 2018. I do not want to proceed with this project unless you can assure me that this date will be met. I need it in writing since the original contract called for substantial completion by June 28, and despite my requests, a revised contract was not sent to me after we discussed a delayed date. I based the 12/1 date on a discussion I had with Briggs Noble today. I hope we can get the project back on track and make it a success!

Thank you,                                              Mica 808-339-1958

EXHIBIT

E

tabbies



# STANDARD FORM OF AGREEMENT BETWEEN OWNER AND DESIGN-BUILDER - LUMP SUM

**Document No. 525**
Second Edition, 2010
© Design-Build Institute of America
Washington, DC



## Design-Build Institute of America - Contract Documents
## LICENSE AGREEMENT

**By using the DBIA Contract Documents, you agree to and are bound by the terms of this License Agreement.**

1. **License.** The Design-Build Institute of America ("DBIA") provides DBIA Contract Documents and licenses their use worldwide. You acknowledge that DBIA Contract Documents are protected by the copyright laws of the United States. You have a limited nonexclusive license to: (a) Use DBIA Contract Documents on any number of machines owned, leased or rented by your company or organization; (b) Use DBIA Contract Documents in printed form for bona fide contract purposes; and (c) Copy DBIA Contract Documents into any machine-readable or printed form for backup or modification purposes in support of your permitted use.

2. **User Responsibility.** You assume sole responsibility for the selection of specific documents or portions thereof to achieve your intended results, and for the installation, use, and results obtained from the DBIA Contract Documents. You acknowledge that you understand that the text of the DBIA Contract Documents has important legal consequences and that consultation with an attorney is recommended with respect to use or modification of the text. You will not represent that any of the contract documents you generate from DBIA Contract Documents are DBIA documents unless (a) the document text is used without alteration or (b) all additions and changes to, and deletions from, the text are clearly shown.

3. **Copies.** You may not use, copy, modify, or transfer DBIA Contract Documents, or any copy, modification or merged portion, in whole or in part, except as expressly provided for in this license. Reproduction of DBIA Contract Documents in printed or machine-readable format for resale or educational purposes is expressly prohibited. You will reproduce and include DBIA's copyright notice on any printed or machine-readable copy, modification, or portion merged into another document or program.

4. **Transfers.** You may not transfer possession of any copy, modification or merged portion of DBIA Contract Documents to another party, except that a party with whom you are contracting may receive and use such transferred material solely for purposes of its contract with you. You may not sublicense, assign, or transfer this license except as expressly provided in this Agreement, and any attempt to do so is void.

5. **Term.** The license is effective for one year from the date of purchase. DBIA may elect to terminate it earlier, by written notice to you, if you fail to comply with any term or condition of this Agreement.

6. **Limited Warranty.** DBIA warrants the electronic files or other media by which DBIA Contract Documents are furnished to be free from defects in materials and workmanship under normal use during the Term. There is no other warranty of any kind, expressed or implied, including, but not limited to the implied warranties of merchantability and fitness for a particular purpose. Some states do not allow the exclusion of implied warranties, so the above exclusion may not apply to you. This warranty gives you specific legal rights and you may also have other rights which vary from state to state. DBIA does not warrant that the DBIA Contract Documents will meet your requirements or that the operation of DBIA Contract Documents will be uninterrupted or error free.

7. **Limitations of Remedies.** DBIA's entire liability and your exclusive remedy shall be: the replacement of any document not meeting DBIA's "Limited Warranty" which is returned to DBIA with a copy of your receipt, or at DBIA's election, your money will be refunded. In no event will DBIA be liable to you for any damages, including any lost profits, lost savings or other incidental or consequential damages arising out of the use or inability to use DBIA Contract Documents even if DBIA has been advised of the possibility of such damages, or for any claim by any other party. Some states do not allow the limitation or exclusion of liability for incidental or consequential damages, so the above limitation or exclusion may not apply to you.

8. **Acknowledgement.** You acknowledge that you have read this agreement, understand it and agree to be bound by its terms and conditions and that it will be governed by the laws of the District of Columbia. You further agree that it is the complete and exclusive statement of your agreement with DBIA which supersedes any proposal or prior agreement, oral or written, and any other communications between the parties relating to the subject matter of this agreement.

# INSTRUCTIONS

For DBIA Document No. 525 Standard Form of Agreement Between Owner and Design-Builder - Lump Sum (2010 Edition)

## Checklist

Use this Checklist to ensure that the Agreement is fully completed and all exhibits are attached.

| | | |
|---|---|---|
| x | Page 1 | Owner's name, address and form of business |
| x | Page 1 | Design-Builder's name, address and form of business |
| x | Page 1 | Project name and address |
| x | Section 2.1.3 | Identify other exhibits to the Agreement |
| x | Section 4.2 | Note the optional provisions that are provided |
| x | Section 4.3.2 | Complete blanks for additional sum for use of Work Product |
| x | Section 5.2.1 | Complete blanks for calendar days and note the optional language that is provided |
| | Section 5.2.2 | Insert any interim milestones (optional) |
| x | Section 5.4 | Complete blanks for liquidated damages and note the optional provisions that are provided |
| x | Section 5.5 | If the parties select the option provided they have to insert an amount |
| x | Section 5.6 | Complete blanks for early completion bonus and note the optional provision that is provided |
| x | Section 5.7 | Note the optional provisions that are provided |
| x | Section 6.1 | Complete blanks for Contract Price |
| x | Section 6.2 | Insert markups for changes and note optional provisions |
| x | Section 6.3.4 | Note the optional provision that is provided |
| x | Section 6.4.1 | Note optional provision |
| x | Section 7.1.1 | Complete blanks for day of month |
| x | Section 7.2.1 | Complete blanks for retention percentage and note optional provision |
| x | Section 7.4 | Complete blanks for interest rate |
| x | Section 8.1.3 | Choose overhead/profit rate for termination for convenience |
| x | Section 8.2.1 | Complete blanks for percentages |
| x | Section 8.2.2 | Complete blanks for percentages |
| | Section 9.1.1 | Insert Owner's Senior Representative's name, etc. (optional) |
| | Section 9.1.2 | Insert Owner's Representative's name, etc. (optional) |
| x | Section 9.2.1 | Insert Design-Builder's Senior Representative's name, etc. (optional) |
| x | Section 9.2.2 | Insert Design-Builder's Representative's name, etc. (optional) |
| | Section 10.1 | Attach Insurance Exhibit |
| | Section 10.2 | Insert amount and conditions of bonds or other security and note the options that are provided |
| | Section 11.1 | Insert any other provisions (optional) |
| x | Last Page | Owner's and Design-Builder's execution of the Agreement |

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 88 of 122    Document 1

# General Instructions

| No. | Subject | Instruction |
|---|---|---|
| 1. | Standard Forms | Standard form contracts have long served an important function in the United States and international construction markets. The common purpose of these forms is to provide an economical and convenient way for parties to contract for design and construction services. As standard forms gain acceptance and are used with increased frequency, parties are able to enter into contracts with greater certainty as to their rights and responsibilities. |
| 2. | DBIA Standard Form Contract Documents | Since its formation in 1993, the Design-Build Institute of America ("DBIA") has regularly evaluated the needs of owners, design-builders, and other parties to the design-build process in preparation for developing its own contract forms. Consistent with DBIA's mission of promulgating best design-build practices, DBIA believes that the design-build contract should reflect a balanced approach to risk that considers the legitimate interests of all parties to the design-build process. DBIA's Standard Form Contract Documents reflect a modern risk allocation approach, allocating each risk to the party best equipped to manage and minimize that risk, with the goal of promoting best design-build practices. |
| 3. | Use of Non-DBIA Documents | To avoid inconsistencies among documents used for the same project, DBIA's Standard Form Contract Documents should not be used in conjunction with non-DBIA documents unless the non-DBIA documents are appropriately modified on the advice of legal counsel. Moreover, care should also be taken when using different editions of the DBIA Standard Form Documents on the same project to ensure consistency. |
| 4. | Legal Consequences | DBIA Standard Form Contract Documents are legally binding contracts with important legal consequences. Contracting parties are advised and encouraged to seek legal counsel in completing or modifying these Documents. |
| 5. | Reproduction | DBIA hereby grants to purchasers a limited license to reproduce its Documents consistent with the License Agreement accompanying these Documents. At least two original versions of the Agreement should be signed by the parties. Any other reproduction of DBIA Documents is strictly prohibited. |
| 6. | Modifications | Effective contracting is accomplished when the parties give specific thought to their contracting goals and then tailor the contract to meet the unique needs of the project and the design-build team. For that reason, these Documents may require modification for various purposes including, for example, to comply with local codes and laws, or to add special terms. DBIA's latest revisions to its Documents provide the parties an opportunity to customize their contractual relationship by selecting various optional contract clauses that may better reflect the unique needs and risks associated with the project.<br><br>Any modifications to these Documents should be initialed by the parties. At no time should a document be re-typed in its entirety. Re-creating the document violates copyright laws and destroys one of the advantages of standard forms-familiarity with the terms. |
| 7. | Execution | It is good practice to execute two original copies of the Agreement. Only persons authorized to sign for the contracting parties may execute the Agreement. |

© 2010 Design-Build Institute of America
Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 89 of 122   Document 1

# Specific Instructions

| Section | Title | Instruction |
|---------|-------|-------------|
| General | Purpose of This Agreement | DBIA Document No. 525 ("Agreement") should be used only when the parties intend that Owner pay Design-Builder a lump sum fixed price for the completion of all design and construction services. There will be greater mutual understanding and cooperation if the lump sum is established based on Owner's Project Criteria that are well defined.<br><br>If there is uncertainty about Owner's Project Criteria, or it remains to be developed by Owner and Design-Builder jointly, a cost-plus/guaranteed maximum price ("GMP") contracting approach may be more suitable. In such case, the parties should use DBIA Document No. 530. |
| General | Purpose of These Instructions | These Instructions are not part of this Agreement, but are provided to aid the parties in their understanding of the Agreement and in completing the Agreement. |
| General | Related Documents | This Agreement shall be used in conjunction with the General Conditions of Contract. Other related Contract Documents are listed in Article 2 of this Agreement. |
| General | Date | On Page 1, enter the date when both parties reach a final understanding. It is possible, due to logistical reasons, that the dates when the parties execute the Agreement may be different. Once both parties execute the Agreement, the effective date of the Agreement will be the date recorded on Page 1. This date does not, however, determine Contract Time, which is measured according to the terms of Article 5. |
| General | Parties: Owner and Design-Builder | On Page, 1 enter the legal name and full address of Owner and Design-Builder, as well as the legal form of each entity, e.g., corporation, partnership, limited partnership, limited liability company, or other. |
| 2.1.2 | Basis of Design Documents | The Basis of Design Documents are critical in establishing the scope of work. These documents include the Owner's Project Criteria, Design-Builder's Proposal, and the Deviation List, if any, contained in the Design-Builder's Proposal. Prior to the execution of this Agreement, Design-Builder will have submitted its Proposal based on Owner's Project Criteria. To avoid ambiguities or conflicts between Owner's Project Criteria and Design-Builder's Proposal, Design-Builder's Proposal shall specifically list any deviations from Owner's Project Criteria. Design-Builder's Deviation List shall, if accepted by Owner, become a Contract Document and shall have precedence over Owner's Project Criteria. |
| 2.1.5 | Construction Documents | After execution of the Agreement, and consistent with the requirements of Section 2.4 of the General Conditions of Contract, Design-Builder will prepare Construction Documents subject to Owner's review and approval. |
| 3.2 | Order of Precedence | The Contract Documents are listed in Section 2.1 in the order of their precedence. This hierarchy of documents reflects DBIA's belief that the Basis of Design Documents are critical documents that take precedence over other Contract Documents existing at the time the Agreement is executed. This section also makes clear that if a Deviation List exists it takes precedence over the Owner's Project Criteria. Moreover, Section 2.1.3 recognizes that there may be other exhibits attached to this Agreement. If this is the case, the parties should discuss whether these exhibits should be part of the Basis of Design Documents. If these exhibits are not made part of the Basis of Design Documents, these exhibits will not take priority over the Basis of Design Documents in the event of a conflict. |
| 3.3 | Definitions | Terms, words and phrases used in the Agreement shall have the same meanings used in the General Conditions of Contract. |

© 2010 Design-Build Institute of America

| Section | Title | Instruction |
|---|---|---|
| 3.4 | Design Specification | The Owner is cautioned that if it includes design specifications in its Project Criteria, there is case law holding that the Design-Builder is entitled to rely on such information, and to the extent such information is not accurate, the Design-Builder will be entitled to an adjustment in the Contract Price and/or Contract Time. Accordingly, the Owner to avoid such potential liability should consider using performance specifications. |
| 4.1 | Work Product | This Agreement provides that the Design-Builder shall retain ownership of the Work Product it produces, but obligates Design-Builder to grant a limited license to Owner to use the Work Product according to the terms and circumstances described in Sections 4.2, 4.3, 4.4 and 4.5. |
| 4.2 | Owner's Limited License Upon Payment in Full | Design-Builder shall grant Owner, at Owner's sole risk, a limited license to use the Work Product at the completion of the Work in connection with Owner's occupation of the Project. This Section also provides the parties with the option of transferring ownership of some or all of the Work Product to the Owner upon payment in full for all Work performed. Generally, where the Owner desires ownership of Work Product, it is sufficient to transfer ownership of unique architectural and design elements. |
| 4.3 | Owner's Limited License Upon Owner's Termination for Convenience or Design-Builder's Election to Terminate | Owner should not use the Termination for Convenience Clause to obtain Design-Builder's valuable design concepts, and then seek lower bids from other design-builders. Therefore, where Owner terminates this Agreement for its convenience, and then decides to complete the Project with its own or third-party forces, Design-Builder shall grant Owner the rights set forth in Section 4.2, provided Owner pays Design-Builder all amounts due Design-Builder as required by the Contract Documents, including paying Design-Builder an additional sum per Section 4.3.2 for the use of the Work Product. In the event Design-Builder elects to terminate this Agreement for cause, for reasons set forth in Section 11.4 of the General Conditions of Contract, these same conditions apply to Owner's use of the Work Product. |
| 4.3.2 | Additional Compensation | To minimize disputes, the parties should negotiate prior to execution of the Agreement the amount Owner shall pay Design-Builder for use of Design-Builder's Work Product in the event Owner terminates this Agreement for its convenience or Design-Builder elects to terminate this Agreement for cause. Enter this amount. |
| 4.4 | Owner's Limited License Upon Design-Builder's Default | If Design-Builder is properly terminated for default, Owner is granted a limited license to use the Work Product, to complete the Project, and Owner shall thereafter have the same rights and obligations as set forth in Section 4.2. |
| 4.5 | Owner's Indemnification for Use of Work Product | Owner's use or alteration of the Work Product shall be at its sole risk, and Owner must agree to defend, indemnify and hold harmless Design-Builder and anyone working by or through Design-Builder, including Design Consultants of any tier. |
| 5.1 | Date of Commencement | Design-Builder's obligation to commence work is triggered by its receipt of a Notice to Proceed unless the parties mutually agree otherwise. |
| 5.2.1 | Substantial Completion of the Entire Work | Enter the calendar days duration by which Substantial Completion has to be achieved. The parties in this Section have the option of modifying the definition of Substantial Completion set forth in the General Conditions of Contract if they want to use a Temporary Certificate of Occupancy as the benchmark. If this option is selected, Substantial Completion will be deemed to be achieved no later than the date a Temporary Certificate of Occupancy is issued if applicable to the Project. |

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 91 of 122   Document 1

| Section | Title | Instruction |
|---------|-------|-------------|
| 5.2.2 | Interim Milestones | It may be that some portions of the Work must be completed in phases or within a prescribed period of time to accommodate Owner's needs. The parties may, at their option, identify these portions of the Work to be completed prior to Substantial Completion of the entire Work. Enter the calendar days, starting from the Date of Commencement, for achieving Substantial Completion of these identified portions of the Work. If these portions of the Work are required to be substantially completed by certain milestone dates, enter those dates. As presently drafted no remedy is provided to the Owner if an interim milestone is not met. If the Owner has special requirements as it relates to interim milestones, the Owner may want to consider a remedy for the Design-Builder's failure to meet an interim milestone, as well as a bonus to the Design-Builder for satisfying such interim milestone. |
| 5.4 | Liquidated Damages | Owner should make a good faith evaluation of the amount that is reasonably necessary to compensate it for delay. Owner should not establish liquidated damages to penalize Design-Builder.<br><br>Section 5.4 establishes a grace period between the Scheduled Substantial Completion Date and the assessment of liquidated damages in order to prevent disputes as to which party bears responsibility for only a few days of delay. The parties should enter the calendar days that may pass following the Scheduled Substantial Completion Date before liquidated damages will be assessed. The parties are also provided the option of establishing liquidated damages if the Design-Builder fails to achieve Final Completion within a specified number of days after Substantial Completion. If this option is selected, the parties have to negotiate the number of days, as well as the liquidated damages amount. The parties in negotiating liquidated damages should keep in mind that the amount of liquidated damages for failing to achieve Final Completion should be a considerably scaled down amount and should reflect the financial harm to the Owner. In no case should the total amount of liquidated damages for the Project exceed an amount that is reasonably necessary to compensate Owner for Project delay.<br><br>The parties also have the option here of eliminating liquidated damages altogether, in which case the Owner can recover actual damages for Project delay at an amount that is capped by the parties. The Owner is cautioned that even if this option for actual damages is selected it still cannot recover consequential damages, as these are waived under Section 10.5.1 of the General Conditions of Contract. |
| 5.5 | Liquidated Damages Cap | The parties can agree to cap liquidated damages for delay at a negotiated amount. |
| 5.6 | Early Completion Bonus | If the Project economics justify liquidated damages, then it is appropriate to couple these liquidated damages with an early completion bonus. The parties should enter the number of calendar days prior to the Scheduled Substantial Completion Date that will set the Bonus Date. Also, enter the amount of the bonus to be paid per day that will allow Owner to share with Design-Builder the economic benefits of early completion. The parties also have the option in Section 5.6 of capping the early completion bonus at a negotiated amount. |
| 5.7 | Compensation for Force Majeure Events | The parties are provided the opportunity of providing the Design-Builder the right to receive compensation for Force Majeure Events. By selecting this option, the parties agree to modify Section 8.2.2 of the General Conditions of Contract, in which case the parties have to negotiate how many cumulative days of Force Majeure delays must occur before the Design-Builder is entitled to either a negotiated amount per day for delay or the direct costs it has incurred as a result of such delay. |
| 6.1 | Contract Price | Enter the lump sum price Owner will pay Design-Builder for the Scope of Work. The Contract Price should compensate Design-Builder for the services it provides and the risk it assumes in providing single point responsibility to Owner. |

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 92 of 122   Document 1

| Section | Title | Instruction |
|---------|-------|-------------|
| 6.2 | Markups for Changes | Enter the markups agreed upon by Design-Builder and Owner to be used for pricing Changes to the Work. Prior to negotiating or agreeing to these markups, both parties should familiarize themselves with Article 9 of the General Conditions of Contract, Changes to the Contract Price and Time. For additive Change Orders, the parties have to negotiate the Fee the Design-Builder will receive. For deductive Change Orders, parties have the option by checking the appropriate box of whether there will be no additional reduction or whether there will be an additional reduction based on a negotiated percentage. |
| 6.3.4 | Allowance Value | This section recognizes that the parties may agree that certain items of Work should be treated as an Allowance Item and priced based on Allowance Values. The Allowance Value for which the Design-Builder will be entitled to receive compensation includes direct cost of labor, materials, equipment, transportation, taxes and insurance associated with the Allowance Item. All other costs associated with the Allowance Item, such as design fees, general conditions costs and fee, are deemed to be included in the Contract Price. However, the parties agree that in the event the actual cost of the Allowance Item is greater than or less than the Allowance Value by a negotiated percentage, then Design-Builder's right to Fee and markup shall be determined pursuant to Section 6.2. |
| 6.4 | Performance Incentives | There may be performance incentives that will influence Project success. Such incentives may include award fees tied to the Design-Builder achieving certain standards relative to client satisfaction, safety, and personnel retention. The parties are encouraged to discuss the use of such incentives during negotiation of this Agreement. Any agreement on the use of incentives should be set forth in an exhibit attached to this Agreement. |
| 7.1.1 | Progress Payments | Enter the day of the month when Design-Builder shall submit its Application for Payment. |
| 7.2.1 | Retainage | Enter the percentage Owner will retain from Progress Payments to Design-Builder until fifty percent (50%) of the Work is completed. Owner should recognize that it creates undue hardship to hold retainage on Subcontractors that have completed their work early in the Project. Owner should accordingly consider releasing retainage on Subcontractors that complete work early in the Project, providing that these Subcontractors have satisfactorily performed their portion of the Work.<br><br>The parties are provided the option of modifying the retainage provision by checking the box. This option excludes from retainage the Design-Builder's General Conditions costs and amounts paid to Design-Builder's Design Consultant. The rationale for selecting this option is that the Design-Builder is obligated to pay its General Conditions costs in full each month and that under the design-bid-build delivery method, the Owner typically does not retain sums from its designer. |
| 7.4 | Interest | The parties should enter the rate at which interest will accrue on Design-Builder's payments if unpaid five (5) days after due. Late payment creates a hardship for Design-Builder, its Design Consultants and Subcontractors. |
| 7.5 | Record Keeping | The Owner is provided access to Design-Builder's accounting information as it relates to changes of the Work. However, if the parties have agreed to multipliers or markups for changes, the time to challenge and negotiate those percentages is at the time the parties execute the Agreement and not during the Project or after it has been completed. Accordingly, the Owner can at any time audit these percentages only to confirm that such percentage has been properly charged and not to challenge the composition of such percentage. |

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 93 of 122   Document 1

| Section | Title | Instruction |
|---------|-------|-------------|
| 8.1.3 | Termination for Convenience: Overhead and Profit | The parties should choose prior to execution of the Agreement the method that will be used to determine overhead and profit paid to Design-Builder in the event Owner terminates Design-Builder for its convenience. The parties may choose to set percentage rates for overhead and profit prior to execution of the Agreement, or may choose to determine reasonable sums to be paid for overhead and profit at the time of the termination. If the parties choose to set overhead and profit rates prior to execution of the Agreement, the percentages should be entered in Section 8.1.3. |
| 8.2 | Termination for Convenience: Additional Payments | Although it is important for Owner to have a process for terminating this Agreement for convenience, the process must consider the interests of Design-Builder. If Owner terminates this Agreement for its own convenience, compensating Design-Builder for its costs will not be adequate because Design-Builder will have committed its resources for a small amount of revenue. Therefore, in addition to the overhead and profit paid in Section 8.1, Owner shall pay Design-Builder an additional sum, calculated as a percentage of the remaining balance of the Contract Price. Enter the percentages Owner shall pay Design-Builder if Owner terminates this Agreement for its own convenience prior to or after the start of construction. |
| 8.3 | Termination for Convenience: Owner's Use of Work Product | Owner should not use the Termination for Convenience clause to obtain Design-Builder's valuable design concepts and then seek lower bids from another design-builder. If Owner terminates this Agreement for its own convenience, and chooses to proceed with the Project using Design-Builder's Work Product, Owner should pay an additional sum for the use of Design-Builder's Work Product pursuant to Section 4.3. |
| Article 9 | Representatives of the Parties | Enter the name, title, address and telephone number of Owner's Senior Representative and Owner's Representative at Sections 9.1.1 and 9.1.2, respectively.<br><br>Enter the name, title, address and telephone number of Design-Builder's Senior Representative and Design-Builder's Representative at Sections 9.2.1 and 9.2.2, respectively.<br><br>The parties can elect to establish Representatives during the performance of the Project rather than at the time of execution of this Agreement. If Representatives are identified after execution of the Agreement, an appropriate amendment should be made to the Agreement at the time these individuals are designated. |
| 10.1 | Insurance | Attach an Insurance Exhibit setting forth in detail the insurance coverages required for the Project. Parties are advised to familiarize themselves with the terms of Article 5 of the General Conditions of Contract, Insurance and Bonds, and to consult their insurance advisor. |
| 10.2 | Bonds | Enter the type and amount of bonds or other performance security required for the Project. Where bonding is not required by statute, Owner may want to evaluate the project risks versus the bonding costs in deciding what type of performance security to require. |
| 11.1 | Other Provisions | Insert any other provisions. For example, the parties may elect to have disputes resolved through litigation rather than arbitration in which case the optional language in this Section should be included. |

Case 1:15-cv-00079-WCG   Filed 01/14/19   Page 94 of 122   Document 1

# TABLE OF CONTENTS

**Article    Name    Page**

Article 1   Scope of Work .......................................................................................4

Article 2   Contract Documents .......................................................................................4

Article 3   Interpretation and Intent.......................................................................................4

Article 4   Ownership of Work Product .......................................................................................5

Article 5   Contract Time .......................................................................................6

Article 6   Contract Price .......................................................................................7

Article 7   Procedure for Payment .......................................................................................9

Article 8   Termination for Convenience.......................................................................................10

Article 9    Representative of the Parties.......................................................................................11

Article 10  Bonds and Insurance .......................................................................................11

Article 11  Other Provisions .......................................................................................12



# Standard Form of Agreement Between Owner and Design-Builder - Lump Sum

*This document has important legal consequences. Consultation with
an attorney is recommended with respect to its completion or modification.*

This **AGREEMENT** is made as of the _____10th_____ day of _February_____ in the year 2018, as amended August 10, 2018, by and between the following parties, for services in connection with the Project identified below.

## OWNER:
*(Name and address)*

> Mica Deerfield
> 19115 Mossy Hedge Lane
> Katy, Texas 77449
> 808-339-1958
> mica.deerfield@gmail.com

## DESIGN-BUILDER:
*(Name and address)*

> MODS International, Inc.
> 5523 West Integrity Way
> Appleton, WI 54913
> 800-869-1277 Main Office
> 920-574-0215 Cell phone for Douglas Larson
> dlarson@modsinternational.com

## PROJECT:
*(Include Project name and location as it will appear in the Contract Documents)*

> **Four New Container Residences** located at 14-3734 Government Beach Road
> Pahoa, Hawaii
> New Building Lot

Case 1.19-cv-00079-WCG    Filed 01/14/19    Page 96 of 122    Document 1

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

Weekly updates to the Project Plan in Excel format provided to Owner.
Architectural design including engineering with wet stamped plans
Design based on owner drawing as previously discussed
8 New Shipping containers 20'x8'x9'-6" giving you a clear height of 9' inside 16'x20' foot print each unit
Structural steel welded in place as designed by our structural engineer
Concrete foundation using piers with steel plate embedded in top
Excavation for piers and minor site grading
Containers welded to steel plates in piers
Landscape by others
Transportation from factory to your building location
Crane or all terrain forklift for placement on piers
Tapered foam insulated roof panels
White rubber membrane roof system
New Excel 10 wind turbine with tower installed
48"x48" sliding windows on side walls
15' curtain wall windows on front of units as previously shown with screens and inserted mini-blinds
Smoothed edges on discarded metal glass protectors
Stealth metal panels with color choice
½" reveal between panels
Interior walls framed with 2x4" wood studs
Foam insulation
5/8" type X fire rated drywall with knockdown finish
Primed and painted with two coats of paint, colors to be determined
Interior metal ceiling to be painted per your choice of colors
9' clear height ceiling level for maximum height
Interior doors pre-hung with solid panel core
Door hardware to be selected
50amp electrical service with electrical design per code
Interior wall sconce lights and ceiling lights as needed using low voltage LED
Ceiling fans (3) per unit
Exterior lights
CAT5 cables for TV and internet pre-wired
Plumbing design
Septic System
Bathroom with Kohler or equal fixtures
Water Catchment System
Shower module with mixer and hand wand
Mirror, medicine cabinet, all towel bars and paper holders (finish to be determined)
Three units have kitchen cabinets, upper and lower with sink
Corian counter tops with over 100 color selections
Appliances by owner
One unit has lower cabinets and space for minifridge (furnished by MODS)
Flooring to be Armstrong lux vinyl wood grain or carpet tiles (to be determined)
Hard tiles in bathroom (Ceramic or equal)
Single Wind Turbine
HVAC using Mitsubishi Mini-split system with remote control
Project supervision on site by MODS staff
Project manager and interior designer assigned to project

Final cleaning before turn over to owner
Project warranty of one full year from date of turn over


Price Breakdown


Each Unit          $45,000 with stealth panels
Transportation      4,390 Each unit
Single Wind Turbine 4,000 Each unit      (The Turbine is $16,000/4 Units lowers the overall price)

**Total Investment   $53,390 Each x 4 units equals $213,560**


**Payment Schedule:**

50%  Due at contract execution     $106,780

25%  Due when building components are ready to ship from factory to your building site.   $53,390

25%  Due at completion and units are ready to move in to.   $53,390

## Article 1

### Scope of Work

**1.1** Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

## Article 2

### Contract Documents

**2.1** The Contract Documents are comprised of the following:

**2.1.1** All written modifications, amendments, minor changes and Change Orders to this Agreement issued in accordance with DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (2010 Edition) ("General Conditions of Contract");

**2.1.2** The Basis of Design Documents, including the Owner's Project Criteria, Design-Builder's Proposal and the Deviation List, if any, contained in the Design-Builder's Proposal, which shall specifically identify any and all deviations from Owner's Project Criteria;

**2.1.3** This Agreement, including all exhibits and attachments, executed by Owner and Design-Builder (List for example, performance standard requirements, performance incentive requirements, markup exhibits, allowances, or unit prices);

**2.1.4** The General Conditions of Contract; and

**2.1.5** Construction Documents prepared and approved in accordance with Section 2.4 of the General Conditions of Contract.

## Article 3

### Interpretation and Intent

**3.1** Design-Builder and Owner, prior to execution of the Agreement, shall carefully review all the Contract Documents, including the various documents comprising the Basis of Design Documents, for any conflicts or ambiguities. Design-Builder and Owner will discuss and resolve any identified conflicts or ambiguities prior to execution of the Agreement.

**3.2** The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event inconsistencies, conflicts, or ambiguities between or among the Contract Documents are discovered after execution of the Agreement, Design-Builder and Owner shall attempt to resolve any ambiguity, conflict or inconsistency informally, recognizing that the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof. Conflicts existing within Section 2.1.2 shall be resolved by giving precedence first to the Deviation List, if any, then the Owner's Project Criteria, and then the Design-Builder's Proposal.

**3.3** Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

**3.4** If Owner's Project Criteria contain design specifications: (a) Design-Builder shall be entitled to reasonably rely on the accuracy of the information represented in such design specifications and their

compatibility with other information set forth in Owner's Project Criteria, including any performance specifications; and (b) Design-Builder shall be entitled to an adjustment in the Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by such inaccurate design specification.

**3.5** The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

# Article 4

## Ownership of Work Product

**4.1** **Work Product.** All drawings, specifications and other documents and electronic data, including such documents identified in the General Conditions of Contract, furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service and Design-Builder shall retain the ownership and property interests therein, including but not limited to any intellectual property rights, copyrights and/or patents, subject to the provisions set forth in Sections 4.2 through 4.5 below.

**4.2** **Owner's Limited License Upon Project Completion and Payment in Full to Design-Builder.** Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's occupancy of the Project, conditioned on Owner's express understanding that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below.

*[At the parties' option, one of the following may be used in lieu of Section 4.2]:*

☐ Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder: (a) grants Owner a limited license to use the Work Product in connection with Owner's occupancy of the Project; and (b) transfers all ownership and property interests, including but not limited to any intellectual property rights, copyrights and/or patents, in that portion of the Work Product that consists of architectural and other design elements and specifications that are unique to the Project. The parties shall specifically designate those portions of the Work Product for which ownership in the Work Product shall be transferred. Such grant and transfer are conditioned on Owner's express understanding that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below.

or

☒ Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder transfers to Owner all ownership and property interests, including but not limited to any intellectual property rights, copyrights and/or patents, in the Work Product. Such transfer is conditioned on Owner's express understanding that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligations to provide the indemnity set forth in Section 4.5 below.

**4.3** **Owner's Limited License upon Owner's Termination for Convenience or Design-Builder's Election to Terminate.** If Owner terminates this Agreement for its convenience as set forth in Article 8 hereof,

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 100 of 122   Document 1

or if Design-Builder elects to terminate this Agreement in accordance with Section 11.4 of the General Conditions of Contract, Design-Builder shall, upon Owner's payment in full of the amounts due Design-Builder under the Contract Documents, grant Owner a limited license to use the Work Product to complete the Project and subsequently occupy the Project, and Owner shall thereafter have the same rights as set forth in Section 4.2 above, conditioned on the following:

**4.3.1** Use of the Work Product is at Owner's sole risk without liability or legal exposure to any Indemnified Party and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below; and

**4.3.2** Owner agrees to pay Design-Builder the additional sum of thirty-five thousand Dollars ($ 35,000) as compensation for the right to use the Work Product to complete the Project and subsequently use the work Product in accordance with Section 4.2 if Owner resumes the Project through its employees, agents, or third parties.

**4.4** **Owner's Limited License upon Design-Builder's Default.** If this Agreement is terminated due to Design-Builder's default pursuant to Section 11.2 of the General Conditions of Contract, then Design-Builder grants Owner a limited license to use the Work Product to complete the Project and subsequently occupy the Project, and Owner shall thereafter have the same rights and obligations as set forth in Section 4.2 above. Notwithstanding the preceding sentence, if it is ultimately determined that Design-Builder was not in default, Owner shall be deemed to have terminated the Agreement for convenience, and Design-Builder shall be entitled to the rights and remedies set forth in Section 4.3 above.

**4.5** **Owner's Indemnification for Use of Work Product.** If Owner is required to indemnify any Indemnified Parties based on the use or alteration of the Work Product under any of the circumstances identified in this Article 4, Owner shall defend, indemnify and hold harmless such Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the use or alteration of the Work Product.

# Article 5

## Contract Time

**5.1** **Date of Commencement.** The Work shall commence within five (5) days of Design-Builder's receipt of Owner's signed contract ("Date of Commencement") unless the parties mutually agree otherwise in writing.

**5.2** **Substantial Completion and Final Completion.**

**5.2.1** Substantial Completion of the entire Work shall be achieved no later than one hundred twenty (_____90_____) calendar days after the Date of Commencement ("Scheduled Substantial Completion Date").

*[At the parties' option, the following supplemental language may be inserted at the end of Section 5.2.1. if the Project is subject to a Temporary Certificate of Occupancy]*

☒ The parties agree that the definition for Substantial Completion set forth in Section 1.2.18 of the General Conditions of Contract is hereby modified to read as follows:

"*Substantial Completion* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and use the Project or a portion thereof for its intended purposes, provided, however, that Substantial Completion shall be deemed to have been achieved no later than the date of issuance of a Temporary Certificate of Occupancy issued by the local building official."

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 101 of 122   Document 1

**5.2.2**　Interim milestones and/or Substantial Completion of identified portions of the Work ("Scheduled Interim Milestone Dates") shall be achieved as follows: *(Insert any interim milestones for portions of the Work with different scheduled dates for Substantial Completion)*

**5.2.3**　Final Completion of the Work or identified portions of the Work shall be achieved as expeditiously as reasonably practicable. Final Completion is the date when all Work is complete pursuant to the definition of Final Completion set forth in Section 1.2.7 of the General Conditions of Contract.

**5.2.4**　All of the dates set forth in this Article 5 (collectively the "Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract.

**5.3**　**Time is of the Essence.** Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

# Article 6

## Contract Price

**6.1**　**Contract Price.** Owner shall pay Design-Builder in accordance with Article 6 of the General Conditions of Contract the sum of _____ two hundred thirteen thousand, five hundred sixty _____ Dollars (\$ 213,560) ("Contract Price"), subject to adjustments made in accordance with the General Conditions of Contract. Unless otherwise provided in the Contract Documents, the Contract Price is deemed to include all sales, use, consumer and other taxes mandated by applicable Legal Requirements.

**6.2**　**Markups for Changes.** If the Contract Price requires an adjustment due to changes in the Work, and the cost of such changes is determined under Sections 9.4.1.3 or 9.4.1.4 of the General Conditions of Contract, the following markups shall be allowed on such changes:

**6.2.1**　For additive Change Orders, including additive Change Orders arising from both additive and deductive items, it is agreed that Design-Builder shall receive a Fee of fifteen _____ _____ percent ( ___15___ %) of the additional costs incurred for that Change Order, plus any other markups set forth at Exhibit  hereto.

**6.2.2**　For deductive Change Orders, including deductive Change Orders arising from both additive and deductive items, the deductive amounts shall include:

*[Check one box only]*

☐　　No additional reduction to account for Design-Builder's Fee or any other markup.

or

Case 1:19-cv-00079-WCG　　Filed 01/14/19　　Page 102 of 122　　Document 1

☒     An amount equal to the sum of: (a) fifteen_____
percent    (____15____%) applied to the direct costs of the net reduction (which amount will
account for a reduction associated with Design-Builder's Fee); plus (b) any other markups set
forth at Exhibit   hereto applied to the direct costs of the net reduction.

## 6.3    Allowance Items and Allowance Values.

**6.3.1**    Any and all Allowance Items, as well as their corresponding Allowance Values, are set forth in
an Exhibit hereto.

**6.3.2**    Design-Builder and Owner have worked together to review the Allowance Items and
Allowance Values based on design information then available to determine that the Allowance Values
constitute reasonable estimates for the Allowance Items. Design-Builder and Owner will continue
working closely together during the preparation of the design to develop Construction Documents
consistent with the Allowance Values. Nothing herein is intended in any way to constitute a guarantee
by Design-Builder that the Allowance Item in question can be performed for the Allowance Value.

**6.3.3**    No work shall be performed on any Allowance Item without Design-Builder first obtaining in
writing advanced authorization to proceed from Owner. Owner agrees that if Design-Builder is not
provided written authorization to proceed on an Allowance Item by the date set forth in the Project
schedule, due to no fault of Design-Builder, Design-Builder may be entitled to an adjustment of the
Contract Time(s) and Contract Price.

**6.3.4**    The Allowance Value for an Allowance Item includes the direct cost of labor, materials,
equipment, transportation, taxes and insurance associated with the applicable Allowance Item. All
other costs, including design fees, Design-Builder's overall project management and general
conditions costs, overhead and fee, are deemed to be included in the original Contract Price, and are
not subject to adjustment, regardless of the actual amount of the Allowance Item.

*[In the alternative, the parties may want to delete Section 6.3.4 and add the following
provision.]*

☐     In the event the actual direct cost of labor, materials, equipment, transportation, taxes and
insurance associated with an Allowance Item is fifteen percent (15%) greater than or less than the
Allowance Value for such Allowance Item, Design-Builder and Owner agree that Design-Builder's right
to Fee and markup shall be adjusted in accordance with Section 6.2.

**6.3.5**    Whenever the actual costs for an Allowance Item is more than or less than the stated
Allowance Value, the Contract Price shall be adjusted accordingly by Change Order, subject to
Section 6.3.4. The amount of the Change Order shall reflect the difference between actual costs
incurred by Design-Builder for the particular Allowance Item and the Allowance Value.

## 6.4    Performance Incentives.

**6.4.1**    Owner and Design-Builder have agreed to the performance incentive arrangements set forth
in Exhibit _____N/A_____.

*[The parties are encouraged to discuss and agree upon performance incentives that will influence project success. These
incentives may consist of Award Fees, incentives for safety, personnel retention, client satisfaction and similar items.]*

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 103 of 122    Document 1

# Article 7

## Procedure for Payment

**7.1** **Progress Payments.**

See Payment Schedule above.

**7.2** **Retainage on Progress Payments.**

**7.2.1** Owner will retain _____zero_____ percent (_____0_____%) of each Application for Payment provided, however, that when fifty percent (50%) of the Work has been satisfactorily completed by Design-Builder and Design-Builder is otherwise in compliance with its contractual obligations, Owner will not retain any additional retention amounts from Design-Builder's subsequent Applications for Payment. Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project.

*[Design-Builder and Owner may want to consider substituting the following retainage provision.]*

☐ Owner will retain _____zero_____ percent (_____0_____%) from Design-Builder's Applications for Payment, exclusive of general conditions costs, and any amounts paid to Design-Builder's Design Consultant, from each Application for Payment provided, however, that when fifty percent (50%) of the Work has been satisfactorily completed by Design-Builder and Design-Builder is otherwise in compliance with its contractual obligations, Owner will not retain any additional amounts from Design-Builder's subsequent Applications for Payment. Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project.

**7.2.2** Within fifteen (15) days after Substantial Completion of the entire Work or, if applicable, any portion of the Work, pursuant to Section 6.6 of the General Conditions of Contract, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work or completed portion of the Work, less an amount equal to (a) the reasonable value of all remaining or incomplete items of Work as noted in the Certificate of Substantial Completion and (b) all other amounts Owner is entitled to withhold pursuant to Section 6.3 of the General Conditions of Contract.

**7.3** **Final Payment.** Design-Builder shall submit its Final Application for Payment to Owner in accordance with Section 6.7 of the General Conditions of Contract. Owner shall make payment on Design-Builder's properly submitted and accurate Final Application for Payment within thirty (30) days after Owner's receipt of the Final Application for Payment, provided that Design-Builder has satisfied the requirements for final payment set forth in Section 6.7.2 of the General Conditions of Contract.

**7.4** **Interest.** Payments due and unpaid by Owner to Design-Builder, whether progress payments or final payment, shall bear interest commencing five (5) days after payment is due at the rate of _six_____ percent (_____6_____%) per month until paid.

**7.5** **Record Keeping and Finance Controls.** With respect to changes in the Work performed on a cost basis by Design-Builder pursuant to the Contract Documents, Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after Final Payment, Owner and Owner's accountants shall be afforded access to, and the right to audit from time-to-time, upon reasonable notice, Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to changes in the Work performed on a cost basis in accordance with the Contract Documents, all of which Design-Builder shall preserve for a period of

three (3) years after Final Payment. Such inspection shall take place at Design-Builder's offices during normal business hours unless another location and time is agreed to by the parties. Any multipliers or markups agreed to by the Owner and Design-Builder as part of this Agreement are only subject to audit to confirm that such multiplier or markup has been charged in accordance with this Agreement, with the composition of such multiplier or markup not being subject to audit.

# Article 8

## Termination for Convenience

**8.1**    Upon ten (10) days' written notice to Design-Builder, Owner may, for its convenience and without cause, elect to terminate this Agreement. In such event, Owner shall pay Design-Builder for the following:

    **8.1.1**    All Work executed and for proven loss, cost or expense in connection with the Work;

    **8.1.2**    The reasonable costs and expenses attributable to such termination, including demobilization costs and amounts due in settlement of terminated contracts with Subcontractors and Design Consultants; and

    **8.1.3**    *(Choose one of the following:)*

    ☐ The fair and reasonable sums for overhead and profit on the sum of items 8.1.1 and 8.1.2 above.

or

    ☒ Overhead and profit in the amount of <u>twenty</u> percent (<u>    20    </u>%) on the sum of items 8.1.1 and 8.1.2 above.

**8.2**    In addition to the amounts set forth in Section 8.1 above, Design-Builder shall be entitled to receive one of the following as applicable:

    **8.2.1**    If Owner terminates this Agreement prior to commencement of construction, Design-Builder shall be paid <u>   twenty five   </u> percent (<u>    25    </u>%) of the remaining balance of the Contract Price.

    **8.2.2**    If Owner terminates this Agreement after commencement of construction, Design-Builder shall be paid _____ percent (_____%) of the remaining balance of the Contract Price.

**8.3**    If Owner terminates this Agreement pursuant to Section 8.1 above and proceeds to design and construct the Project through its employees, agents or third parties, Owner's rights to use the Work Product shall be as set forth in Section 4.3 hereof. Such rights may not be transferred or assigned to others without Design-Builder's express written consent and such third parties' agreement to the terms of Article 4.

*[The following Article 9 should be used only if the Owner and Design-Builder agree to establish their respective representatives at the time the Agreement is executed rather than during the performance of the Project.]*

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 105 of 122    Document 1

# Article 9

## Representatives of the Parties

**9.1**    **Owner's Representatives.**

**9.1.1**    Owner designates the individual listed below as its Senior Representative ("Owner's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

**9.1.2**    Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

**9.2**    **Design-Builder's Representatives.**

**9.2.1**    Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Dick Vock, Project Manager above address with mobile number of 314-406-4350

**9.2.2**    Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Same as above

# Article 10

## Bonds and Insurance

**10.1**    **Insurance.** Design-Builder and Owner shall procure the insurance coverages set forth in the Insurance Exhibit attached hereto and in accordance with Article 5 of the General Conditions of Contract.

**10.2**    **Bonds and Other Performance Security.** Design-Builder shall provide the following performance bond and labor and material payment bond or other performance security:

Case 1:19-cv-00079-WCG   Filed 01/14/19   Page 106 of 122   Document 1

*[Check one box only. If no box is checked, then no bond is required.]*

☐ Required       ☒ Not Required

**Payment Bond.**

*[Check one box only. If no box is checked, then no bond is required.]*

☐ Required       ☒ Not Required

**Other Performance Security.**

*[Check one box only. If no box is checked, then no other performance security is required. If the "Required" box is checked, identify below the specific performance security that is being required and all salient commercial terms associated with that security.]*

☐ Required       ☒ Not Required


# Article 11

## Other Provisions

11.1     **Other provisions, if any, are as follows:** *(Insert any additional provisions)*




*[Section 2.3.1 of the General Conditions of Contract sets forth a traditional negligence standard as it relates to the Design-Builder's performance of design professional services. If the Basis of Design Documents identify specific performance standards that can be objectively measured, the parties, by including the following language, agree that the Design-Builder is obligated to achieve such standards.]*


☒      Notwithstanding Section 2.3.1 of the General Conditions of Contract, if the parties agree upon specific performance standards in the Basis of Design Documents, the design professional services shall be performed to achieve such standards.


*[In lieu of Sections 10.3.1 through 10.3.3 of the General Conditions of Contract, the parties may want to delete such sections and include the following alternative dispute resolution clause.]*

XX    Any claims, disputes, or controversies between the parties arising out of or related to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 of the General Conditions of Contract shall be resolved in mediation or arbitration in the State of Wisconsin.  Both parties agree to non-court settlement.

Case 1:19-cv-00079-WCG    Filed 01/14/19    Page 108 of 122    Document 1

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**

Mica Deerfield
*(Name of Owner)*

*Mica Deerfield*

*(Signature)*

Mica Deerfield
*(Printed Name)*

Owner
*(Title)*

Date: _____

**DESIGN-BUILDER:**

MODS International, Inc.
*(Name of Design-Builder)*

*Douglas Larson*

*(Signature)*

Douglas Larson
*(Printed Name)*

President
*(Title)*

Date: ___ February 10, 2018

**Caution: You should sign an original DBIA document which has this caution printed in blue. An original assures that changes will not be obscured as may occur when documents are reproduced.**

From: Mica Deerfield <mica.deerfield@gmail.com>
Date: Tue, Aug 21, 2018 at 12:14 PM
Subject: Contract for Hawaii project
To: Mods Container Homes Doug <dlarson@modsinternational.com>
Cc: Briggs Noble <bnoble@modsinternational.com>

In accordance with our current contract, I'm hereby stating that I would like to proceed with the contract. I prefer a substantially completion date of December 1, however, the contract calls for 120 days which would be January 1, 2019. Please begin work and keep me informed as to our status. Thank you.

Mica Sunday Deerfield
Wild Hawaii
808-339-1958

EXHIBIT

F

tabbies®

>> From: Mica Deerfield <mica.deerfield@gmail.com>
>> Sent: Monday, August 27, 2018 2:49 PM
>> To: Doug Larson MODS <dlarson@modsinternational.com>
>> Subject: Hawaii Project
>>
>> Hi Doug, I haven't heard back from you about getting my project started again. Please let me know what is our status. I tried calling Briggs but he said he had not heard from you about it restarting. Thank you very much.
>>
>> Mica Sunday Deerfield
>> Wild Hawaii
>> 808-339-1958

EXHIBIT

G

tabbies

>> On Aug 27, 2018, at 3:07 PM, Doug Larson MODS <dlarson@modsinternational.com>
wrote:
>>
>> Good afternoon Mica,
>>
>> We received your request to re-start the project with a completion of December for the 4
small units in Hawaii.
>>
>> This is all dependent on the volcano and being allowed to work on the island. In the
meantime, you filed a complaint with the State of Wisconsin Consumer protection. I assume you
will withdraw this otherwise our lawyer will file a counterclaim.
>>
>> Thanks,
>>
>>
>>
>>
>>
>> Douglas Larson
>> President
>>
>> www.modsinternational.com
>> 5523 Integrity Way
>> Appleton, WI 54913
>> 800-869-1277 Phone
>> 920-574-0215 Cell
>> 920-560-4850 Fax

EXHIBIT

tabbies

H

> From: Mica Deerfield <mica.deerfield@gmail.com>
> Sent: Tuesday, August 28, 2018 1:21 PM
> To: Doug Larson MODS <dlarson@modsinternational.com>
> Subject: Re: Hawaii Project
>
> I will withdraw my complaint assuming we get this project started and you send me back the contract with the new completion date. Thank you.
>
> Mica Sunday Deerfield
> Wild Hawaii
> 808-339-1958

EXHIBIT
I
tabbies

> On Aug 28, 2018, at 1:23 PM, Doug Larson MODS <dlarson@modsinternational.com> wrote:
>
> Will do
>
>
>
> Douglas Larson
> President
>
> www.modsinternational.com
> 5523 Integrity Way
> Appleton, WI 54913
> 800-869-1277 Phone
> 920-574-0215 Cell
> 920-560-4850 Fax

EXHIBIT
J
tabbies

From: Mica Deerfield <mica.deerfield@gmail.com>
Date: Thu, Sep 6, 2018 at 8:01 AM
Subject: Re: Hawaii Project
To: Doug Larson MODS <dlarson@modsinternational.com>


Need contract back.  Please sign and return. Thank you!

EXHIBIT

K

tabbies

From: Mica Deerfield <mica.deerfield@gmail.com>
Date: Sat, Sep 15, 2018 at 10:16 AM
Subject: Contract for Hawaii Project
To: Mods Container Homes Doug <dlarson@modsinternational.com>
Cc: Briggs Noble <bnoble@modsinternational.com>


Please send the signed contract to me forthwith so that we can move forward and make our agreed to date of Dec. 1, 2018. The volcano has calmed down and should not cause us any trouble.

Mica Sunday Deerfield
Wild Hawaii
808-339-1958

EXHIBIT

L

tabbies®

From: Mica Deerfield <mdeerfie@juno.com>
Date: Tue, Oct 2, 2018 at 8:47 PM
Subject: Hawaii Project
To: Mods Container Homes Doug <dlarson@modsinternational.com>, Briggs Noble
<bnoble@modsinternational.com>


I have not heard from you regarding the contract, the site plan and surveyor, or permit
application for my homes. With a December 1 completion date, there is not a lot of time to get
everything done. Please advise what is the status. You also told me you would send me a Excel
format of the project plan so that I would know what was going on, but to date I have not
received that either. Thank you, Mica

Mica Sunday Deerfield
Wild Hawaii
808-339-1958

EXHIBIT

M

tabbies

From: Mica Deerfield <mdeerfie@juno.com>
Date: Fri, Oct 12, 2018 at 5:38 PM
Subject: Hawaii project - please respond ASAP
To: Mods Container Homes Doug <dlarson@modsinternational.com>, Briggs Noble
<bnoble@modsinternational.com>


 Hi Doug, you said you were sending back my contract but I haven't received it. Please send it
and make sure it has the new date December one on it for substantial completion. Thank you. So

Mica Sunday Deerfield
Wild Hawaii
808-339-1958

EXHIBIT
N

From: Mica Deerfield <mdeerfie@juno.com>
Date: Tue, Oct 23, 2018 at 5:15 PM
Subject: December one is fast upon us
To: Mods Container Homes Doug <dlarson@modsinternational.com>


Doug, you have agreed to a December 1 substantial completion date, yet I am not aware of anything going on there. What is the status? And you promised me a contract, which I never received. Please advise!

Mica Sunday Deerfield
Wild Hawaii
808-339-1958

EXHIBIT

tabbies

Mica S. Deerfield
19918 Hoppers Creek Dr.
Katy, TX 77449

October 27, 2018

Douglas Larson, President
MODS International, Inc.
5523 W. Integrity Way
Appleton, WI 54913

Dear Sir:

On February 10, 2018, we entered into a contract to build four units on my property in Pahoa, Hawaii.

The contract specified a substantial completion date of 120 days from then, or June 10, 2018. No written modifications or amendments to the contract have been executed.

Due to the volcanic activity on the island, I wrote to you asking if we could delay completion until the volcano stopped erupting. I never received a reply. The project manager, Briggs Noble, said that only you as President and owner of the company could give me an answer. I later asked if I were to cancel the contract, what would the monetary cost be. I telephoned, sent texts, sent emails, but yet I got no response. Finally, Briggs Noble sent an email **misstating** the terms of the contract. At that point I put in a complaint with the Wisconsin consumer protection agency and also talked with an Appleton attorney.

I decided that rather than go the legal route, *I would prefer a win/win for both of us*, and sent an email stating that I wanted to go ahead with the project. I also sent you a copy of the original contract with a new completion date of December 1, 2018. You told me that date was fine and you would send me back the signed contract, but you did not do so. Since then, I have had no evidence that work has commenced on the project.

It is now almost November, and it seems apparent that you cannot meet the 12/1 completion date.

I want to know what your plans are to make this right. Please contact me IN WRITING with your response within the week.

Thank you,

Mica S. Deerfield





**EPIPHANY LAW**

December 10, 2018

**SENT VIA EMAIL -** jwilson@modsinternational.com
Atty. Jeffrey Wilson
MODS International                    **SETTLEMENT PURPOSES ONLY**
5523 Integrity Way                    **PURSUANT TO WIS. STAT § 904.08**
Appleton, WI 54913

RE: Mica Deerfield – Hawaii Container Homes

Dear Attorney Wilson:

As I explained to you during our telephone call the other day, I have been retained by Mica Deerfield to pursue a full refund from MODs of the down payment she made in February of this year. I have enclosed a copy of the DBIA Standard Form of Agreement she executed with MODs on or about February 10, 2018. Pursuant to this Agreement, she paid MODs a 50% down payment of $106,780 ("Down Payment") for the purchase and installation of 4 small container homes in Hawaii. The Agreement further provided that the work would be complete within 120 days of the Commencement Date. Even allowing for some unforeseen slippage on time, the container homes should have been completed and installed no later than July 1, 2018. We are now more than 5 months beyond even that date and no work has been done at the site, nor has Ms. Deerfield been able to get any information from MODs with respect to the status of the project. It is indisputable that the project was not completed within the time required under the parties' Agreement. At this point, Ms. Deerfield feels it best for her and MODs to simply part ways. To this end, Ms. Deerfield requests a refund to her of the full $106,780. As it appears MODs has completed no work on the project, MODs will suffer no prejudice by refunding Ms. Deerfield's Down Payment. I look forward to your response to this request on or before December 17, 2018.

Yours truly,

EPIPHANY LAW, LLC

Heather J. Macklin
Attorney at Law
hmacklin@epiphanylaw.com

HJM/tmp

Enclosures
Copy to GAB Investments, LLC

S:\clients\Deerfield, Mica\MODS Drafts\COR to J Wilson RE Settlement.docx 12/10/2018 12:24 PM 12/10/2018 12:24 PM

EXHIBIT

tabbies



5523 INTEGRITY WAY   APPLETON WI 54913
920-560-4800    1-800-496-1277

***Sent via Email** - hmacklin@epiphanylaw.com***

December 17, 2018

Attorney Heather Macklin
Epiphany Law
4211 N. Lightning Dr.
Appleton, WI 54913

Re: MODS International Inc. and Mica Deerfield – Hawaii Container Homes

Dear Attorney Macklin,

I had a chance to review your concern letter with our president in the above-referenced matter. After my discussion with him, I understand that Ms. Deerfield terminated the project for convenience per Article 8 of the contract signed by her on February 13, 2018. Accordingly, MODS is entitled to the costs and expenses of work completed as of the date of termination, as well as any costs and expenses attributable to the termination, and a 20% charge for overhead and profit based on the sum of those previously referenced costs and expenses.

It is MODS' contention that those costs and expenses, coupled with the 20% charge, are substantially equivalent to the amount of funds that Ms. Deerfield paid MODS for her down payment. Accordingly, MODS would not be liable to return any of the amount of the down payment. The termination, however, does allow Ms. Deerfield to walk away from the contract without having to make any additional payments upon delivery or for final construction of the units in Hawaii.

I hope this helps clarify MODS's position as to why they cannot refund Ms. Deerfield the amount she has requested. Should you need anything else, or if you have any other questions or concerns, please let me know.

Thank you,

Jeff Wilson
Corporate Counsel for MODS International

EXHIBIT
R